**ALLEN OVERY SHEARMAN STERLING US LLP**
Laura G. Amadon, SBN 321524
1460 El Camino Real, 2nd Floor
Menlo Park, CA 94025
Telephone: (650) 838-3600
Email: laura.amadon@aoshearman.com

Adam S. Hakki (admitted *pro hac vice*)
599 Lexington Ave.
New York, NY 10022
Telephone: (212) 848-4000
Email: adam.hakki@aoshearman.com

Lyle Roberts (admitted *pro hac vice*)
1101 New York Ave., N.W.
Washington, D.C. 20005
Telephone: (202) 508-8108
Email: lyle.roberts@aoshearman.com

*Counsel for Defendants PayPal Holdings,*
*Inc., James Alexander Chriss,*
*Jamie S. Miller, Frank Keller, and Diego Scotti*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY E. DARCY, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br><br>v.<br><br>PAYPAL HOLDINGS, INC., JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, and DIEGO SCOTTI,<br><br>Defendants. | Case No.: 3:26-cv-01589-JSC<br><br>**DECLARATION OF LYLE ROBERTS IN SUPPORT OF UNOPPOSED ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**<br><br>(Civil L.R. 3-12 and 7-11) |

1

DECLARATION OF LYLE ROBERTS ISO UNOPPOSED ADMIN. MOT. TO CONSIDER
WHETHER CASES SHOULD BE RELATED: Case Nos. 3:26-cv-01589-JSC; 5:26-cv-2849-PCP

I, Lyle Roberts, hereby declare as follows:

1.    I am an attorney duly licensed to practice before the courts of Maryland, the District of Columbia, Virgina, and New York.  I am a Partner of Allen Overy Shearman Sterling US LLP, counsel of record for defendants PayPal Holdings, Inc., James Alexander Chriss, Jamie S. Miller, Frank Keller, and Diego Scotti in the above-captioned action.

2.    I submit this declaration in support of the Unopposed Administrative Motion to Consider Whether Cases Should Be Related (the "Unopposed Motion"). I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would competently testify to these matters.

3.    Attached hereto as **Exhibit A** is a true and correct copy of the Complaint filed in this action, *Darcy v. PayPal Holdings, Inc. et al*, No. 3:26-cv-01589-JSC (the "*Darcy* Action").

4.    Attached hereto as **Exhibit B** is a true and correct copy of the Complaint filed in the action captioned, *Norfolk County Retirement System v. PayPal Holdings, Inc. et al*, No. 5:26-cv-02849-PCP (the "*Norfolk* Action").

5.    On April 14, 2026, Norfolk County Retirement System's counsel, Connor C. Boehme of Labaton Keller Sucharow LLP, confirmed via email that plaintiff in the *Norfolk* Action does not oppose the Unopposed Motion or the relation of the *Norfolk* Action to the *Darcy* Action.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true to the best of my knowledge.


Dated: April 14, 2026                                        Respectfully submitted,

                                                             */s/ Lyle Roberts*
                                                             Lyle Roberts

DECLARATION OF LYLE ROBERTS ISO UNOPPOSED ADMIN. MOT. TO CONSIDER
WHETHER CASES SHOULD BE RELATED: Case Nos. 3:26-cv-01589-JSC; 5:26-cv-2849-PCP

# Exhibit A

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY E. DARCY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PAYPAL HOLDINGS, INC., JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, and DIEGO SCOTTI,<br><br>Defendants. | Case No. 26-cv-01589<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Timothy E. Darcy ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by PayPal Holdings, Inc. ("PayPal" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of PayPal's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired PayPal common stock between February 25, 2025, to February 2, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning PayPal's expected financial targets for 2027 alongside the growth trajectory for its core branded checkout segment ("Branded Checkout"). Defendants' statements included, among other things, confidence in PayPal's ability to capitalize on its growth potential through new initiatives to facilitate Branded Checkout growth both in the U.S. and internationally.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of PayPal's salesforce; notably, that it was not truly equipped to execute on the Company's perceived growth potential and were "too optimistic" as to how easily and expeditiously its staff could change customer adoption. Such statements absent

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

these material facts caused Plaintiff and other shareholders to purchase PayPal's securities at artificially inflated prices.

4.      On February 3, 2026, PayPal announced its financial results for the fourth quarter and full fiscal year 2025, unveiling disappointing earnings results with worsening performance in Branded Checkout. The Company also unveiled a sudden and surprising transition of its Chief Executive Officer role alongside the below-expectation results. PayPal further withdrew its 2027 financial targets provided one year before and announced projections that suggested a slowdown against those prior targets.  PayPal attributed its results and lowered guidance to a combination of macroeconomic factors competition, and "operational and deployment issues" across all regions.

5.      Investors and analysts reacted immediately to PayPal's revelation. The price of PayPal's common stock declined dramatically. From a closing market price of $52.33 per share on February 2, 2026, PayPal's stock price fell to $41.70 per share on February 3, 2026, a decline of about 20.31% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant PayPal is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **THE PARTIES**

11. Plaintiff purchased PayPal common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in PayPal is attached hereto.

12. PayPal Holdings, Inc. is a California corporation with its principal executive offices located at 2211 North First Street, San Jose, CA 95131. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PYPL."

13. Defendant James Alexander Chriss ("Chriss") was, at all relevant times, the President, Chief Executive Officer, and Director of PayPal until his termination on February 3, 2026.

14. Defendant Jamie S. Miller ("Miller") was, at all relevant times, the Executive Vice President, Chief Financial Officer, and Chief Operating Officer of PayPal. Defendant Miller also took on the role of Interim President and Interim Chief Executive Officer on February 3, 2026.

15. Defendant Diego Scotti ("Scotti") was, at all relevant times, the Executive Vice President and General Manager of the Consumer Group and of the Global Marketing & Communications Group of PayPal.

16. Defendant Frank Keller ("Keller") was, at all relevant times, the Executive Vice President and General Manager of Large Enterprise & Merchant Platform Group of PayPal

17. Defendants Chriss and Miller are sometimes referred to herein as the "Individual Defendants." PayPal together with the Individual Defendants are referred to herein as the "Defendants."

18. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PayPal's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information n available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19. PayPal is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to PayPal under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

21. PayPal is an international company that enables digital payments to simplify commerce experiences.

22. PayPal operates a two-sided network, connecting merchants on the one hand to consumers on the other in order to facilitate shopping and the transfer of money securely online or in person through its Branded Checkout solutions, such as PayPal and Venmo, as well as through unbranded alternative offerings.

### B.    The Defendants Materially Misled Investors Concerning PayPal's Branded Checkout Growth Potential Through Fiscal Year 2027

*February 25, 2025*

23. On February 25, 2025, Defendants conducted their annual Analyst/Investor Day call, providing an overview of PayPal's recent and projected business. During the call, Defendant

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Chriss, then-CEO of PayPal, touted the Company's Branded Checkout segment and its overall growth into the next three fiscal cycles, stating, in pertinent part:

We are the #1 branded checkout choice

. . .

*Well, we've committed from guidance to grow greater than 5% in transaction margin and '25. As we look out into '27, we see high single-digit growth for transaction margin.* And as we think about all the levers for growth that we have into the future and this transformation into a commerce platform, we believe and have our ambition that we will deliver double-digit transaction margin growth into the future and deliver it responsibly with 20% plus non-GAAP EPS growth.

So this is our vision. This is what we look at as we look into the future. *We are maniacally focused, and what you will hear throughout the rest of the day is our strategic imperatives that I laid out at our last earnings call are where our teams are focused and executing and they are all in line with the vision that I just laid out. We will win checkout.* We will scale our omni experience, we will grow Venmo and we will accelerate our SMB penetration.

(Emphasis added).

24. Defendant Scotti provided some background on Branded checkout, highlighting the general value proposition for the consumer, in pertinent part, as follows:

So let's start with PayPal. Branded checkout is the heart of PayPal. And every business in the company has a critical role in driving it. So on the consumer side, it's all about selection, consumer selection. How we drive consumers to select and demand PayPal at checkout, but it doesn't stop there.

Our strategy also drives engagement across our ecosystem of products to increase monetization. Later, you're going to hear from my colleagues, Frank, Michelle and Suzan about how the checkout experience will also drive conversion and how we are going to scale merchant adoption. Now as we always do, let's start with the consumer. So PayPal's value proposition resonates across all demographics. But we are maniacally focused on young families and individuals in their 30s and 40s who have medium to high incomes. This is a very important distinction. They want convenience, and they want to make the most of their money. So for them, we want Paper to be the easiest, the safest and the most rewarding way to pay, to send and to save money, which makes us the smartest way to pay. Now there are 3 pillars that underpin how we drive selection and answer the question, why PayPal pay everywhere, pay your way and get the most value.

. . .

5

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Now what is really important is that if you look at these numbers, every start that we have in this page shows that *every consumer product leads to checkout*. And that is a very important distinction for our strategy. *That's why it's both about having an amazing checkout experience, but it's also critical that we build and we nurture a consumer product ecosystem that drives engagement, that gives us more ways to monetize and that keeps reinforcing selection.*

(Emphasis added).

25. Defendant Keller then provided growth expectations for branded checkout through 2027 and described what that growth would mean to the Company, in pertinent part:

So PayPal is not only the smartest way to pay, but it's also for merchants, the smartest way to get paid. And that's why PayPal Checkout is at the core of our flywheel. Diego already talked about this. This is our branded checkout growth formula.

. . .

When we step back, we saw an immense opportunity to bring more consumers into the PayPal ecosystem and ultimately, the branded checkout flywheel.

. . .

Fastlane fuels our branded flywheel with the second opportunity to bring consumers into our ecosystem. Let me tell you, we're watching Fastlane user cohorts extremely carefully. And what we're seeing is interesting, 25% are new to PayPal. And over 50% are inactive, meaning they have a PayPal account, they are no longer using. So it becomes a great channel for us to engage new or lapsed users with branded checkout.

. . .

*So I know you're all interested in understanding our growth expectations for branded checkout. Our plan is to accelerate TPV growth to between 8% and 10% by 2027.*

*We will measure success by growing our new experience share to over 80%, growing pay later usage by more than 20% and growing pay with Venmo by more than 40%, as you heard in Diego's section.*

So to summarize, *we have a rigorous plan to drive checkout growth*. We're reigniting consumer selection. We have reimagined our checkout experiences and innovate it with Fastlane, and those are highly performing to exceed merchant and consumer needs. And now we're laser-focused on scaling them across our global merchant base. *When we talk to merchants, they are impressed by our new experiences, which opens doors for having much more holistic conversations about how we help them driving their business.*

6

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

***Merchants typically enter to our ecosystem through branded checkout***, then they adopt processing and move to platform integration which allows us then to add higher-margin value-added services and new innovations. As you can see down there, we have a lot of upside.

. . .

I want to leave you with 3 takeaways. ***We're raising the bar on branded checkout. We have an end-to-end plan to accelerate growth***. Our new experiences are delightful for consumers and drive conversion and outcomes for merchants.

(Emphasis added).

26.     Defendant Miller provided more specific financial results, goals, and benchmarks associated with PayPal's 2027 projections, pertinently as follows:

Looking ahead, we have a diversified portfolio to drive growth. And what you see on this slide is a more simple and relevant TPV breakout than in the past. It's a better way of how we think about the product portfolio today, our customer needs and our use cases, and we're making progress across each of these areas. ***So the first online branded checkout includes PayPal, branded checkout, eBay and Pay with Venmo. And it's about 30% of our TPV. We have a clear plan and execution milestones to accelerate, and I'll talk about that more in a bit.***

. . .

I want to take a minute and walk you through some of the specific goals and ***ways for you to track our progress underpinning each of the initiatives.*** And starting with ***Checkout, which is at the center of everything we do, our new products, partnerships and campaigns are all aimed at accelerating Checkout***. We want to be the easiest, the fastest, the safest solution, and it is essential we deliver more value to customers, and that means higher conversion for merchants and making things even more flexible and rewarding for consumers.

This chart shows our path from 6% volume growth last year to at least 8% to 10% by 2027. Our strategy is underpinned by 3 key building blocks: first, modernizing Checkout solutions to drive higher selection rates. Taking our latest branded checkout experience from about 30% coverage in the U.S. today to more than 80% globally by 2027. Our goal is for these experiences to deliver more than 1 point of conversion improvement to merchants. But the real opportunity is how this impacts selection rate, better experiences, less breakage, more retention, all lead to stickier, more engaged consumers and a higher share of wallet.

. . .

7

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Now I'll take you through our financial outlook. As you've heard consistently, we are focused on accelerating profitable growth, moving from 5% TM dollars growth, excluding interest in '24 to a range of 7% to 9% by 2027, driving expense leverage, operating margin expansion and share buyback combines for low teens plus EPS growth. And that includes headwinds from lower interest rates and tax rate inflation. And as I mentioned earlier, our long-term ambition is higher. We believe the opportunity in front of us is significant, and we want our team's ambition to be 20% plus EPS growth over time.

(Emphasis added).

27.     A question-and-answer segment followed the Defendants' prepared remarks during the call.  During the segment, Defendants fielded multiple questions surrounding their projections and confidence in Branded Checkout's growth acceleration through the new initiatives PayPal is undertaking in the following pertinent exchanges:

<Q: Tien-Tsin Huang – JPMorgan Chase & Co – Senior Analyst> It's Tien-Tsin Huang from JPMorgan. I just want to ask to accelerate branded checkout. Can you do it at the same economics that you have today? Is there still a price-to-value exercise to go through? Because you make the case that you're doing a lot of work on the consumer, giving a lot of choice, things like that. I'm sure if you unbundle that, there's an interesting exercise there. But I'm curious just about economics and take rate and ARPA, that kind of thing.

<A: James Alexander Chriss>Yes. Let me start and then maybe Jamie or anyone else pop in. The way I think about it is, again, *if we change the game in how we engage with our merchants, branded checkout gets far more valuable for our merchants as we*ll. So you're already starting to see things like habituation with buy now, pay later. Right, the increase in now bringing buy now, pay later into the experience. *The uplift it gives for merchants is also economics for us as well*.

But *what we're starting to see is we're having merchant conversations, and I'm having many of these personally with CEOs of some of our largest merchants, is we are now able to bring them new customers*. And so the people they're bringing into the conversation are their CMOs, are the people talking about customer acquisition. *And so we're tapping into economics and the relationship that's beyond just their payments person or their Checkout person.* And so I just think, again, it's the biggest mindset shift that I asked you all at the beginning, and I will continue to ask you all to go through now, which is *the evolution of a payments company that is just focused on creating a frictionless Checkout experience, which we are still the #1 player in into a commerce company, and I think it just taps us into much broader addressable markets.*

<A: Jamie S. Miller> Yes. And when -- to add to what Alex said, I mean a lot of what we're doing around branded checkout, driving debit, driving buy now, pay later, driving Pay with Venmo. *These are all high-margin products in addition to*

8
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*the habituation and other halo effect they bring to branded. And we see that halo effect in the cohorts and in the numbers. And so when you look at take rates, some of those do carry lower take rates, but they're margin accretive. And so margin will be accelerating over the time as we do this, but at the same time, take rate may shift based on product mix and things like that.*

. . .

<Q: Darrin David Peller – Wolfe Research, LLC – MD & Senior Analyst> Well, it's Darrin Peller from Wolfe. Guys, I just want to understand a little bit more. You've had great data on the Checkout experience getting better and you have such a great runway there and how many monthly active users you have is really a differentiator. But how do we help us understand the steps you're going to take to convince the consumer, really light the fire under a consumer to say, from here on, I'm going to use Pay with Venmo. I'm going to use PayPal when maybe they didn't before. Beyond just the Checkout experience getting better, something has to really, I think, ignite them. Help us understand the steps, marketing, loyalty, anything else that would be helpful to get -- and where does that 34 transactions per month or per year rather? Where is that going to go over the next few years?

<A: Diego Scotti> Yes. *Let me go back to the point about the shift on the mindset because we are moving from a value proposition that was only about Checkout*, meaning a button to a value proposition about data, which means we want people to stay, we want consumers to stay in our ecosystem because there is a much larger equation of value from them when they do more with PayPal. So *it starts with Checkout. As we were saying before, now we are connecting the rest of the products from the ecosystem to check out like never before, from debit to pay later, to Pay with Venmo, even crypto now.*

And that is going to create not only habituation, but on top of that, we're also going to build rewards that are going to give you really a lot of reasons for you to stay on that ecosystem. And I said it very quickly during the presentation, but we are thinking on rewards and -- because we are the only ones that can do it that will really connect PayPal first-party rewards not only on just payments, but the whole ecosystem, so you really get more for doing more with us. And then merchant rewards as well that would be merchant funded, connecting also through our smart wallet with the rewards program from our merchants.

*So when you put all of this together, you're going to get so much value as a consumer that is going to be really compelling for you to stay with us*. On top of that, and you saw what we did last September, our marketing is also changing to, number one, help you think differently about PayPal. It's not just for some purchases or just for online purchases, it's for all purchases. And that is a massive change for the way the consumer thinks about PayPal, which in combination with the other things, is going to allow us to keep you super engaged with our brand.

<A: James Alexander Chriss> Just to add on to -- pile on to what Diego was saying. *I think the fact that we have both sides of the ecosystem gives us an opportunity*

9

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*to create completely differentiated experiences.* We are consumer-obsessed and merchant obsessed. I think there are other players out there and other platforms that actually looked at while driving customers, disintermediate the customer from the merchant because they actually want to own that relationship. We don't have to play that game. We actually can -- if you look at that commerce API, we can provide the merchant with the information to personalize the experience for that consumer and drive loyalty into the consumer's wallet because the consumer is engaging with us on a daily basis.

And so when you think about a loyalty experience, I mean, everyone think back to the '90s when you had a thick wallet with a whole bunch of loyalty cards sitting in there. Those have gone away as you've now moved to a phone. But that also means that your relationship with your local merchant, your relationship with that loyalty platform has gone away as well. ***I think we have an opportunity to bring that back. So that consumer understands that, hey, this is where I make my purchases all the time. And this is where I want my rewards and my loyalty to be, and the merchant gets to have a deeper relationship with those consumers. And I think we have a very, very unique opportunity to create that flywheel***.

. . .

<Q: Jason Alan Kupferberg – BofA Securities – MD in US Equity Research & Senior Analyst> I wanted to follow up on brand checkout. When do we start this path towards acceleration. We're talking about 300 basis points 2 years from now. When does it start? Is it late this year? Is it first half of next year? Talk about cadence. And then just in terms of geographic mix, our understanding right now, U.S. is growing a little slower than international. So does the bulk of the acceleration in the next couple of years come from the U.S.?

. . .

<A: Jamie S. Miller> So Jason let me talk about that in maybe 2 parts. The first is really thinking about margin dollar growth over the next couple of years, and then I'll pivot and talk a little bit about the U.S. From a margin dollars perspective, ***our guidance this year assumes 100 basis points of shift in margin***. And certainly, all the things I talked about are a part of that and a significant part of that. ***Branded checkout, we're already at 30% penetration in the U.S. on the merchant experiences.*** All the work Diego has done around offline, debit, marketing, that stuff you're going to see us continue and be very focused on as we move through '25.

So what I'd say to that is it will be a gradation over the period of time is how to think about transaction margin. ***When we come over to branded checkout, the U.S. side of it, we are very, very focused on U.S. growth with branded checkout. It is something that has the full weight of the organization behind it.*** We have very, very strong market positions internationally. We expect growth there too and to continue taking share, but the U.S. is a big, big focus there. And Frank talked about the merchant experience as being a key part of that. The other piece of it, and I

10

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

really want to make sure we make this link is all of the things that we're doing offline, that habituation really does come back into more MAAs better halo effect, higher branded checkout use in the funds flow that works through the products and that's both to PayPal. And branded, it's also on Pay with Venmo and how Venmo habituates the same way. So all of that comes into play there.

(Emphasis added).

28. Defendant Chriss further spoke to PayPal's current and projected competitive position, as well as what advantages on the ongoing growth initiatives provide in response to the following pertinent question:

<Q: Harshita Rawat – Sanford C. Bernstein & Co., LLC – Senior Researcher> Harshita with Bernstein. So Alex, Jamie, I want to follow up on the 6% to kind of 8% to 10% branded TPV acceleration. You discussed a number of initiatives and modern experiences, which will drive that. How do you factor in the competitive dynamics with respect to Apple Pay coming online, Shop Pay, other buy now pay later kind of factoring into your outlook?

<A: James Alexander Chriss> Yes. It's a great question. And obviously, **we spend a lot of time benchmarking ourselves versus competition.** The first thing I'd say is we have to have a best-in-class experience for consumers. And that's what you saw today, which is -- and I've been very consistent. If you go back a year ago, that branded checkout experience, particularly on mobile, as Frank walked through today was entering your e-mail, entering your password, it was very clunky. **And our ability to now leapfrog competition and ensure that we have the best-in-class consumer experience is step 1.**

But **that is insufficient. I think if we are here 3, 4 years from now talking about a frictionless Checkout experience, we, as an industry, have failed**. This has to now turn into commerce experience. This has to turn into experience, where you as a customer are getting a personalized Checkout experience, just like you saw on screen today where I go into my store, I go to Checkout, and I'm getting in our case, a button that is speaking to me. It knows me, it's personalized to me. It's giving me the right reward. It's understanding the loyalty that I have with this merchant.

**That, to me, is a completely different experience. And I think we are the only ones with a 2-sided ecosystem with access to merchants at scale with access to 80 million-plus shopper profiles and access to hundreds of millions of consumers on an open agnostic platform to be able to deliver that next version of commerce**. So we need to keep looking at competition. We need to get to best-in-class on the current experience, but we are focused on innovating for the future and being the leaders in the next version of commerce.

(Emphasis added).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*April 29, 2025*

29.     On April 29, 2025, Defendants published their first quarter fiscal 2025 results. During the corresponding earnings call, Defendant Chriss attributed the strength of the quarter to management's Branded Checkout growth initiatives discussed during the Analyst/Investor Day call.  In pertinent part, Defendant Chriss discussed PayPal's first quarter results as follows:

Turning to Q1. We have so much to be proud of. Let me share just a few highlights. Our strategy is designed to improve PayPal's profitability over time. In Q1, we delivered our fifth consecutive quarter of profitable growth, with transaction margin dollars growing by 8%, excluding the impact from last year's leap day. ***That growth was driven by multiple sources across our strategic initiatives, including omnichannel commerce, both online, branded checkout and off-line branded payment methods, Venmo and PSP***. As a result of this focus on profitability, non-GAAP earnings per share increased 23% year-over-year.

Additionally, PayPal and Venmo are being used by more people more often. Both total active accounts and monthly active accounts grew a healthy 2% in the quarter. Transactions per active account ex PSP grew 4%, reflecting improved engagement and transaction growth in online branded checkout and Venmo.

As we expand our offerings from online to everywhere, ***the best way to see the traction we're gaining is through branded experiences TPV***. *Branded experiences comprises volume from PayPal and Venmo online checkout as well as branded in-store payment methods like debit and Tap to Pay.*

***In Q1, branded experiences TPV grew 8%, excluding last year's leap day. That's a full 2 points higher than branded experiences' growth for the full year of 2024, highlighting the growing contribution of our omnichannel initiatives. It's still early days, but we are very proud of this progress.***

Within branded experiences, we're continuing to accelerate the rollout of our upgraded online branded checkout flows. This includes our simplified and modernized paysheet design, with streamlined log-in and reduced latency. ***Since the beginning of the year, we've driven a 25-point jump to more than 45% of U.S. checkout traffic***. ***This shows we can execute, and we anticipate an even faster rollout for Europe starting in the second quarter.***

And finally, Venmo had another standout quarter. We hit an important inflection point for Venmo monetization, with 20% revenue growth, driven by our push to make Venmo one of the best ways to pay online and in-store.

***These are only a few examples of the strength we're seeing in the execution of our strategy. We're feeling the excitement of our innovations in the market and the engagement from our consumers and merchant partners, and we're just getting started***.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

*Starting with win checkout. Online branded checkout TPV, including PayPal and Pay with Venmo, grew nearly 6% this quarter, accounting for last year's leap day. We're proud of this growth and expect it to increase over time as more traffic flows through our upgraded experience.*

. . .

Today, our PayPal and Venmo debit cards are enabling our customers to use their balance to shop anywhere cards are accepted. Adoption is strong and growing, with approximately 2 million first-time PayPal and Venmo debit card users in the quarter, an increase of nearly 90% from last year. Debit card TPV grew approximately 64% in the first quarter. Venmo debit card monthly active accounts grew nearly 40%, and penetration has reached to 6% of Venmo MAAs.

We are focused on getting these products into the hands of even more of our customers because they allow them to choose PayPal and Venmo as their way to pay more often. In the first quarter, users who adopted the PayPal debit card transacted nearly 6x more and generated more than 2x the average revenue per account, compared to those who used online branded checkout only. *There is also a halo effect where debit card users choose PayPal more often in online branded checkout.*

(Emphasis added).

30.    Defendant Miller added more concrete financial details to the results, in pertinent part:

*In the first quarter, online branded checkout volumes grew more than 4% on a currency-neutral basis. And excluding last year's leap day, which contributed over 1 point to growth, online branded checkout volumes increased nearly 6%. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as Tap to Pay, grew 8% ex leap day*, accelerating from the prior year.

. . .

Moving to more financial detail on Slide 8. *Transaction revenue was flat on a spot basis or up 1% on a currency-neutral basis to $7 billion, driven primarily a branded checkout, Venmo and SMB processing.* This growth was offset by the shift away from unprofitable Braintree volume that I just mentioned.

(Emphasis added).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

31. During the question-and-answer segment, Defendants reiterated their current progress and confidence in the Company's Branded Checkout strategy in response to the following pertinent inquiry:

> <Q: Dan Dolev – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst> Great results here. Really appreciate it. Can you give us like a sense of -- it looks like the branded experience TPV strategy is doing really well. Can you give us maybe a sense of like how much traction you're getting there and what you're doing to get those nice results?
>
> <A: James Alexander Chriss> Yes, Dan, let me start. So good to hear from you. We've got -- this is the strategy that we've laid out really coming to light. So first, *we have a branded checkout strategy that is really about driving habituation everywhere that the customer wants to pay*. We have such strong brands in both PayPal and Venmo, and our customers are asking to be able to leverage that trust, the safety, the brand, the rewards in every purchase that they make.
>
> *And so we've been focused on not only improving that online experience that we've talked about, and I'm sure we'll talk about more, making it available for them exactly how they want to pay, whether that's immediately or with pay later scenario, with buy now, pay later, but then also off-line.*
>
> And you mentioned branded experiences. This really is enabling our PayPal debit card or our Venmo debit card to be accessible to our consumers. *We saw PayPal debit card TPV growth over 100% in Q1. And that really is driving habituation. This is driving our consumers to actually start to come back, move online and start to pay with PayPal wherever they see it.*
>
> *So the strategy is working. TPV, up 8% overall in branded experiences. And this really is the metric that we are focused on and we hope you're focused on as well because, again, it is really all about the strategy that we've laid out.*

(Emphasis added).

32. Defendants further touted confidence in PayPal's international competitive position and ability to extend the Brand Checkout initiatives to Germany and the U.K., in particular, in pertinent part:

> <Q: Jason Alan Kupferberg – BofA Securities – MD in US Equity Research & Senior Analyst> So it looks like online branded, you were stable on an underlying basis here in Q1 at up 6%. But now we've got almost half the U.S. on the new checkout experience. It sounds like Europe is on tap to start pretty soon. So could we start to see some initial acceleration in online branded volume growth by the end of this year if the macro stays stable? And can you just give us a word on what the U.S. versus international branded split looked like in terms of Q1 growth rates?

14

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<A: James Alexander Chriss> Jason, thanks. So again, *just to unpack our branded strategy, I'd really think about it as 3 parts. One is the improved branded checkout experience. And as you mentioned, we're -- we've moved very quickly up now over 45% in the U.S.* Again, that still is -- think of that as sort of double digits of our global transactions. And so *we're really excited. We think we've got a really strong playbook now. And we think, as we start to roll this out into Europe, we'll actually accelerate even faster.* But our paysheet redesign is holding, the improvement is holding, and now this is just about scaling.

*Second lever is really accelerating Pay with Venmo*, and you've seen the results there. So very, very fast flywheel starting to happen from a Pay with Venmo perspective. TPV up over 50%, and MAAs up over 30%.

*And then the third lever is buy now, pay later and our pay later products.* And again, TPV up over 20%.

*So you add all 3 of those together, and as we continue to see us leaning into those 3 levers, I don't know the exact timing of when we'll start to see branded checkout, but we put pretty strong growth numbers of 8% to 10% by 2027*. And I think those 3 levers are -- continue to give us confidence that we're executing well and heading in that direction.

<A: Jamie S. Miller> Good. And then, Jason, what I would just add to that. When you look at the paysheet redesign, I would say we think about that as ramping over time. I mean this is something that as things come on, transactions start flowing, it's not something that is an immediate translation. And we do see impact coming through the numbers, but it's very small so far. So maybe that's how I would position that piece of it.

When you look at the U.S. and international, I guess I'd start with the U.S. and saying performance was relatively consistent with the fourth quarter. And we are beginning to see good traction across U.S. MAAs, across TPA, across shifting to power -- more upstream to more power users. And Alex mentioned Pay with Venmo, which is really -- had good traction there.

*It is early, but we talked in the fourth quarter about seeing some shifting in our U.S. branded checkout levels. We saw that hold again this quarter, watching it very closely but cautiously optimistic about that.*

And then on the outside the U.S. side, relatively consistent as well, a little bit of macro volatility across the markets. But in Europe, we continue to take share in Continental Europe, including in Germany. Really strong brand presence, as you know, across merchants, across consumers.

And I think what we're really excited about is that we're bringing our new product innovation to the market in Europe starting this quarter. *So we'll start with Germany and the U.K. And this is the checkout redesign*. It is buy now, pay later.

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

It is omni and NFC launches. And brand marketing to accompany all of that, with a fast follow to other countries after that.

*So I think the overall look right now, we feel pretty good about branded checkout and just laser-focused on our execution*.

<Q: Timothy Edward Chiodo – UBS Investment Bank – Analyst> I want to dig in a little bit more to Germany and the U.K. I believe they're the 2 largest branded markets outside of the U.S., particularly from a gross profit standpoint. I believe they are 2 of the largest markets for branded. Two topics I was hoping we could touch on. One is a little bit about the competitive landscape in those 2 markets specifically. And then on the U.K., I know there were some efforts to roll out biometrics to help with 2-factor authentication. And I was hoping you could talk a little bit about the progress and the phasing of that initiative.

<A: James Alexander Chriss> Yes. Let me get started, Tim. So as you said, 2 very important markets for us and strong markets outside of the U.S. Competitive dynamics is a little bit different, so let me unpack them. *Germany, we are really the market leader there. We're -- I think we're the #1 brand in Germany for the last 3 years. So very, very strong consumer presence. Very strong merchant presence*.

*It's also a different type of market. As I just mentioned, it was not a -- it's not a credit-heavy market. So the way PayPal is used is we're connected to bank, and then PayPal is used as really the way to make an online purchase. And so our transactions in e-commerce in Germany are extremely high. That's what gives us a lot of confidence as we now move into off-line, is we're really going to be really one of the first at-scale, bank-connected, off-line wallets that we think will be able to drive significant penetration into the market.*

So we're really excited about that as well as bringing some new innovations to market with not only our rewards program, but also the buy now, pay later connected element as well. *So with the brand presence we've got in Germany, with the banks already connected and the onboarding experience, that's just really delightful. I mean it's literally one click from your bank to be able to set up your off-line wallet. And with the innovation of rewards and buy now, pay later, we're really excited to get into the market there.*

*U.K., much more competitive dynamic there. We've really suffered in the last few years with what I would consider to be one of our poorest app experiences for consumers.* We're rolling out a new app experience in the U.K. shortly. But we've already started with, as you mentioned, the biometrics. So we actually got a favorable connection with the regulator there to enable us to -- enable our biometrics to be considered 2-factor authentication. That's rolling out quickly and enabling a much better experience, whereas before, it really was choppy and created a lot of friction and a lot of latency in the experience.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Biometrics is now really creating a seamless experience. You add on top of that the new app that's going to be rolling out and then our rewards program and all the other innovation that we brought to bear. And we think we're going to be competing quite well in the U.K. And you'll see us leaning in from a go-to-market perspective as well to really remind consumers that we now have the best product in the market.*

The last thing I'd say is I was actually just there a few weeks ago, and I think there's a big opportunity for us in buy now, pay later. Actually, I sat down with a lot of merchants in the market, and they're really looking for PayPal to come in. There's a lot of different options that are available now. And I think we're hearing from merchants that PayPal is a beloved, trusted brand that they would love to be able to have their consumers have a single onetime checkout or buy now, pay later option from a single brand. And so we're going to lean in heavily in buy now, pay later in the U.K. as well.

(Emphasis added).

*July 29, 2025*

33.     On July 29, 2025, Defendants published their results for the second quarter of fiscal year 2025.  Defendant Chriss, during the associated earnings call, again pressed the narrative that PayPal's initiatives and upgrades to the Branded Checkout segment was working as intended to generate new growth for the Company, in pertinent part as follows:

Turning to our second quarter performance. *We delivered our sixth consecutive quarter of profitable growth despite the macro uncertainty*. Transaction margin dollars grew 8%, excluding interest on customer balances. *Success across many of our strategic initiatives contributed to that growth, including online and off-line branded experiences, payment services and Venmo*. This highlights a healthy business with multiple avenues to sustain and accelerate growth, and non-GAAP earnings per share increased 18% year-over-year. We continue to build upon our broad reach and strong engagement. Both total active accounts and monthly active accounts grew 2% in the quarter. Transactions per active account ex PSP grew 4% as more people use PayPal and Venmo more often.

*If we look at our 4 strategic growth drivers: Winning checkout, scaling omni and growing Venmo, driving PSP profitability, and scaling our next-gen growth vectors, we are making meaningful and tangible progress on all 4*. I'd like to walk through each one, highlighting examples of our progress. *The first 2 growth drivers are entirely focused on improving and growing our branded experiences. I'm proud that we drove 8% currency-neutral growth in branded experiences TPV this quarter. This positive result reflects the benefit of meeting our customers wherever they choose to shop with PayPal and Venmo, online and offline*. As a reminder, branded experiences includes winning Checkout, expanding buy now, pay later, winning with Venmo and scaling omnichannel capabilities.

17

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Starting with online branded checkout. TPV, including PayPal, BNPL and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year. ***Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs.***

Our focus is on the things that are within our control and that we know will have a positive impact on our overall growth trajectory over time. That starts with driving more traffic through our upgraded checkout experiences, both in the U.S. and internationally. ***These upgrades offer a much better consumer experience, improved presentment of BNPL and drive meaningful conversion rate improvements. This is currently rolling out in the U.S., Germany and the U.K., and we have a comprehensive playbook that we will apply to other countries***. Around mid-teens percent of our global transactions are now on our latest experience, including more than 60% of our U.S. checkout transactions.

We are also investing in key use cases like subscriptions to drive repeat branded checkout use. Many of these efforts that are contributing to growth this year will continue to ramp into next year and add to our confidence that we are on track to achieve our growth outlook for branded checkout TPV.

(Emphasis added).

34. Defendant Chriss also discussed the launch of "PayPal World," a new piece of the branded puzzle which would purportedly help push Branded Checkout's growth potential even further, pertinently stating:

Finally, I'd like to explain how last week's announcement of ***PayPal World will be a game changer for our branded experiences.*** Digital wallets have become ubiquitous and the standard for making a payment or sending money worldwide. Today, almost 3.5 billion people rely on digital wallets as their go-to method for shopping and transferring funds. That's 83% of global digital payments happening through wallets, and the number is only going to continue growing. There will be over 5 billion wallets globally by 2026. But among those billions of users, there are hundreds of regional wallets represented. This fragmented system of wallets poses tremendous challenges and immense friction in a global commerce ecosystem.

For consumers, it means you are never quite sure if and where your wallet will be accepted. Even for wallets like PayPal with tremendous global reach, there are large regions of the world and millions of merchants that are closed off. For many users with regional wallets, traveling out of the country poses new challenges with spotty or no acceptance and the need to create and keep track of multiple wallets just to interact with the world. And while P2P payments should be easy, the need for a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

common wallet between users often makes it impossible to send money to friends or family around the world.

For businesses, it means building the technology to accept dozens of wallets, which adds unnecessary costs and creates a fractured experience full of friction for customers, ultimately limiting reach and, of course, sales. When you want to sell to the world, how do you choose which wallets to accept and which customers to turn away? You shouldn't have to make that choice. ***This is where PayPal World comes in to make it simple and easy to connect any consumer with any merchant.*** Five of the largest digital wallets in the world, PayPal, Venmo, Mercado Pago, Tenpay Global and UPI are coming together on a seamless global platform. So you can now use your preferred wallet anywhere in the world.

***For our PayPal merchants, PayPal World will mean access to billions of new customers through their existing branded checkout integration***. Now a UPI user in India who wants to buy a pair of sneakers from an online store in Germany that accepts PayPal can simply click the PayPal button at checkout and their familiar UPI button will be presented for them to complete the transaction. It's that simple. ***This means our connections for branded checkout will extend beyond our 400 million customers to more than 2 billion consumers worldwide, and that will continue to grow.***

(Emphasis added).

35.    Defendant Miller took over the prepared remarks to detail the financial performance for the second quarter, in pertinent part, as follows:

Total payment volume grew 6% at spot and 5% on a currency-neutral basis to nearly $444 billion. Looking across the product portfolio, there are a few key areas I'd like to highlight. As Alex noted, we are driving faster growth at Venmo. Venmo TPV increased 12%, its highest rate of growth in 3 years. In addition to driving more awareness and usage of commerce capabilities, we have been focused on improving core product and user experiences, which contributed to a P2P acceleration in the quarter. ***Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as Tap to Pay posted another quarter of 8% growth.***

While debit and tap-to-pay spend represent a smaller amount of volume in branded experiences today, they are growing rapidly and are up more than 60% year-over-year. ***Winning checkout remains our most critical priority. Our teams are laser-focused on advancing the many initiatives that reinforce our checkout business. In the second quarter, online branded checkout volumes grew 5% on a currency-neutral basis.*** This was relatively consistent with the growth we delivered over the past few years. At the same time, the macro and consumer spending environment has been uneven. As we moved through the quarter, we observed a slight softening in retail spending in the U.S., most apparent in areas likely impacted by tariffs such as Asia-based marketplaces with higher exposure to goods sourced from China.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

36.     A question-and-answer segment similarly followed Defendants' prepared remarks for the call. During the following pertinent exchanges, Defendants again highlighted the performance and growth of Branded Checkout through their new initiatives:

<Q: Ramsey Clark El-Assal – Barclays Bank PLC – Research Analyst> . . . How meaningful was the tariff headwind on branded online checkout TPV in Q2? And in July, are you seeing a stable tariff-related headwind there? Or is that a metric -- on that same metric, or could we see the headwind change and potentially intensify?

<A: Alex Chriss> Ramsey, thank you for the question, and I appreciate the comments on branded checkout. *Look, we're excited as well. I think our execution on the global rollout, the U.S. rollout is exactly what we were looking for*. And really, the cohorts that we now have live in market are delivering exactly the way we expected. *To the comment on these platforms from Asia, the way we think about it is, without that pressure, our branded checkout really would have been at 6%. And so it's a small amount, but we've started to see it stabilize a little bit as we get into this month*. Jamie, anything you'd add?

<A: Jamie S. Miller> Yes. No, I would just say that *our trends underlying all this really have been broadly consistent. There's puts and takes in any given quarter. And like Alex said, we did see a slight deceleration really in those Chinese to U.S. corridors.* In July, I would say it's still early, but seeing a bit less pressure in that space. *We plan the full year with branded checkout at mid-single digits*. *We are on track for that.* And the watchout that I really am looking at is we still have a fair amount of policy and macro uncertainty. So we're obviously monitoring that. *But we're very focused on our execution around our strategic initiatives.* And bending the curve takes time, and we expect to accelerate as we move through the next couple of quarters and the next couple of years.

. . .

<Q: Tien-Tsin Huang – JPMorgan Chase & Co. – Senior Analyst> I want to ask about all the initiatives, Alex, that you went through upfront. There's a lot going on, a lot to study. Specifically, I want to ask on Pay with Crypto and PayPal World. Because when you think about this, I can make the case that both are TAM expanding, but potentially at a lower take rate. We've been getting a lot of these questions on both sides. So how do you see it? And are you confident that both will be revenue and profit accretive as you push towards -- I think you call it, interoperability quite a bit in some of the releases.

<A: Alex Chriss> Thanks, Tien-Tsin. So *yes, we're very excited, and hopefully, you're seeing the pace of our innovation just continue to accelerate and sort of you're starting to see our whole strategy and the system that we're building together really play out*. Let me take each of those. So PayPal World, I think the easiest way to think about it in the short term is, a, what I'm really excited about is

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the interoperability between PayPal and Venmo. So now you've got a huge amount of Venmo customers that can click on the PayPal branded checkout and make their purchase online.

***Then we've opened it up to almost 2 billion additional users, and that will just continue to grow. And the best way to think about it is that's branded checkout***. And the way that we've orchestrated the agreements on PayPal World as a platform is the merchants maintain their branded checkout economics. And so if you're a user and I've gotten a lot of really fun notes in from LinkedIn UPI users that are now thrilled to be able to click on the PayPal button anywhere in the world and be able to make a checkout. And for us, that's just expansion of TAM at the existing economics that we have. And then on top of that, you've got P2P economics and all sorts of other things that will play out over time. So that's on PayPal World. It really is an expansion of the TAM.

On ***Pay with Crypto, we really do see this as, again, expansion of TAM at pretty attractive economics***. The expenses come down significantly with crypto. This is still early days in consumers really using crypto to pay, but we want to make sure that our merchants are enabled and have the ability to take the payment when they need to. So if you look at the net take rate on Pay with Crypto, it's actually quite attractive. And we'll see how it ramps up over time from a volume perspective. But again, to your question, both are expansion of TAM for us.

. . .

<Q: Dan Dolev – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst> So can we talk about any benefits you're getting from the upgraded checkout experience? ***Obviously, there should be an uplift in the second half.*** Is there any way to quantify that, that would be great.

<A: Alex Chriss> Yes, Dan, what I'd say is, ***from the cohorts that we've rolled this out to, and remember, this is 15% of global TPV, we're continuing to see the uplift*** that we've talked about, call it, 1 point of uplift. ***So that is going to continue. We just need to roll this out to more.*** And so our expectation is if you look at branded checkout overall, it's this new branded experiences, it's the momentum that we've got in buy now, pay later, which we're seeing over 20% year-over-year growth. It's the improvement in Pay with Venmo, which we're seeing 45% year-over-year growth. All of those coming together, we continue to see momentum on.

***And so as we exit this year, I expect that we're going to start to see real improvement in branded checkout overall and then as we move into '26. So this is a big shift. It takes time to move. I'm excited about the momentum we have across all 3 of those elements, the new experiences, buy now, pay later and Pay with Venmo. And I think we're going to start to see this thing turn as we get through the next few quarters and into '26.***

(Emphasis added).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

37. Defendants further discussed the ongoing European rollout of the Branded Checkout initiatives and the overall growth potential in those markets during the following exchange:

<Q: Darrin David Peller – Wolfe Research, LLC – MD & Senior Analyst> Can we touch on how the European rollout of the modern checkout initiatives are coming along now? Just what's the time line on it? When do you anticipate seeing measurable results? And then just overall looking at branded, maybe a little more color on international growth versus U.S. And just revisiting whether you still expect to exit the year at an accelerated rate for branded versus the beginning of the year?

<A: Alex Chriss> Yes. Thanks, Darrin. So again, just to highlight, *we were very deliberate in our strategy to start our rollout of our new branded experiences in the U.S. We're up over 60% now in the U.S. And again, the cohorts that we've rolled out are continuing to operate in the way that we wanted and showing the uplift that we expected*, that we talked about in the past.

*We've now started to roll that out in the U.K. and Germany*. As I mentioned previously, those integrations typically are on newer integrations throughout Europe. And so I actually think *we're going to continue to accelerate our adoption over the coming quarters across Europe. So very, very excited there.* We're mid-teens overall on global TPV, and we want to see that continue to increase over the next few quarters.

<A: Jamie S. Miller> Yes. I can jump in here and talk about non-U.S. growth, which I think, Darrin, is where you were taking the second part of this. *If you look at outside the U.S., again, we're really seeing largely consistent trends here. We continue to take share in Europe, including Germany. And as Alex mentioned, our broad push around our latest innovation, it's not just the latest experience, but it is buy now, pay later. It is the new app and app upgrades and the experience around that.* It's in its NFC, which we had a really successful rollout in the second quarter in Germany around that. *So it's all around branded checkout, really driving the habituation and the resulting halo that comes with that. And the teams are really focused on scaling that and pushing that as they go through.*

*With respect to accelerated rate, what I would tell you is that we are laser-focused on branded checkout. And I think as we talk about all of this, that focus on execution, the focus on the strategic initiatives, we fully expect to see an accelerated rate of growth over the next few quarters and the next few years.*

(Emphasis added).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*October 28, 2025*

38.     On October 28, 2025, Defendants published their third quarter 2025 results. Despite some headwinds, Defendant Chriss remained confident in the Branded Checkout initiatives, highlighting accelerated growth rates due to their actions, stating, in pertinent part:

> ***Thanks to our omnichannel initiatives, we've accelerated branded experiences TPV growth to be between 7% and 8% on a currency-neutral basis over the past 4 quarters***
>
> . . .
>
> Put simply, this is the new PayPal, built for faster, more profitable growth. ***Our strong foundation, differentiated competitive advantages and clear strategic direction position us to capture a massive and growing addressable market***. With building execution momentum, ***we are driving innovation at a remarkable pace and scale. This makes us exceptionally well placed to win into the future.***
>
> . . .
>
> For example, in the third quarter, we reached 10% branded experiences volume growth in the U.S., more than double our growth the same quarter a year ago. That acceleration comes from 2 things: growing omnichannel adoption and sustained improvement in the U.S. online branded checkout trends, supported by our improved experiences.
>
> ***We have the right set of drivers and initiatives in place. Now our focus is on adoption and investing to amplify our impact. As we move into 2026, we will be leaning more into these efforts and expanding across key international markets.***
>
> Let me address online branded checkout in more detail. TPV grew 5% in the third quarter on a currency-neutral basis. ***That's solid growth, especially with the choppy global macro trends we continue to see this quarter. Given the competitive intensity online, we know more work is needed to close the gap between our performance and overall e-commerce growth.*** Our strategy moving into next year centers on 3 priorities: continuing to scale our redesigned checkout experiences, improving how we are prioritized across merchants and, importantly, driving biometric adoption.

(Emphasis added).

39.     Defendant Chriss went on to tout some recent developments positioned to accelerate PayPal's growth trajectories, stating, in pertinent part:

> I'll highlight just a few of our recent developments. We continue to partner with leaders across the agentic space, including Perplexity earlier this year. And in September, we announced our expansive multiyear partnership with Google to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

create new AI shopping experiences. This morning, we announced a significant partnership with OpenAI to expand payments and commerce in ChatGPT, including adding PayPal branded checkout for shoppers and payment processing for merchants using Instant Checkout. This is a big win for PayPal and our customers.

Today, we also announced our own agentic commerce services, which help merchants sell through multiple AI platforms, including Google, OpenAI and Perplexity. Merchants will have one integration to access consumers through multiple LLMs. Agentic commerce will take time, but we do believe consumer behavior will shift. PayPal is building for that future.

Finally, I'm very excited to share that PayPal World is officially in its pilot stage, and the first test transactions are happening this week. ***I'm proud of the progress that we've made this quarter from partnerships to new product innovations, to continuing to strengthen our profitability***.

(Emphasis added).

40. Defendant Miller similarly spoke to the Company's efforts to improve Branded Checkout and facilitate PayPal's overall growth pertinently highlighting the following:

***The diversification and quality of this growth is a meaningful improvement from where we were at the start of the company's transformation. We have clear opportunities to build on this progress with investments that strengthen our competitive position and drive durable profitable growth.***

. . .

***We've moved branded experiences to the top of this slide to reflect the importance of this metric to our more expansive strategy and value creation***. Looking across the product portfolio, ***we see encouraging signs that our initiatives are gaining traction and making an impact. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap-to-pay posted another quarter of 8% growth.***

As Alex mentioned, U.S. branded experiences TPV growth accelerated to 10% in the quarter, benefiting from both omnichannel adoption and better trends in U.S. online branded checkout.

. . .

***We remain focused on the initiatives we can control. We're confident in our branded checkout strategy and the road map that our teams are advancing. The early results in the U.S. demonstrate that we're on the right path with our initiatives***, including our redesigned experiences; buy now, pay later; and Pay with Venmo. ***We're laser-focused on execution across the 3 key areas Alex discussed: scaling our redesigned experiences, improving prioritization and driving***

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***biometric adoption.*** All of this is increasingly complemented by a compelling consumer value prop that differentiates PayPal and Venmo as one of the best, most rewarding ways to pay.

While this work is complex and takes time, ***we fully expect to see our efforts build as we move through the next year and scale these initiatives***. Pay with Venmo and buy now, pay later continue to outpace the market, taking share from other payment methods, growing 40% and 20%, respectively. ***These results give us the confidence to begin making targeted investments in the fourth quarter that amplify the impact of these and other initiatives throughout the portfolio***.

(Emphasis added).

41.     Defendant Miller further provided updated guidance for the fourth quarter of fiscal 2025, pertinently, as follows:

Following another quarter of strong financial performance, ***we are raising our full year guidance for TM dollars and non-GAAP EPS***. For the fourth quarter, we expect currency-neutral revenue growth in the mid-single digits. ***We expect fourth quarter TM to be between $4.02 billion and $4.12 billion, which represents about 3.5% growth at the midpoint. Excluding interest on customer balances, we expect TM dollars to grow by about 5% at the midpoint compared to 7% year-to-date.***

Setting interest rates aside, there are a few factors to highlight that impact our fourth quarter outlook. First, we have seen strong credit outperformance over the past year, driven by good execution from the team as well as a more benign loss environment. We expect to see year-over-year comparisons start to normalize more in the fourth quarter.

***Second, given the performance of some of our key initiatives, we see an opportunity to lean into our competitive differentiation with additional investment to drive faster growth over time***. In the fourth quarter, we will begin increasing investments designed to drive product attachment and habituation. Some of these investments are linked to volumes and, therefore, recorded as contra revenue impacting TM dollars and designed to drive additional growth over time.

Other growth investments such as global brand awareness campaigns, typically sit within marketing and non-transaction OpEx. Lastly, on TM, ***our fourth quarter guide assumes some deceleration in branded checkout growth relative to our third quarter average. From a volume perspective, the most important weeks and months of the quarter still lay ahead***. That said, ***we are planning prudently given recent spending trends and the uncertain macro backdrop. We are also cognizant of lapping strong consumer spending in the fourth quarter of last year.***

(Emphasis added).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

42.     Defendant Chriss wrapped up the Defendants' prepared remarks claiming that the results for fiscal 2025 thus far demonstrate that the initiatives introduced at the Analyst/Investor Day are working to generate the growth intended, in pertinent part:

> *We are operating from a position of strength. The results you're seeing are proof that our strategy is working*. We built a more balanced, profitable growth engine across branded experiences, PSP and Venmo, and that's exactly what we set out to do. We're investing in high-impact growth initiatives that will move the needle and future-proofing the business with critical partnership, while simultaneously returning value to shareholders through our buyback program and our newly launched dividend. *We have moved this business from defense to offense, from stabilization to acceleration. We know exactly where the opportunities are, and we are laser-focused on executing our strategy.*

(Emphasis added).

43.     During the question-and-answer segment of the call, Defendants discussed their updated guidance and the benefits of their recent initiatives to drive Branded Checkout growth in response to the following pertinent inquiries:

> <Harshita Rawat – Sanford C. Bernstein & Co., LLC – Senior Research Associate> So I want to ask about branded. I know you highlighted some headwinds in the 5% growth number. You kind of highlighted some kind of deceleration in the fourth quarter. But I'm also thinking you have some benefit from Pay with Venmo and buy now, pay later promotion in the holiday season. So going back to the Investor Day, you kind of laid out the path to branded acceleration. I know it's not linear. So how should we think about just the overall path from here? Or should we focus more on the Slide 4, right, like that you highlighted, which is very helpful, which kind of focuses on more diversified drivers of growth?
>
> <A: Jamie S. Miller> Yes. Harshita, maybe I'll answer that in 2 parts. I'll talk about fourth quarter and then really talk about the broader investor framework. *We've had consistent mid-single-digit growth in branded checkout for multiple quarters now. And for the quarter, we've seen really good momentum across our growth initiatives with buy now, pay later, with Pay with Venmo. And we've seen continued U.S. growth at higher rates as well this quarter.*
>
> *When we got into September, we began to see macro-related deceleration. And that is both in the U.S. and in Europe. And I talked about it in my prepared remarks, but really a relatively consistent number of transactions, but we're seeing basket sizes just trade down.* Average order value being down, particularly in retail where consumers are just being more selective. *And that behavior has continued into October. So obviously, it's really early in the fourth quarter. The holiday season is very back-end loaded. So it's something we're watching.* But we did call out, and you're right, *our guidance assumes a rate of growth lower than third quarter.*

26

*And so when you look at that macro and I pivot now to talking about the broader framework, we've seen very good progress. And I think what I'm most excited about is we know what's working, and we're really doubling down against that*. And Alex has talked a lot about buy now, pay later. We've talked a lot about Pay with Venmo. *And importantly, year-to-date in the U.S., our growth rates are higher than what we saw year-to-date last year in the U.S. So we're really seeing nice progress. But that macro piece of it, whether it's tariffs or some of this deceleration is offsetting our progress. And we set those 2027 targets, assuming a strong -- or assuming a consistent consumer macro environment. And ultimately, that's how we'll measure progress against that.*

*What I am excited about is we have scaled our initiatives in the U.S. first. And so where we see progress, we've got real confidence as we scale outside of the U.S. and internationally*. I think we've invested in the right products. We're seeing customer adoption and engagement around the things we've talked about in addition to things like omni and places where we get other halo effect. And the investments we're making are really predicated on our confidence in our ability to continue to build on our progress as we get through the next couple of years.

. . .

<Q: Jason Alan Kupferberg – Wells Fargo Securities, LLC – Equity Analyst> So you obviously had a nice beat here on TM dollars in the quarter. It seems like the branded business came in right in line with your expectations. The OVAS revenues were quite strong. So I wanted to just unpack the sources of TM upside in the quarter a bit, if you can give us a relative sense on how much of that upside came from the credit products versus some of the other drivers? And then just any quick comments on how you see cadence of additional penetration of the new checkout experience moving beyond the 25% level as we move into next year

<A: Jamie S. Miller> Thanks, Jason. Really, when you look at third quarter transaction margin dollar performance, we had meaningful contribution across each of branded checkout, Venmo, PSP, VAS and credit. And I think what's important there, and we really tried to highlight this in our prepared remarks as well, is that we've got nice diversification not only on the revenue side but on the margin sources. And I think that's demonstrative of that.

<A: Alex Chriss> Yes. And on the penetration, we talked a little bit about it. But again, just to set the tone, we really started in the U.S. We now are roughly 25% of global transactions. Even under that 25%, though, about half were actually optimized. And so we're really working through how do we nail the overall paysheet improvement, the biometrics that we're starting to put together. When all of that comes together, the paysheet and the biometrics, we're actually seeing conversion rates increase 2% to 5%. So we know we have a winning product. It just is taking time.

27

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*And look, I'm as impatient as anyone, I want to see this move as fast as we can. But we're talking about bending the curve on over $0.5 trillion of spend, and it's just taking time to get there. So we have confidence, as Jamie mentioned earlier, U.S. branded checkout is growing faster year-to-date than it did in '24. So we know the experiences are working. We're now rolling it out in Europe. We expect that to continue through '26.* And in the meantime, we're leaning into BNPL growing north of 20%, Pay with Venmo growing north of 40%. And so we know that overall, in branded checkout, we're on the right path, it's just taking time.

(Emphasis added).

44.    The above statements in Paragraphs 23 to 43 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, PayPal's optimistic plan for growth through various initiatives to bolster the Company's Branded Checkout offerings fell short of reality as the 2027 targets were not achievable under the tenure of Defendant Chriss as CEO; they required both an unrealistically stable consumer landscape and strong execution with clear direction from PayPal and its management.  PayPal was simply not equipped to execute on Defendants' claimed growth potential.

## C.    The Truth Emerges during PayPal's Fourth Quarter Earnings Report

### *February 3, 2026*

45.    On February 3, 2026, Defendants published their fourth quarter and full fiscal year results financial results as follows, in pertinent part:

**4Q'25 Financial Results**
- Net revenues increased 4% to $8.7 billion; 3% currency-neutral ("FXN").
- Transaction margin dollars1 ("TM$") increased 3% to $4.0 billion; TM$ excluding interest on customer balances1,2 increased 4% to $3.7 billion.
- GAAP operating income increased 5% to $1.5 billion; non-GAAP operating income increased 3% to $1.6 billion.
- GAAP operating margin expanded 19 basis points to 17.4%; non-GAAP operating margin contracted 9 basis points to 17.9%.
- GAAP EPS increased 38% to $1.533; non-GAAP EPS increased 3% to $1.23.

**FY'25 Financial Results**
- Net revenues increased 4% to $33.2 billion; 4% FXN.
- TM$1 increased 6% to $15.5 billion; TM$ excluding interest on customer balances1,2 increased 6% to $14.2 billion.

- GAAP operating income increased 14% to $6.1 billion; non-GAAP operating income increased 9% to $6.4 billion.
- GAAP operating margin expanded 154 basis points to 18.3%; non-GAAP operating margin expanded 87 basis points to 19.2%.
- GAAP EPS increased 35% to $5.413; non-GAAP EPS increased 14% to $5.31.

46.     Defendant Miller was quoted in the release as saying:

In 2025, PayPal delivered solid performance across multiple areas of the business. We grew revenue, transaction margin dollars, and earnings per share, underscoring the strength of our increasingly diversified platform. ***At the same time, our execution has not been where it needs to be, particularly in branded checkout. As announced today, the Board's appointment of Enrique Lores as PayPal's next President and CEO reflects a clear commitment to strengthening execution, innovation, and results***. We are fully aligned on the path forward as PayPal enters its next chapter of growth.

(Emphasis added).

47.     Prior to the earnings call, Defendants produced a second press release, announcing the appointment of "Enrique Lores as President and CEO, effective March 1, 2026 … succeed[ing] Alex Chriss. To ensure a seamless transition, Jamie Miller, Chief Financial and Operating Officer, will serve as Interim CEO until Lores assumes the role."

48.     The release provided little detail for the sudden termination of Defendant Chriss from PayPal, but did note the following:

Today's appointment follows a detailed evaluation conducted by the Board of Directors on the current position of the company relative to its competition and the broader industry landscape. ***While some progress has been made in a number of areas over the last two years, the pace of change and execution was not in line with the Board's expectations.*** The Board is confident that the appointment of Lores, a seasoned executive with more than three decades of technology and commercial experience, will provide the leadership necessary to lead PayPal into its next chapter.

(Emphasis added).

49.     During the earnings call, now Interim CEO Defendant Miller highlighted PayPal's disappointment with the declining growth for Branded Checkout growth and detailed the headwinds facing the Company, in pertinent part:

Last February, we held an Investor Day outlining our transformation strategy. One year later, there are elements working very well, but there are also areas pacing

29
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

below our expectations, primarily within branded checkout, which I will spend much of my time discussing today.

. . .

Where we haven't made the same progress is in online branded checkout. We've reimagined a product that had been stagnant and underinvested in for years, creating a new value proposition for merchants and consumers, but *we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base. The results are not yet where we expected them or want them to be. Let me update you on where we are, what is working and the steps we're taking to get back on track.*

For the past few years, we have delivered consistent mid-single-digit TPV growth. However, *in the fourth quarter, online branded checkout TPV grew 1% on a currency-neutral basis, down from 5% in the third quarter. The 4-point deceleration was more than we expected* and was concentrated in three main areas, each contributing roughly 1 point or so to the slowdown. First, U.S. retail weakness. We saw pressure across our retail merchant portfolio, particularly among lower and middle income consumers. *While part of this can be attributed to macro factors and a K-shaped economy, it's also clear that we need to do more to win with key merchants, particularly during high-volume shopping periods.*

Second, international headwinds particularly in Germany, which is one of our largest markets. *Our German growth has moderated due to macroeconomic softness, normalization of our long-standing market leadership position and competition from alternative payment methods.*

Third, deceleration in several high-growth verticals, specifically in travel, ticketing, crypto and gaming, categories that had strong growth in the fourth quarter of '24 and continuing through much of '25.

*Cutting across all of these, we had operational and deployment issues that amplified the pressure.* To date, our delivery process has started with building a better product and expecting merchants to adopt at scale because of conversion benefits. *The reality is our merchants, especially the largest ones, have many competing priorities and require much more hands-on integration support than we anticipated, which has slowed our progress.* Additionally, the combination of biometric adoption and competitive presentment have proven critical to branded checkout performance.

So while challenges in the macro environment are real, *we haven't executed as well as we need to, and our product deployment in the second half of the year was slower than we planned.*

. . .

30

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

First, a relentless focus on the highest impact merchants. *To date, we've been optimizing for every merchant, and that approach has slowed our ability to move quickly on what matters most. We're changing our approach to focus on strategic merchants, representing nearly 25% of our branded checkout volume today but could be much larger*. In January, we formed dedicated teams to implement improvements across experience, presentment and selection for these merchants.

Second, focus on implementing experience and biometrics together, not sequentially*. In too many cases, we were deploying our redesigned checkout without biometric enablement, which does not deliver the full conversion lift we know we can provide. That's changing*. We're now deploying experience and biometrics together as a package more consistently. When we integrate a merchant on to our latest experience, we will simultaneously run biometric adoption campaigns, targeting their consumer base.

. . .

Third is a focus on presentment. It is just as critical as experience. As I mentioned before, when we secure a competitive placement on a merchant site, we perform significantly better.

. . .

Fourth, a focus on giving consumers a reason to come back

. . .

*For branded checkout, our focus is on narrowing the gap with the market over time. Following our fourth quarter performance, we need to prove that out in coming quarters and years.* There are multiple ways for us to deliver profitable growth over the long term, and 2025 was a great example of that. But *given everything I've outlined, we are no longer committing to the specific outlook for 2027 we laid out at Investor Day last year.*

*For these reasons, we think it's prudent for now to provide financial guidance 1 year at a time*. And Steve will speak in more detail about how we're thinking about 2026 as a starting point. The strategy I outlined today focuses on three fundamentals: experience, presentment and selection. And *these critical changes to our go-to-market approach* will lay the groundwork for a stronger, more competitive online branded checkout business over time.

In closing, while *we're not satisfied with our online branded checkout performance today,* we are confident in the plan to stabilize and strengthen it. Importantly, we are executing with multiple competitive advantages. Our scale, our trusted brand, deep consumer and merchant relationships and diversified growth drivers give us resilience and flexibility moving forward.

(Emphasis added).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

50.     PayPal's Chief Investor Relations Officer, Steven Eric Winoker, took over the normal financial reporting duties from Defendant Miller on the call, providing, in pertinent part, the following details:

> TM dollars excluding interest grew 4% in the fourth quarter. The drivers of that growth were broad-based, led by strong credit performance, PSP profitability, Venmo monetization and loss improvement across multiple products. This diversification was **key in offsetting the headwinds to branded checkout**
>
> . . .
>
> On an **online-only branded checkout basis, volume grew 1% on a currency-neutral basis**, impacted by the factors that Jamie discussed in depth earlier. I'll talk more about how we are planning for the current year shortly.
>
> . . .
>
> As Jamie discussed, **we are no longer providing the specific multiyear growth outlook we presented at our Investor Day** a year ago. **As it relates to branded checkout, our prior outlook assumed a more stable e-commerce environment and a certain pace of product rollout and merchant adoption. Neither has materialized to date as we anticipated**. And while we can point to a number of constructive indicators, **it's hard to call the precise time frame when we will see an overall inflection for branded. Branded checkout represents over half our profit dollars**, and we're confident the product, channel and marketing investments we're making will drive improvement and acceleration over time.

(Emphasis added).

51.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 25, April 29, July 29, and October 28, 2025, earnings and shareholder calls. On those calls, Defendants continually praised the progress of their initiatives to facilitate growth in Branded Checkout, dismissed concerns of competition, touted their significant "market leadership" in Germany, and repeatedly affirmed PayPal was "laser-focused" on execution, while minimizing the potential risks associated with scaling their customer base, convincing merchants to spend resources to adopt PayPal's new initiatives, and operational capacity, as well as those associated with the potential impact of the macroeconomic environment on the Company's profitability.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

52.     Investors and analysts reacted immediately to PayPal's revelation. The price of PayPal's common stock declined dramatically. From a closing market price of $52.33 per share on February 2, 2026, PayPal's stock price fell to $41.70 per share on February 3, 2026, a decline of about 20.31% in the span of just a single day.

53.     A number of well-known analysts who had been following PayPal lowered their price targets in response to PayPal's disclosures. For example, J.P. Morgan, while dropping their price target nearly 35%, noted that "Fueling the sell-off was weakness in the vulnerable branded checkout KPI, driving a miss down the P&L, coupled with a disappointing FY26 outlook and an unexpected CEO change. Results helped validate the bear thesis that PayPal will struggle to maintain share in a competitive environment, evidenced by Branded volume up only 1%." Speaking to the fourth quarter's performance directly, the analyst highlighted that "results were below expectations and guidance, largely driven by light Branded volume growth (up 1% vs. JPMe +3%), which is a material P&L driver … decelerating from 5% last quarter, directly consistent with intra-qtr commentary pointing to deteriorating but worse in magnitude than was broadly expected."

54.     William Blair, while noting they "have not recommended PayPal, but we believe an abrupt financial outlook downgrade and barely understandable CEO change after less than three years highlight broader industry challenges."  The analyst opined that they "see little chance that the stock will outperform the market … The key takeaway for us: ***PayPal's branded offering, which is more than 50% of profit, offers insufficient merchant and consumer value to be relevant.*** The company is ***throwing good money after bad as it invests for illusory growth acceleration***" (emphasis added). William Blair further commented on the "inexplicable" CEO change, commenting that "Former CEO Alex Chriss … ostensibly did not move fast enough to improve branded checkout growth … This begs whether Chriss pushed back on the idea of value-destroying investment or is the fall guy for a flawed business model."

55.     The fact that these analysts, and others, discussed PayPal's shortfall, below-expectation projections, and abrupt CEO change suggests the public placed significant weight on PayPal's prior growth estimates and turnaround plan for Branded Checkout. The frequent, in-depth

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

discussion of PayPal's guidance confirms that Defendants' statements during the Class Period were material.

### D.     Additional Scienter Allegations

56.     During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of PayPal were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the customer adoption of the initiatives to growth Branded Checkout, the capacity of PayPal to drive such adoption, and the desire for merchants to allocate the resources necessary to facilitate the integration of these initiatives and purported upgrades.

57.     Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that PayPal was well positioned to implement and capitalize upon its growth initiatives to reach its 2027 fiscal targets. Defendants further repeatedly claimed strength against their competition and minimized the concerns of influence from competitors in both the U.S. and abroad.

58.     Yet, Defendants made selective and misleading disclosures in repeated claims of progress in the implementation of their growth initiatives, their adoption, and the ability for them to continue driving Branded Checkout growth.

59.     Defendants' scienter was further evidenced by the abrupt, surprise departure of Defendant Chriss from the roles of PayPal's President and Chief Executive Officer immediately following the setback. In retrospect, it arguably appears Defendant Chriss needed these growth initiatives and, in particular, the growth of Branded Checkout to meet expectations in order to maintain his position at the Company.

60.     Defendants' scienter was further evidenced by their repeated claims of confidence that Branded Checkout would continue its growth pace into and through 2026, despite ultimately disclosing both a financial underperformance and significant inter-company issues that limited PayPal's ability to achieve its purported potential through these initiatives.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

61. Defendants were aware of the risks to Branded Checkout growth, yet they continued to deliberately disregard or otherwise minimize them in their claims of confidence to investors. At one point, Defendant Chriss claimed the results were "proof that [PayPal's] strategy is working," despite only one quarter later management disclosed that management was "too optimistic," and "the results are not yet where we expected them or want them to be."

62. Moreover, considering the disappointing outcome was ultimately significantly blamed on "operational and deployment issues, Defendants' repeated statements of confidence and "laser-focused" execution were, at best, deliberately reckless.

### E. Loss Causation and Economic Loss

63. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of PayPal's common stock and operated as a fraud or deceit on Class Period purchasers of PayPal's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of PayPal's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of PayPal's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

64. PayPal's stock price fell in response to the corrective event on February 2, 2026, as alleged *supra*. On February 2, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning PayPal's forecasting processes and growth guidance.

65. In particular, on February 3, 2026, PayPal announced results for the fourth quarter and full fiscal year 2025 below expectations and further rescinded their 2027 projections. Additionally, presumably due to the setbacks and inability to capitalize on the Branded Checkout growth initiatives, Defendant Chriss was removed from his post as President and Chief Executive Officer of PayPal.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**F.      Presumption of Reliance; Fraud-On-The-Market**

66.      At all relevant times, the market for PayPal's common stock was an efficient market for the following reasons, among others:

(a)      PayPal's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)      PayPal communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)      PayPal was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)      Unexpected material news about PayPal was reflected in and incorporated into the Company's stock price during the Class Period.

67.      As a result of the foregoing, the market for PayPal's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in PayPal's stock price. Under these circumstances, all purchasers of PayPal's common stock during the Class Period suffered similar injury through their purchase of PayPal's common stock at artificially inflated prices, and a presumption of reliance applies.

68.      Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**G.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

69.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

70.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

71.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of PayPal who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PayPal's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

73. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PayPal's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PayPal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of January 28, 2026, there were 920.66 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

74. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PayPal;

38

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c)     whether the Individual Defendants caused PayPal to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of PayPal's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members,

39

as alleged herein; (ii) artificially inflate and maintain the market price of PayPal common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PayPal's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PayPal's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

82. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

83. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of PayPal's internal affairs.

84. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a duty to disseminate timely, accurate, and truthful information with respect to PayPal's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of PayPal's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PayPal's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

85. During the Class Period, PayPal's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PayPal's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of PayPal's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of PayPal's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about PayPal's misstatements.

90.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by PayPal which had become materially false or misleading.

91.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PayPal disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PayPal to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PayPal's common stock.

92.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause PayPal to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.     By reason of the above conduct, the Individual Defendants and/or PayPal are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  February 24, 2026                              Respectfully submitted,

                                                       **LEVI & KORSINSKY LLP**

                                                        /s/ Adam Apton
                                                       Adam M. Apton (SBN 316506)
                                                       1160 Battery Street East, Suite 100
                                                       San Francisco, CA 94111
                                                       Tel: (415) 373-1671
                                                       Email: aapton@zlk.com

                                                       *Counsel for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# Exhibit B

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
FRANCIS P. MCCONVILLE (*pro hac vice* forthcoming*)*
(fmcconville@labaton.com)
CONNOR C. BOEHME (*pro hac vice* forthcoming*)*
(cboehme@labaton.com)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> PAYPAL HOLDINGS, INC., JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, and DIEGO SCOTTI, <br><br> Defendants. | Case No. 5:26-cv-2849 <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

---

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Norfolk County Retirement System ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to its own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by PayPal Holdings, Inc. ("PayPal" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of PayPal's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of a "Class" of all persons or entities who purchased or otherwise acquired PayPal common stock between February 8, 2024, through February 2, 2026, inclusive (the "Class Period").  Plaintiff brings this action seeking to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      PayPal is a multinational digital payments company which generates most of its revenue from applying fees on transactions made by its merchant and consumer customers.  PayPal's branded checkout offering allows consumers to use their PayPal account when making e-commerce purchases from various merchants.  In recent years branded checkout has been one of PayPal's most important business lines in part because it is the Company's highest-margin offering.

3.      This case is about how PayPal misled investors by claiming it had successfully executed substantial improvements of its branded checkout business, which included a redesign, leading to sustainable growth.  In reality, PayPal was experiencing severe execution issues in the branded checkout business that were undermining growth, yet these issues were concealed for investors during the Class Period.

1

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4. Investors learned the truth on February 3, 2026, when PayPal disclosed weak branded checkout growth and announced the sudden departure of its chief executive officer ("CEO"). PayPal largely attributed these poor results to "operational and deployment issues" across all regions.

5. On this news, the price of PayPal stock declined from $52.33 per share on February 2, 2026, to $41.70 per share on February 3, 2026, a decline of over 20 percent.

**JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

6. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant PayPal is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District. The intra-district assignment to the San Jose division of the Court is proper under Local Rule 3-2(e) because a substantial number of the events or omissions giving rise to the claims arose in Santa Clara County, where PayPal is headquartered and the Defendants conduct business.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

10. Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased PayPal common stock during the Class Period and was damaged as the result of Defendants' wrongdoing alleged in this complaint.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

11.     PayPal Holdings, Inc. is a California corporation with its principal executive offices located at 2211 North First Street, San Jose, CA 95131.  During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PYPL."

12.     Defendant James Alexander Chriss was, at all relevant times, the President, CEO, and Director of PayPal until his termination on February 3, 2026.

13.     Defendant Jamie S. Miller was, at all relevant times, the Executive Vice President and Chief Financial Officer of PayPal.  Additionally, she has been the Chief Operating Officer of PayPal since February 2025.

14.     Defendant Diego Scotti was, at all relevant times, the Executive Vice President and General Manager of the Consumer Group and of the Global Marketing & Communications Group of PayPal.

15.     Defendant Frank Keller was, at all relevant times, the Executive Vice President and General Manager of Large Enterprise & Merchant Platform Group of PayPal.

16.     Defendants Chriss, Miller, Scotti, and Keller are sometimes referred to herein as the "Individual Defendants."  PayPal together with the Individual Defendants are referred to herein as the "Defendants."

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PayPal's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

18.     PayPal is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to PayPal under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     PayPal is an international company that enables digital payments to simplify commerce experiences.  PayPal generates most of its revenue from applying fees on transactions made by its merchant and consumer customers.

21.     An important statistic for PayPal, closely tracked by analysts and investors, is total payment volume ("TPV"), meaning the total value of the payments completed on PayPal platforms. TPV is closely connected to PayPal's revenue because greater TPV typically leads to greater transactions fees.

22.     One of PayPal's critical business lines is its branded checkout offering, which allows consumers to make payments on merchant sites using their PayPal credentials.  In recent years branded checkout has been one of PayPal's most important business lines in part because it is the Company's highest-margin offering.

23.     Defendant Chriss took over as CEO of PayPal on September 27, 2023.  From early in his tenure, improving branded checkout to increase its growth was a major priority for PayPal. At the outset of the Class Period, Defendant Chriss called accelerating branded checkout one of the "most important priorities we're focused on."  He also stated that "we're focused on accelerating growth in branded checkout" and "[b]randed checkout is a critical part of PayPal's value proposition."  As part of these efforts, Defendant Chriss explained the Company had "redesigned our branded checkout experience."

### Materially False and Misleading Statements Issued During the Class Period

24.     The Class Period begins on February 8, 2024, the first trading day after Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2024.  During the

4

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

corresponding earnings call, Defendants made the following statement regarding branded checkout and the Company's business outlook:[1]

> *To start, we redesigned our branded checkout experience, creating more simplicity and consistency with the goal of optimizing presentment, increasing speed and minimizing friction across all major checkout flows. When combined with our efforts in password less authentication, these new flows can result in up to an additional 50% drop in latency, allowing a shopper to checkout twice as fast. Improvements like this are aimed at driving a higher selection rate of PayPal and better conversion for our merchants.*

25.     On March 4, 2024, during the Morgan Stanley Technology, Media & Telecom Conference, Defendants claimed that "*our branded checkout is healthy, it's growing.*"

*26.*     On March 13, 2024, during the Wolfe Fintech Forum, Defendants claimed "*branded checkout is growing healthily,*" and "*we continue to think that branded will grow healthily.*"

27.     On July 30, 2024, Defendants published PayPal's results for the second quarter of fiscal year 2024.    During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

> *We're encouraged to see not only the strength and stability in PayPal's platform, but also early contributions from some of the initiatives we have underway. Branded checkout continues to grow profitably.*
>
> . . .
>
> *Within branded checkout, we continue to see strength across large enterprise platforms, marketplaces and international growth.*

28.     On October 29, 2024, Defendants published PayPal's results for the third quarter of fiscal year 2024.    During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

> *I'm proud of our team's innovation velocity as we reestablish ourselves as the best converting branded experience for consumers and merchants.*
>
> . . .
>
> *Maybe something we haven't connected the dots on well enough is all of the innovation that we're doing with Fastlane and with PayPal Everywhere and with what I talked about in my remarks on branded checkout, it all comes back to that*

---

[1] Emphasis added throughout unless otherwise noted.

*durable branded checkout growth, right? PayPal Everywhere, we're starting to see real habituation of people not just getting access to the offline checkout, but also now bringing that back into online. So, all of this is driving back branded checkout growth.*

*. . .*

*What I'd say is branded checkout has been very consistent. We are, again, the largest, best converting and most share of branded checkout anywhere in the world, and it has been consistent.*

29.     On February 4, 2025, Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2024.  During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

*I think it's really important to set our branded checkout strategy in context. First, as Jamie said, and I think we've been consistent throughout the year, we're excited about the innovations. I think we've been pretty prudent in the way that we have looked at a forward guide.*

*. . .*

*But if I just step back and think about the strategy, think about what we did in 2024, we really worked on innovation and what I would call just fixing the basics of branded checkout. As I described earlier, an improved product now in the hands of customers on both desktop and mobile, and we're now starting to see that scale.*

30.     On February 25, 2025, Defendants conducted their annual Analyst/Investor Day call.  During the call, Defendants made a series of claims regarding PayPal's branded checkout business and business outlook:

*Well, we've committed from a guidance to grow greater than 5% in transaction margin in 2025. As we look out into 2027, we see high-single-digit growth for transaction margin.*

*. . .*

*We are maniacally focused and what you will hear throughout the rest of the day is our strategic imperatives that I laid out at our last earnings call are where our teams are focused and executing, and they are all in line with the vision that I just laid out. We will win checkout.*

*. . .*

6

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Now what is really important is that if you look at this numbers, every start – every start that we have in this page shows that *every consumer product leads to checkout*. And that is a very important distinction for our strategy. ***That's why it's both about having an amazing checkout experience, but it's also critical that we build and we nurture a consumer product ecosystem that drives engagement, that gives us more ways to monetize and that keeps reinforcing selection***.

. . .

***So, I know you're all interested in understanding our growth expectations for branded checkout. Our plan is to accelerate TPV growth to between 8% and 10% by 2027.***

***We will measure success by growing our new experience share to over 80%, growing Pay Later usage by more than 20% and growing pay with Venmo by more than 40% as you heard in Diego's section.***

***So, to summarize, we have a rigorous plan to drive checkout growth. We're reigniting consumer selection. We have reimagined checkout experiences and innovated with Fastlane. And those are highly performing to exceed merchant and consumer needs. And now, we're laser focused on scaling them across our global merchant base. When we talk to merchants, they are impressed by our new experiences, which opens doors for having much more holistic conversations about how we help them driving their business.***

. . .

***Merchants typically enter to our ecosystem through branded checkout***. Then, they adopt processing and move to platform integration, which allows us then to add higher margin value-added services and new innovations. As you can see down there, we have a lot of upside.

. . .

I want to leave you with three takeaways. ***We're raising the bar on branded checkout. We have an end-to-end plan to accelerate growth. Our new experiences are delightful for consumers and drive conversion and outcomes for merchants.***

. . .

Looking ahead, we have a diversified portfolio to drive growth. And what you see on this slide is a more simple and relevant TPV breakout than in the past. It's a better way of how we think about the product portfolio today, our customer needs and our use cases, and we're making progress across each of these areas***. So, the first online branded checkout includes PayPal branded checkout, eBay and Pay with Venmo, and it's about 30% of our TPV. We have a clear plan and execution milestones to accelerate and I'll talk about that more in a bit.***

. . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

I want to take a minute and walk you through some of the specific goals and ways for you to track our progress, underpinning each of the initiatives. ***And starting with checkout, which is at the center of everything we do, our new products, partnerships, and campaigns are all aimed at accelerating checkout. We want to be the easiest, the fastest, the safest solution and it is essential we deliver more value to customers.***

. . .

***[W]e spend a lot of time benchmarking ourselves versus competition***. The first thing I'd say is we have to have a best-in-class experience for consumers. And that's what you saw today, which is -- and I've been very consistent. If you go back a year ago, that branded checkout experience, particularly on [mobile], as Frank walked through today was entering your e-mail, entering your password, it was very clunky. ***And our ability to now leapfrog competition and ensure that we have the best-in-class consumer experience is step one.***

But ***that is insufficient. I think if we are here three, four years from now talking about a frictionless checkout experience, we, as an industry, have failed***. This has to now turn into commerce experience. This has to turn into an experience, where you as a customer are getting a personalized checkout experience, just like you saw on screen today where I go into my store, I go to checkout, and I'm getting in our case, a button that is speaking to me. It knows me, it's personalized to me. It's giving me the right reward. It's understanding the loyalty that I have with this merchant.

***That, to me, is a completely different experience. And I think we are the only ones with a two-sided ecosystem with access to merchants at scale with access to 80 million-plus shopper profiles and access to hundreds of millions of consumers on an open agnostic platform to be able to deliver that next version of commerce.***

. . .

The way I think about it is, again, ***if we change the game in how we engage with our merchants, branded checkout gets far more valuable for our merchants as well***. So, you're already starting to see things like habituation with Buy Now, Pay Later. Right, the increase in now bringing Buy Now Pay Later into the experience. ***The uplift it gives for merchants is also economics for us as well.***

But ***what we're starting to see is we're having merchant conversations, and I'm having many of these personally with CEOs of some of our largest merchants, is we are now able to bring them new customers***. And so, the people they're bringing into the conversation are their CMOs, are the people talking about customer acquisition. ***And so, we're tapping into economics and the relationship that's beyond just their payments person or their checkout person.*** And so, I just think, again, it's the biggest mindset shift that I asked you all at the beginning, and I will continue to ask you all to go through now, which is ***the evolution of a payments company that is just focused on creating a frictionless checkout experience,***

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*which we are still the number one player in into a commerce company, and I think it just taps us into much broader addressable markets*.

. . .

[A] lot of what we're doing around branded checkout, driving debit, driving Buy Now, Pay later, driving Pay with Venmo, *these are all high-margin products in addition to the habituation and other halo effect they bring to branded. And we see that halo effect in the cohorts and in the numbers. And so, when you look at take rates, some of those do carry lower take rates, but they're margin accretive. And so, margin will be accelerating over the time as we do this, but at the same time, take rate may shift based on product mix and things like that.*

. . .

*Let me go back to the point about the shift on the mindset because we are moving from a value proposition that was only about checkout*, meaning a button, to a value proposition about PayPal, which means we want people to stay. We want consumers to stay in our ecosystem because there is a much larger equation of value from them when they do more with PayPal. So, *it starts with checkout. As we were saying before, now we are connecting the rest of the products from the ecosystem to check out like never before, from debit to pay later, to Pay with Venmo, even crypto now*.

. . .

*So, when you put all of this together, you're going to get so much value as a consumer that is going to be really compelling for you to stay with us.* On top of that, and you saw to the - what we did last September, our marketing is also changing to, number one, help you think differently about PayPal. It's not just for some purchases or just for online purchases, it's for all purchases. And that is a massive change for the way the consumer thinks about PayPal, which in combination with the other things, is going to allow us to keep you super engage[d] with our brand.

. . .

*I think the fact that we have both sides of the ecosystem gives us an opportunity to create completely differentiated experiences*.

. . .

And so, when you think about a loyalty experience, I mean, everyone think back to the '90s when you had a thick wallet with a whole bunch of loyalty cards sitting in there. Those have gone away as you've now moved to a phone. But that also means that your relationship with your local merchant, your relationship with that loyalty platform has gone away as well. *I think we have an opportunity to bring that back. So that that consumer understands that, hey, this is where I make my purchases all the time. And this is where I want my rewards and my loyalty to be, and the*

9

*merchant gets to have a deeper relationship with those consumers. And I think we have a very, very unique opportunity to create that flywheel.*

. . .

From a margin dollars perspective, *our guidance this year assumes 100 basis points of shift in margin*. And certainly, all the things I talked about are a part of that and a significant part of that. *Branded checkout, we're already at 30% penetration in the U.S. on the merchant experiences.* All the work Diego has done around offline, debit, marketing, that stuff you're going to see us continue and be very focused on as we move through 2025.

So what I'd say to that is it will be a gradation over the period of time is how to think about transaction margin. *When we come over to branded checkout, the U.S. side of it, we are very, very focused on U.S. growth with branded checkout. It is something that has the full weight of the organization behind it.*

31. On April 29, 2025, Defendants published PayPal's results for the first quarter of fiscal 2025 year. During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

In Q1, we delivered our fifth consecutive quarter of profitable growth, with transaction margin dollars growing by 8%, excluding the impact from last year's leap day. *That growth was driven by multiple sources across our strategic initiatives, including omnichannel commerce, both online, branded checkout and off-line branded payment methods, Venmo and PSP.* As a result of this focus on profitability, non-GAAP earnings per share increased 23% year over year.

Additionally, PayPal and Venmo are being used by more people more often. Both total active accounts and monthly active accounts grew a healthy 2% in the quarter. Transactions per active account ex-PSP grew 4%, reflecting improved engagement and transaction growth in online branded checkout and Venmo.

As we expand our offerings from online to everywhere, *the best way to see the traction we're gaining is through branded experiences, TPV. Branded experiences comprises volume from PayPal and Venmo online checkout as well as branded in-store payment methods like debit and tap to pay*.

*In Q1, branded experiences TPV grew 8%, excluding last year's leap day. That's a full 2 points higher than branded experiences' growth for the full year of 2024, highlighting the growing contribution of our omnichannel initiatives. It's still early days, but we are very proud of this progress.*

Within branded experiences, we're continuing to accelerate the rollout of our upgraded online branded checkout flows. This includes our simplified and modernized paysheet design, with streamlined log-in and reduced latency. *Since the beginning of the year, we've driven a 25-point jump to more than 45% of U.S.*

10

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*checkout traffic. This shows we can execute, and we anticipate an even faster rollout for Europe starting in the second quarter.*

And finally, Venmo had another standout quarter. We hit an important inflection point for Venmo monetization, with 20% revenue growth, driven by our push to make Venmo one of the best ways to pay online and in-store.

*These are only a few examples of the strength we're seeing in the execution of our strategy. We're feeling the excitement of our innovations in the market and the engagement from our consumers and merchant partners, and we're just getting started.*

. . .

*Starting with win checkout. Online branded checkout TPV, including PayPal and Pay with Venmo, grew nearly 6% this quarter, accounting for last year's leap day. We're proud of this growth and expect it to increase over time as more traffic flows through our upgraded experience.*

. . .

Today, our PayPal and Venmo debit cards are enabling our customers to use their balance to shop anywhere cards are accepted. Adoption is strong and growing, with approximately 2 million first-time PayPal and Venmo debit card users in the quarter, an increase of nearly 90% from last year. Debit card TPV grew approximately 64% in the first quarter. Venmo debit card monthly active accounts grew nearly 40%, and penetration has reached to 6% of Venmo MAAs.

We are focused on getting these products into the hands of even more of our customers because they allow them to choose PayPal and Venmo as their way to pay more often. In the first quarter, users who adopted the PayPal debit card transacted nearly six times more and generated more than two times the average revenue per account, compared to those who used online branded checkout only. *There is also a halo effect where debit card users choose PayPal more often in online branded checkout.*

. . .

*In the first quarter, online branded checkout volumes grew more than 4% on a currency-neutral basis. And excluding last year's leap day, which contributed over 1 point to growth, online branded checkout volumes increased nearly 6%. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap to pay, grew 8% ex leap day*, accelerating from the prior year.

. . .

*Transaction revenue was flat on a spot basis or up 1% on a currency-neutral basis to $7 billion, driven primarily by branded checkout, Venmo and SMB processing.*

11

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

We've got -- this is the strategy that we've laid out really coming to light. So first, *we have a branded checkout strategy that is really about driving habituation everywhere that the customer wants to pay*. We have such strong brands in both PayPal and Venmo. And our customers are asking to be able to leverage that trust, the safety, the brand, the rewards in every purchase that they make.

*And so, we've been focused on not only improving that online experience that we've talked about, and I'm sure we'll talk about more, making it available for them exactly how they want to pay, whether that's immediately or with pay later scenario, with buy now, pay later, but then also offline.*

And you mentioned branded experiences. This really is enabling our PayPal debit card or our Venmo debit card to be accessible to our consumers. *We saw PayPal debit card TPV growth over 100% in Q1. And that really is driving habituation. This is driving our consumers to actually start to come back, move online and start to pay with PayPal wherever they see it.*

*So, the strategy is working. TPV, up 8% overall in branded experiences. And this really is the metric that we are focused on and we hope you're focused on as well because, again, it is really all about the strategy that we've laid out.*

. . .

*[J]ust to unpack our branded strategy, I'd really think about it as 3 parts. One is the improved branded checkout experience. And as you mentioned, we've moved very quickly up now over 45% in the U.S.* Again, that still is -- think of that as sort of double digits of our global transactions. And so *we're really excited. We think we've got a really strong playbook now. And we think, as we start to roll this out into Europe, we'll actually accelerate even faster*. But our paysheet redesign is holding, the improvement is holding, and now this is just about scaling.

*Second lever is really accelerating Pay with Venmo*, and you've seen the results there. So very, very fast flywheel starting to happen from a Pay with Venmo perspective. TPV up over 50%, and MAAs up over 30%.

*And then the third lever is buy now, pay later and our pay later products.* And again, TPV up over 20%.

*So you add all three of those together, and as we continue to see us leaning into those three levers, I don't know the exact timing of when we'll start to see branded checkout, but we put pretty strong growth numbers of 8% to 10% by 2027.* And I think those 3 levers continue to give us confidence that we're executing well and heading in that direction.

. . .

12

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*It is early, but we talked in the fourth quarter about seeing some shifting in our U.S. branded checkout levels. We saw that hold again this quarter, watching it very closely but cautiously optimistic about that.*

. . .

And I think what we're really excited about is that we're bringing our new product innovation to the market in Europe starting this quarter. *So we'll start with Germany and the U.K. And this is the checkout redesign.* It is buy now, pay later. It is omni and NFC launches. And brand marketing to accompany all of that, with a fast follow to other countries after that.

*So I think the overall look right now, we feel pretty good about branded checkout and just laser-focused on our execution.*

. . .

*Germany, we are really the market leader there. I think we're the number one brand in Germany for the last 3 years. So very, very strong consumer presence, very strong merchant presence.*

*It's also a different type of market. As I just mentioned, it was not a -- it's not a credit-heavy market. So the way PayPal is used is we're connected to bank, and then PayPal is used as really the way to make an online purchase. And so our transactions in e-commerce in Germany are extremely high. That's what gives us a lot of confidence as we now move into off-line, is we're really going to be really one of the first at-scale, bank-connected, off-line wallets that we think will be able to drive significant penetration into the market.*

So we're really excited about that as well as bringing some new innovations to market with not only our rewards program, but also the buy now, pay later connected element as well. *So with the brand presence we've got in Germany, with the banks already connected and the onboarding experience, that's just really delightful. I mean it's literally one click from your bank to be able to set up your off-line wallet. And with the innovation of rewards and buy now, pay later, we're really excited to get into the market there.*

*U.K., much more competitive dynamic there. We've really suffered in the last few years with what I would consider to be one of our poorest app experiences for consumers.* We're rolling out a new app experience in the U.K. shortly. But we've already started with, as you mentioned, the biometrics. So we actually got a favorable connection with the regulator there to enable us to enable our biometrics to be considered 2-factor authentication. That's rolling out quickly and enabling a much better experience, whereas before, it really was choppy and created a lot of friction and a lot of latency in the experience.

*Biometrics is now really creating a seamless experience. You add on top of that the new app that's going to be rolling out and then our rewards program and all the other innovation that we brought to bear. And we think we're going to be*

13

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*competing quite well in the U.K. And you'll see us leaning in from a go-to-market perspective as well to really remind consumers that we now have the best product in the market.*

32.   On July 29, 2025, Defendants published PayPal's results for the second quarter of fiscal year 2025.   During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

*We delivered our sixth consecutive quarter of profitable growth despite the macro uncertainty.* Transaction margin dollars grew 8%, excluding interest on customer balances. *Success across many of our strategic initiatives contributed to that growth, including online and off-line branded experiences, payment services and Venmo.* This highlights a healthy business with multiple avenues to sustain and accelerate growth, and non-GAAP earnings per share increased 18% year-over-year. We continue to build upon our broad reach and strong engagement. Both total active accounts and monthly active accounts grew 2% in the quarter. Transactions per active account ex-PSP grew 4% as more people use PayPal and Venmo more often.

*If we look at our four strategic growth drivers: winning checkout, scaling omni and growing Venmo, driving PSP profitability, and scaling our next-gen growth vectors, we are making meaningful and tangible progress on all four.* I'd like to walk through each one, highlighting examples of our progress. *The first two growth drivers are entirely focused on improving and growing our branded experiences. I'm proud that we drove 8% currency-neutral growth in branded experiences TPV this quarter. This positive result reflects the benefit of meeting our customers wherever they choose to shop with PayPal and Venmo, online and offline.* As a reminder, branded experiences includes winning checkout, expanding buy now, pay later, winning with Venmo and scaling omnichannel capabilities.

Starting with online branded checkout. TPV, including PayPal, BNPL and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year. *Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs.*

Our focus is on the things that are within our control and that we know will have a positive impact on our overall growth trajectory over time. That starts with driving more traffic through our upgraded checkout experiences, both in the U.S. and internationally. *These upgrades offer a much better consumer experience, improved presentment of BNPL and drive meaningful conversion rate improvements. This is currently rolling out in the U.S., Germany and the U.K., and we have a comprehensive playbook that we will apply to other countries.*

. . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Finally, I'd like to explain how last week's announcement of **PayPal World will be a game changer for our branded experiences**.

. . .

For businesses, it means building the technology to accept dozens of wallets, which adds unnecessary costs and creates a fractured experience full of friction for customers, ultimately limiting reach and, of course, sales. When you want to sell to the world, how do you choose which wallets to accept and which customers to turn away? You shouldn't have to make that choice. **This is where PayPal World comes in to make it simple and easy to connect any consumer with any merchant.** Five of the largest digital wallets in the world, PayPal, Venmo, Mercado Pago, Tenpay Global and UPI are coming together on a seamless global platform. So you can now use your preferred wallet anywhere in the world.

**For our PayPal merchants, PayPal World will mean access to billions of new customers through their existing branded checkout integration.** Now a UPI user in India who wants to buy a pair of sneakers from an online store in Germany that accepts PayPal can simply click the PayPal button at checkout and their familiar UPI button will be presented for them to complete the transaction. It's that simple. **This means our connections for branded checkout will extend beyond our 400 million customers to more than 2 billion consumers worldwide, and that will continue to grow.**

. . .

**Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as Tap to Pay posted another quarter of 8% growth.**

While debit and tap-to-pay spend represent a smaller amount of volume in branded experiences today, they are growing rapidly and are up more than 60% year-over-year. **Winning checkout remains our most critical priority. Our teams are laser-focused on advancing the many initiatives that reinforce our checkout business. In the second quarter, online branded checkout volumes grew 5% on a currency-neutral basis.**

. . .

[T]hank you for the question, and I appreciate the comments on branded checkout. **Look, we're excited as well. I think our execution on the global rollout, the U.S. rollout is exactly what we were looking for.** And really, the cohorts that we now have live in market are delivering exactly the way we expected. **To the comment on these platforms from Asia, the way we think about it is, without that pressure, our branded checkout really would have been at 6%. And so, it's a small amount, but we've started to see it stabilize a little bit as we get into this month.**

. . .

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

I would just say that *our trends underlying all this really have been broadly consistent. There's puts and takes in any given quarter. And like Alex said, we did see a slight deceleration really in those Chinese to U.S. corridors*. In July, I would say it's still early, but seeing a bit less pressure in that space. *We plan the full year with branded checkout at mid-single digits. We are on track for that.* And the watch-out that I really – I am looking at is, we still have a fair amount of policy and macro uncertainty. So we're obviously monitoring that. *But we're very focused on our execution around our strategic initiatives.* And bending the curve takes time, and we expect to accelerate as we move through the next couple of quarters and the next couple of years.

. . .

*[W]e're very excited, and you can hopefully, you're seeing the pace of our innovation just continue to accelerate and sort of you're starting to see our whole strategy and the system that we're building together really play out*. Let me take each of those. So PayPal World - I think the easiest way to think about it in the short term is, a, what I'm really excited about is the interoperability between PayPal and Venmo. So now you've got a huge amount of Venmo customers that can click on the PayPal branded checkout and make their purchase online.

*Then we've opened it up to almost 2 billion additional users, and that will just continue to grow. And the best way to think about it is that's branded checkout.*

. . .

On *Pay with Crypto, we really do see this as, again, expansion of TAM at pretty attractive economics*.

. . .

So again, just to highlight, *we were very deliberate in our strategy to start our rollout of our new branded experiences in the U.S. We're up over 60% now in the U.S. And again, the cohorts that we've rolled out are continuing to operate in the way that we wanted and showing the uplift that we expected*, that we talked about in the past.

*We've now started to roll that out in the U.K. and Germany.* As I mentioned previously, those integrations typically are on newer integrations throughout Europe. And so I actually think *we're going to continue to accelerate our adoption over the coming quarters across Europe. So very, very excited there*. We're mid-teens overall on global TPV, and we want to see that continue to increase over the next few quarters.

. . .

*If you look at outside the U.S., again, we're really seeing largely consistent trends here. We continue to take share in Europe, including Germany. And as Alex mentioned, our broad push around our latest innovation, it's not just the latest*

16

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*experience, but it is buy now, pay later. It is the new app and app upgrades and the experience around that.* It's in its NFC, which we had a really successful rollout in the second quarter in Germany around that. *So it's all around branded checkout, really driving the habituation and the resulting halo that comes with that. And the teams are really focused on scaling that and pushing that as they go through.*

*With respect to accelerated rate, what I would tell you is that we are laser-focused on branded checkout. And I think as we talk about all of this, that focus on execution, the focus on the strategic initiatives, we fully expect to see an accelerated rate of growth over the next few quarters and the next few years.*

. . .

*[F]rom the cohorts that we've rolled this out to, and remember, this is 15% of global TPV, we're continuing to see the uplift* that we've talked about, call it, one point of uplift. *So that is going to continue. We just need to roll this out to more.* And so our expectation is if you look at branded checkout overall, it's this new branded experiences, it's the momentum that we've got in buy now, pay later, which we're seeing over 20% year-over-year growth. It's the improvement in Pay with Venmo, which we're seeing 45% year-over-year growth. All of those coming together, we continue to see momentum on.

*And so as we exit this year, I expect that we're going to start to see real improvement in branded checkout overall and then as we move into 2026. So - this is a big shift. It takes time to move. I'm excited about the momentum we have across all three of those elements, the new experiences, buy now, pay later and Pay with Venmo. And I think we're going to start to see this thing turn as we get through the next few quarters and into 2026.*

33.     On October 28, 2025, Defendants published PayPal's third quarter 2025 results. During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

*Thanks to our omnichannel initiatives, we've accelerated branded experiences TPV growth to be between 7% and 8% on a currency-neutral basis over the past four quarters.*

. . .

Put simply, this is the new PayPal, built for faster, more profitable growth. *Our strong foundation, differentiated competitive advantages and clear strategic direction position us to capture a massive and growing addressable market. With building execution momentum, we are driving innovation at a remarkable pace and scale. This makes us exceptionally well placed to win into the future.*

. . .

17

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*We have the right set of drivers and initiatives in place. Now our focus is on adoption and investing to amplify our impact. As we move into 2026, we will be leaning more into these efforts and expanding across key international markets.*

Let me address online branded checkout in more detail. TPV grew 5% in the third quarter on a currency-neutral basis. *That solid growth, especially with the choppy global macro trends we continue to see this quarter. Given the competitive intensity online, we know more work is needed to close the gap between our performance and overall e-commerce growth.*

. . .

*I'm proud of the progress that we've made this quarter from partnerships to new product innovations, to continuing to strengthen our profitability.*

. . .

*The diversification and quality of this growth is a meaningful improvement from where we were at the start of the company's transformation. We have clear opportunities to build on this progress with investments that strengthen our competitive position and drive durable profitable growth.*

. . .

*We've moved branded experiences to the top of this slide to reflect the importance of this metric to our more expansive strategy and value creation.* Looking across the product portfolio, *we see encouraging signs that our initiatives are gaining traction and making an impact. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap-to-pay posted another quarter of 8% growth.*

. . .

*We remain focused on the initiatives we can control. We're confident in our branded checkout strategy and the road map that our teams are advancing. The early results in the U.S. demonstrate that we're on the right path with our initiatives,* including our redesigned experiences; buy now, pay later; and Pay with Venmo. *We're laser-focused on execution across the three key areas Alex discussed: scaling our redesigned experiences, improving prioritization and driving biometric adoption.* All of this is increasingly complemented by a compelling consumer value prop that differentiates PayPal and Venmo as one of the best, most rewarding ways to pay.

While this work is complex and takes time, *we fully expect to see our efforts build as we move through the next year and scale these initiatives.* Pay with Venmo and buy now, pay later continue to outpace the market, taking share from other payment methods, growing 40% and 20%, respectively. *These results give us the confidence to begin making targeted investments in the fourth quarter that amplify the impact of these and other initiatives throughout the portfolio.*

18

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

Following another quarter of strong financial performance, *we are raising our full year guidance for TM dollars and non-GAAP EPS*. For the fourth quarter, we expect currency-neutral revenue growth in the mid-single digits. *We expect fourth quarter TM to be between $4.02 billion and $4.12 billion, which represents about 3.5% growth at the midpoint. Excluding interest on customer balances, we expect TM dollars to grow by about 5% at the midpoint compared to 7% year-to-date.*

Setting interest rates aside, there are a few factors to highlight that impact our fourth quarter outlook. First, we have seen strong credit outperformance over the past year, driven by good execution from the team as well as a more benign loss environment. We expect to see year-over-year comparisons start to normalize more in the fourth quarter.

*Second, given the performance of some of our key initiatives, we see an opportunity to lean into our competitive differentiation with additional investment to drive faster growth over time.* In the fourth quarter, we will begin increasing investments designed to drive product attachment and habituation. Some of these investments are linked to volumes and, therefore, recorded as contra revenue impacting TM dollars and designed to drive additional growth over time.

Other growth investments such as global brand awareness campaigns, typically sit within marketing and non-transaction OpEx. Lastly, on TM, *our fourth quarter guide assumes some deceleration in branded checkout growth relative to our third quarter average. From a volume perspective, the most important weeks and months of the quarter still lay ahead*. That said, *we are planning prudently given recent spending trends and the uncertain macro backdrop. We are also cognizant of lapping strong consumer spending in the fourth quarter of last year*.

. . .

*We are operating from a position of strength. The results you're seeing are proof that our strategy is working.* We built a more balanced, profitable growth engine across branded experiences, PSP and Venmo, and that's exactly what we set out to do. We're investing in high-impact growth initiatives that will move the needle and future-proofing the business with critical partnership, while simultaneously returning value to shareholders through our buyback program and our newly launched dividend. *We have moved this business from defense to offense, from stabilization to acceleration. We know exactly where the opportunities are, and we are laser-focused on executing our strategy.*

. . .

*We've had consistent mid-single-digit growth in branded checkout for multiple quarters now. And for the quarter, we've seen really good momentum across our growth initiatives with buy now, pay later, with Pay with Venmo. And we've seen continued U.S. growth at higher rates as well this quarter.*

19

*When we got into September, we began to see macro-related deceleration. And that is both in the U.S. and in Europe. And I talked about it in my prepared remarks, but really a relatively consistent number of transactions, but we're seeing basket sizes just trade down.* Average order value being down, particularly in retail where consumers are just being more selective. *And that behavior has continued into October. So obviously, it's really early in the fourth quarter. The holiday season is very back-end loaded. So it's something we're watching.* But we did call out, and you're right, *our guidance assumes a rate of growth lower than third quarter.*

*And so when you look at that macro and I pivot now to talking about the broader framework, we've seen very good progress. And I think what I'm most excited about is we know what's working, and we're really doubling down against that.* And Alex has talked a lot about buy now, pay later. We've talked a lot about Pay with Venmo. *And importantly, year-to-date in the U.S., our growth rates are higher than what we saw year-to-date last year in the U.S. So we're really seeing nice progress. But that macro piece of it, whether it's tariffs or some of this deceleration is offsetting our progress. And we set those 2027 targets, assuming a strong -- or assuming a consistent consumer macro environment. And ultimately, that's how we'll measure progress against that.*

*What I am excited about is we have scaled our initiatives in the U.S. first. And so where we see progress, we've got real confidence as we scale outside of the U.S. and internationally.*

. . .

*And look, I'm as impatient as anyone, I want to see this move as fast as we can. But we're talking about bending the curve on over $0.5 trillion of spend, and it's just taking time to get there. So we have confidence, as Jamie mentioned earlier, U.S. branded checkout is growing faster year-to-date than it did in 2024. So we know the experiences are working. We're now rolling it out in Europe. We expect that to continue through 2026. And in the meantime, we're leaning into BNPL growing north of 20%, Pay with Venmo growing north of 40%. And so we know that overall, in branded checkout, we're on the right path, it's just taking time.*

34. The above statements in Paragraphs 24 to 33 were materially false and misleading because Defendants failed to disclose that operational and execution issues were harming PayPal's branded checkout business.

## The Truth Begins to Emerge

35. On February 3, 2026, investors began to learn the truth when Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2025. As part of these results, PayPal disclosed weak branded checkout growth of 1% compared to 5% in the prior quarter.

Defendants admitted that much of this slowdown was attributable to "operational and deployment issues." Along with these poor results, PayPal withdrew its financial outlook and announced the sudden departure of its CEO Defendant Chriss.

36. On this news, the price of PayPal stock declined from $52.33 per share on February 2, 2026, to $41.70 per share on February 3, 2026, a decline of over 20 percent.

## **CLASS ACTION ALLEGATIONS**

37. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired PayPal common stock between February 8, 2024, through February 2, 2026, inclusive (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of PayPal, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

38. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, PayPal's common stock was actively traded on the NASDAQ, one of the largest stock exchanges in the world. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PayPal or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

39. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of PayPal stock was artificially inflated; and

(f) The extent of damage sustained by members of the Class and the appropriate measure of damages.

40. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

41. Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation. Plaintiff has no interests which conflict with those of the Class.

42. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

43. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiff and other members of the Class purchased PayPal stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

22

44.    At all relevant times, the market for PayPal stock was efficient for the following reasons, among others:

(a) as a regulated issuer, PayPal filed periodic public reports with the SEC;

(b) PayPal regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c) PayPal was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d) PayPal securities were actively traded in an efficient market, including its common stock that was traded on the NASDAQ under the ticker symbol "PYPL."

45.    As a result of the foregoing, the market for PayPal stock promptly digested current information regarding PayPal from all publicly available sources and reflected such information in the price of PayPal stock.

**NO SAFE HARBOR**

46.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

23

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PayPal who knew that the statement was false when made.

## ADDITIONAL SCIENTER ALLEGATIONS

47. During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

48. The Individual Defendants permitted PayPal to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

49. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PayPal, their control over, receipt, or modification of PayPal's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning PayPal, participated in the fraudulent scheme alleged herein.

50. In addition, branded checkout is PayPal's most important business line, with Defendants describing it as "the heart of PayPal" and the Company's "most important initiative" that "has the full weight of the organization behind it." Accordingly, branded checkout was crucial to PayPal's business, as the Defendants spoke about it on every conference call with investors during the Class Period, and repeatedly emphasized its importance.

51. Further, Defendant Chriss, who spearheaded PayPal's strategic initiatives, was abruptly removed from his position as CEO after just 16 months. There were no signs that Chriss'

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

departure was planned or that he was slowly stepping away from the business to make room for a successor.

52. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of PayPal common stock by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding PayPal's business, operations, and management and the intrinsic value of PayPal stock and caused Plaintiff and members of the Class to purchase PayPal stock at artificially inflated prices.

**LOSS CAUSATION**

53. During the Class Period, as detailed herein, PayPal and the Individual Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially inflated the price of PayPal stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of PayPal stock fell significantly. As a result of their purchases of PayPal stock during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**COUNT I**

*For Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

*Promulgated Thereunder Against All Defendants*

54. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55. This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

25

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

58.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

59.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PayPal personnel to members of the investing public, including Plaintiff and the Class.

60.     As a result of the foregoing, the market price of PayPal stock was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

market price of PayPal stock during the Class Period in purchasing PayPal stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

61. Had Plaintiff and the other members of the Class been aware that the market price of PayPal stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

62. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

63. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PayPal stock during the Class Period.

## COUNT II

### *Violations of Section 20(a) of The Exchange Act*

### *Against the Individual Defendants*

64. Plaintiff repeats and realleges the allegations contained in the ¶¶ 1-53 as if fully set forth herein.

65. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

66. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

67. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various

27

reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

68. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

1. Declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

2. Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

3. Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 2, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Jonathan D. Uslaner
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**

FRANCIS P. MCCONVILLE (*pro hac vice* forthcoming)
(fmcconville@labaton.com)
CONNOR C. BOEHME (*pro hac vice* forthcoming)
(cboehme@labaton.com)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION

I, Kathleen Kiely-Becchetti, as Executive Director of Norfolk County Retirement System ("Norfolk County"), hereby certify as follows:

1.      I have reviewed a complaint prepared against PayPal Holdings, Inc. ("PayPal") alleging violations of the federal securities laws, generally adopt the allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint, and authorize the filing of this pleading;

2.      Norfolk County did not purchase common stock of PayPal at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Norfolk County is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. Norfolk County fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Norfolk County's transactions in PayPal common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Norfolk County sought to serve as a lead plaintiff and representative party in the following class actions under the federal securities laws filed during the last three years:

*Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund v. Vestis Corporation,*
No. 1:24-cv-2175 (N.D. Ga.)
*Norfolk County Retirement System v. Super Micro Computer, Inc.,* No. 4:24-cv-6980 (N.D. Cal.)

6.      Beyond its pro rata share of any recovery, Norfolk County will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 31st day of March, 2026.

Kathleen Kiely-Becchetti
Executive Director
Norfolk County Retirement System

2

## EXHIBIT A

## TRANSACTIONS IN PAYPAL HOLDINGS, INC. COMMON STOCK

| Security | Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|----------|------------------|-----------|--------|-------------|---------------|
| Common Stock | Purchases | 09/19/2024 | 578 | $77.7350 | ($44,930.83) |
| Common Stock | Purchases | 09/19/2024 | 19,071 | $77.5493 | ($1,478,942.70) |
| Common Stock | Purchases | 09/27/2024 | 1,717 | $78.8470 | ($135,380.30) |
| Common Stock | Purchases | 11/08/2024 | 5,128 | $82.6780 | ($423,972.78) |
| Common Stock | Purchases | 04/03/2025 | 4,417 | $62.5179 | ($276,141.56) |
| Common Stock | Purchases | 12/17/2025 | 7,267 | $61.5371 | ($447,190.11) |

JS-CAND 44 (Rev. 04-2025)

# CIVIL COVER SHEET — for people without lawyers only

See Civil Local Rule 3-2 (amended April 28, 2025), which requires the filing of a civil cover sheet only by those unrepresented by counsel.

## I. PLAINTIFF(S)

NORFOLK COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated

County of Residence of First Listed Plaintiff: *Leave blank in cases where United States is plaintiff.* **Norfolk County**

Attorney or Pro Se Litigant Information *(Firm Name, Address, and Telephone Number)*

Jonathan D. Uslaner, Bernstein Litowitz Berger & Grossmann LLP, 2121 Avenue of the Stars, Suite 2575, Los Angeles, CA 90067 Tel: (310) 819-3481

## DEFENDANT(S)

PAYPAL HOLDINGS, INC., JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, and DIEGO SCOTTI

County of Residence of First Listed Defendant: *Use ONLY in cases where United States is plaintiff.*

Defendant's Attorney's Name and Contact Information *(if known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] U.S. Government Plaintiff
- [x] Federal Question *(U.S. Government Not a Party)*
- [ ] U.S. Government Defendant
- [ ] Diversity

## III. CAUSE OF ACTION

Cite the U.S. Statute under which you are filing: *(Use jurisdictional statutes only for diversity)*

15 U.S.C. §§ 78j(b) and 78t(a)

Brief description of case: Violations of the federal securities laws

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS

#### PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury -Medical Malpractice

#### PERSONAL INJURY
- [ ] 365 Personal Injury – Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

#### PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities– Employment
- [ ] 446 Amer. w/Disabilities–Other
- [ ] 448 Education

### PRISONER PETITIONS

#### HABEAS CORPUS
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

#### OTHER
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee– Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC § 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC § 158
- [ ] 423 Withdrawal 28 USC § 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent—Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS–Third Party 26 U.S.C. § 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC § 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [x] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] Original Proceeding
- [ ] Removed from State Court
- [ ] Remanded from Appellate Court
- [ ] Reinstated or Reopened
- [ ] Transferred from Another District
- [ ] Multidistrict Litigation–Transfer
- [ ] Multidistrict Litigation–Direct File

## VI. FOR DIVERSITY CASES ONLY: CITIZENSHIP OF PRINCIPAL PARTIES

*(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

| Plaintiff | Defendant | |
|---|---|---|
| [ ] | [ ] | Citizen of California |
| [ ] | [ ] | Citizen of Another State |
| [ ] | [ ] | Citizen or Subject of a Foreign Country |
| [ ] | [ ] | Incorporated or Principal Place of Business In California |
| [ ] | [ ] | Incorporated and Principal Place of Business In Another State |
| [ ] | [ ] | Foreign Nation |

## VII. REQUESTED IN COMPLAINT

- [x] Check if the complaint contains a **jury demand.**
- [ ] Check if the complaint contains a **monetary demand**. Amount:
- [x] Check if the complaint seeks **class action** status under Fed. R. Civ. P. 23.
- [ ] Check if the complaint seeks a **nationwide injunction** or Administrative Procedure Act vacatur.

## VIII. RELATED CASE(S) OR MDL CASE

*Provide case name(s), number(s), and presiding judge(s).*

Goodman v. PayPal Holdings, Inc., No. 26-cv-1381, Hon. Noel Wise; Darcy v. PayPal Holdings, Inc., No. 26-cv-1589, Hon. Jacqueline Scott Corley

## IX. DIVISIONAL ASSIGNMENT pursuant to Civil Local Rule 3-2

*(Place an "X" in One Box Only)*
- [ ] **SAN FRANCISCO/OAKLAND**
- [x] **SAN JOSE**
- [ ] **EUREKA-MCKINLEYVILLE**

DATE 04/02/2026

SIGNATURE OF ATTORNEY OR PRO SE LITIGANT /s/ Jonathan D. Uslaner

# COMPLETING THE CIVIL COVER SHEET

Complete the form as follows:

**I.  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.

**Attorney/Pro Se Litigant Information**. Enter the firm name, address, telephone number, and email for attorney of record or pro se litigant. If there are several individuals, list them on an attachment.

**II.  Jurisdiction.** Under Federal Rule of Civil Procedure 8(a), pleadings must establish the basis of jurisdiction. If multiple bases for jurisdiction apply, prioritize them in the order listed:

(1) *United States plaintiff*. Jurisdiction based on 28 U.S.C. §§ 1345 and 1348 for suits filed by the United States, its agencies or officers.

(2) *United States defendant.* Applies when the United States, its agencies, or officers are defendants.

(3) *Federal question*. Select this option when jurisdiction is based on 28 U.S.C. § 1331 for cases involving the U.S. Constitution, its amendments, federal laws, or treaties (but use choices 1 or 2 if the United States is a party).

(4) *Diversity of citizenship.* Select this option when jurisdiction is based on 28 U.S.C. § 1332 for cases between citizens of different states and complete Section VI to specify the parties' citizenship. Note: Federal question jurisdiction takes precedence over diversity jurisdiction.

**III.  Cause of Action.** Enter the statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless jurisdiction is based on diversity. Example: U.S. Civil Statute: 47 U.S.C. § 553. Brief Description: Unauthorized reception of cable service.

**IV.  Nature of Suit.**  Check one of the boxes. If the case fits more than one nature of suit, select the most definitive or predominant.

**V.  Origin.**  Check one of the boxes:

(1) *Original Proceedings*. Cases originating in the United States district courts.

(2) *Removed from State Court*. Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. § 1441. When the petition for removal is granted, check this box.

(3) *Remanded from Appellate Court*. Check this box for cases remanded to the district court for further action, using the date of remand as the filing date.

(4) *Reinstated or Reopened*. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) *Transferred from Another District*. Check this box for cases transferred under Title 28 U.S.C. § 1404(a). Do not use this for within-district transfers or multidistrict litigation (MDL) transfers.

(6) *Multidistrict Litigation Transfer*. Check this box when a multidistrict (MDL) case is transferred into the district under authority of Title 28 U.S.C. § 1407.

(7) *Multidistrict Litigation Direct File.* Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

**VI.  Residence (citizenship) of Principal Parties.** Mark for each principal party *only* if jurisdiction is based on diversity of citizenship.

**VII. Requested in Complaint.**

(1) *Jury demand.* Check this box if plaintiff's complaint demanded a jury trial.

(2) *Monetary demand*. For cases demanding monetary relief, check this box and enter the actual dollar amount being demanded.

(3) *Class action.* Check this box if plaintiff is filing a class action under Federal Rule of Civil Procedure 23.

(4) *Nationwide injunction.* Check this box if plaintiff is seeking a nationwide injunction or nationwide vacatur pursuant to the Administrative Procedures Act.

**VIII.   Related Cases.** If there are related pending case(s), provide the case name(s) and number(s) and the name(s) of the presiding judge(s). If a short-form MDL complaint is being filed, furnish the MDL case name and number.

**IX.  Divisional Assignment.** Identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated." Note that case assignment is made without regard for division in the following case types: Property Rights (Patent, Trademark and Copyright), Prisoner Petitions, Securities Class Actions, Anti-Trust, Bankruptcy, Social Security, and Tax.