**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
Grace T. Harmon (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
mcanty@labaton.com
mrogers@labaton.com
nmanningham@labaton.com
gharmon@labaton.com

*Co-Lead Counsel for Lead Plaintiffs*

[Additional counsel listed on signature page]

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Emma Gilmore (*pro hac vice*)
Villi Shteyn (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**POMERANTZ LLP**
Jennifer Pafiti (Bar No. 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel: (310) 405-7190
jpafiti@pomlaw.com

*Local Counsel for Lead Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE: PAYPAL BRANDED CHECKOUT SECURITIES LITIGATION** | Case No. 3:26-cv-01589-JSC<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 2

A. Company Background ..... 4

B. PayPal Announced the Redesigned Branded Checkout Initiative ..... 4

C. Defendants Misled Investors About the Success of the Redesigned Branded Checkout Initiative ..... 6

1. Defendants Falsely Reported Success in Integrating Critical Code Required for Redesigned Branded Checkout Adoption ..... 6

2. Defendants Falsely Touted Redesigned Branded Checkout's Adoption Metrics ..... 7

3. Defendants Falsely Stated PayPal Had Not Lost Any Market Share in the Competitive Checkout Space ..... 9

D. The Truth Began Emerging While Defendants Continued Misleading Investors and Concealing the Full Truth ..... 11

1. Defendants Disclosed Slowing Branded Checkout Growth but Blamed Outside Factors for the Underperformance ..... 11

2. Defendants Warned of Slowing Growth but Continued Hiding the True Reason for Branded Checkout's Underperformance ..... 12

E. Defendants Finally Revealed the Full Truth When They Admitted Their Own Execution Failures Caused Branded Checkout's Decline ..... 12

II. JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT ..... 14

III. PARTIES ..... 15

1. Lead Plaintiffs ..... 15

2. Defendants ..... 16

3. Relevant Third Parties: Former PayPal Employees ..... 17

IV. SUBSTANTIVE ALLEGATIONS ..... 19

A. Relevant Background ..... 19

1. PayPal's Branded Checkout Business ..... 19

2. Total Payment Volume: PayPal's Most Important Metric ..... 20

3. PayPal Needed to Upgrade its Branded Checkout Experience ..... 21

4. Defendant Chriss Took Over as CEO and Announced Redesigned Branded Checkout ..... 22

5. The Success of Redesigned Branded Checkout Depended on Merchant Adoption, Especially Enterprise Merchants ..... 23

B. Defendants Misled Investors About the Success of the Redesigned Branded Checkout Initiative ..... 24

1. Defendants Falsely Claimed They Had the Tools to Make Merchant Adoption Fast and Easy ..... 25

2. Defendants Misled Investors About Loss of Market Share ..... 27

3. Knowing Adoption of Redesigned Branded Checkout was Lagging, Defendants Pivoted to SMB Merchants to Inflate Adoption Metrics ..... 29

4. Defendants Touted Misleading Adoption Metrics While Promising 8-10% Branded Checkout TPV Growth ..... 31

5. Defendants Continued to Deny Any Loss of Market Share and Dismissed Competitive Threats as "Nonsense" ..... 35

6. Defendants Continued to Report Rising Adoption Figures That Created a Misleading Impression of Branded Checkout Growth ..... 35

C. The Truth was Partially Revealed When Defendants Disclosed Disappointing Branded Checkout TPV in July 2025 ..... 37

D. Defendants Continued to Mislead Investors About the Success of Redesigned Branded Checkout ..... 38

1. Defendants Blamed Macroeconomic Factors for Underperformance ..... 38

2. Defendants Continued Touting the Rollout of Redesigned Branded Checkout ..... 40

E. Defendants Further Revealed the Truth When They Warned That Branded Checkout TPV Would Slow ..... 41

F. Defendants Fully Revealed the Truth Regarding Redesigned Branded Checkout When PayPal Reported Branded Checkout TPV Growth of Merely 1% ..... 43

V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ..... 46

A. February 7, 2024 – Q4 2023 Earnings Call ..... 46

B. March 13, 2024 – Wolfe Fintech Forum ..... 48

C. June 5, 2024 – Bank of America Technology Conference ..... 49

D. July 30, 2024 – Q2 2024 Earnings Call ..... 50

E. February 4, 2025 – Q4 2024 Earnings Call and Press Release ..... 53

F. February 25, 2025 – PayPal Annual Analyst/Investor Day Call ..... 56

G. March 5, 2025 – Morgan Stanley Technology, Media & Telecom Conference........58

H. March 11, 2025 – Wolfe Fintech Forum........60

I. March 18, 2025 – Bank of America Securities Electronic Payments Symposium........61

J. April 29, 2025 – Q1 2025 Earnings Call........62

K. May 14, 2025 – J.P. Morgan Global Technology, Media and Communications Conference........63

L. June 10, 2025 – RBC Financial Technology Conference........64

M. July 29, 2025 – Q2 2025 Earnings Call........65

N. September 4, 2025 – Jefferies Fintech Conference........67

O. September 9, 2025 – Goldman Sachs Communacopia and Technology Conference........68

P. October 28, 2025 – Q3 2025 Earnings Call........70

Q. December 3, 2025 – UBS Global Technology and AI Conference........71

VI. LOSS CAUSATION........72

A. July 29, 2025 — First Partial Corrective Disclosure/Materialization of the Concealed Risk........73

B. December 3, 2025 — Second Partial Corrective Disclosure/Materialization of the Concealed Risk........75

C. February 3, 2026 — Final Corrective Disclosure/Materialization of the Concealed Risk........77

VII. ADDITIONAL INDICIA OF SCIENTER........80

A. Defendants Publicly Acknowledged Throughout the Class Period that They Closely Monitored the Company's Metrics for Branded Checkout........80

1. Defendants Paid Close Attention to Redesigned Branded Checkout, Which They Called Their Number One Priority........80

2. Defendants Closely Monitored PayPal's Branded Checkout Business Through Key Performance Indicators........82

3. Defendants Publicly Acknowledged Throughout the Class Period That They Closely Monitored Market Share Data........83

B. Defendant Miller's Admissions on the Day of the Final Corrective Disclosure Support a Strong Inference of Scienter........84

C. Defendants Chriss, Kereere, and Keller Personally Directed the Company to Pivot to SMB Merchants to Inflate Adoption Metrics........86

D. Defendant Chriss's Abrupt Departure Supports Scienter ......... 87

VIII. CONTROL PERSON ALLEGATIONS ......... 89

IX. THE STATUTORY SAFE HARBOR IS INAPPLICABLE ......... 90

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ......... 91

XI. CLASS ACTION ALLEGATIONS ......... 92

XII. COUNTS AGAINST DEFENDANTS ......... 94

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ......... 94

COUNT II For Violations of Section 20(a) of The Exchange Act Against the Individual Defendants ......... 96

JURY TRIAL DEMAND ......... 97

Court-appointed Lead Plaintiffs Wayne County Employees' Retirement System, Macomb County Intermediate Retirees Medical Benefits Trust, Macomb County Retirement Health Care Fund, Macomb County Employees' Retirement System, and Norfolk County Retirement System (collectively, "Lead Plaintiffs"), individually and on behalf of all persons and entities who or which, during the period from February 7, 2024 to February 2, 2026, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock of PayPal Holdings, Inc. ("PayPal" or the "Company") (NASDAQ: PYPL) and were damaged thereby (the "Class"),[1] bring this Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws against PayPal; James Alexander Chriss ("Alex Chriss" or "Chriss"), PayPal's former President, Chief Executive Officer ("CEO") and Director; Jamie S. Miller ("Miller"), PayPal's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"); Suzan Kereere ("Kereere"), PayPal's current President, Global Markets; and Frank Keller ("Keller"), General Manager of Large Enterprise & Merchant Platform Group, and current President, Checkout Solutions (Chriss, Miller, Kereere, and Keller are referred to herein as the "Individual Defendants," and together with PayPal, "Defendants"). Lead Plaintiffs bring this action seeking to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

Lead Plaintiffs' claims are brought upon personal knowledge as to their own acts and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by PayPal with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering PayPal and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about PayPal, its business, and Defendants; (4) an investigation conducted by Lead Plaintiffs' attorneys, including interviews with

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of PayPal during the Class Period, and members of their immediate families and any trust established by or for such excluded person; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) PayPal's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

former employees ("FEs"); and (5) other publicly available information concerning PayPal, its business, and the allegations contained herein. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiffs have a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This case involves a well-known financial services company attempting to reverse the declining market share in its core business. But instead of coming clean to the market and confirming what Defendants knew internally to be a significant decline in that key business segment, Defendants instead wove a series of tall tales intended to convince the market that a sharp turnaround was not only in the offing, but had already occurred.

2. Specifically, for nearly two years, Defendants told the market they had successfully turned around PayPal's declining branded checkout business—the Company's most important business segment—and that this resurgence was driving significant revenue growth for the Company. In reality, however, Defendants actually oversaw further declines in PayPal's branded checkout business.

3. Leading into the Class Period, PayPal's branded checkout business—which allows shoppers to complete online purchases using PayPal—was losing ground to competitors, whose payment technologies were more advanced and user-friendly than PayPal's outdated systems. In response, PayPal hired Defendant Alex Chriss as CEO and tasked him with turning around its declining branded checkout business. To do that, Defendant Chriss hired Defendants Miller and Kereere, and together, they announced a new initiative, known as "Redesigned Branded Checkout," which they then publicly touted had upgraded PayPal's technology, successfully fended off increasing competition from Apple Pay and others in the digital payments industry, and therefore, drove revenue growth for the Company.

4. Indeed, throughout the Class Period, Defendants repeatedly misled the market about the success of that initiative. Most notably, Defendants touted the new branded checkout's **adoption numbers** as proof that they were executing and driving branded checkout revenue growth. And when analysts asked whether PayPal was losing market share, Defendant Chriss dismissed the very

suggestion and insisted PayPal had not lost any share. Together, these statements led investors to believe that PayPal had turned a corner, and the new Redesigned Branded Checkout was driving the growth that Defendants had promised.

5. Unfortunately for investors, none of that was true. In reality, the Redesigned Branded Checkout initiative underperformed from the start, as Defendants utterly failed to upgrade PayPal's large, enterprise merchants (such as Uber, Walmart, Target, and other online mega-companies) to the new branded checkout, and knew that the rising **adoption numbers** were driven almost entirely by small and medium businesses ("SMBs"), which generated only a small fraction of the revenue of large enterprise customers.

6. This was a critical failure, as those large enterprise merchants drove nearly all of PayPal's revenue. Without those enterprise customers, PayPal did not realize any actual **revenue growth**, and the Company fell even further behind the competition. Investors knew none of this, and instead believed Defendants that PayPal's rising Redesigned Branded Checkout **adoption numbers** were proof that they were driving growth for the Company.

7. The truth began to slowly emerge when PayPal disclosed disappointing results for branded checkout despite that rising adoption of Redesigned Branded Checkout. But rather than come clean and admit the truth, Defendants kept the illusion going and told the market that it was not their fault that branded checkout was underperforming. Instead, Defendants blamed outside macroeconomic factors for the poor performance and continued to falsely portray the Redesigned Branded Checkout initiative as a resounding success.

8. Defendants finally revealed the full truth when, on February 3, 2026, PayPal disclosed the worst branded checkout growth in recent history and abruptly fired Defendant Chriss just over two years into his tenure as CEO. Then, during the earnings call the same day, PayPal's interim CEO, Defendant Miller, admitted that Defendants' prior statements were false and misleading.

9. For example, Defendant Miller admitted that, contrary to Defendants' prior statements touting rising adoption as proof of success and growth, Defendants had been "too optimistic about how quickly we could drive . . . customer adoption" from its enterprise merchants, which slowed growth and required PayPal to "chang[e] our approach to focus on **strategic merchants**"—meaning

enterprise companies—moving forward. Defendant Miller also admitted that, contrary to Defendant Chriss's repeated denials of any loss of market share, competitive challenges "ha[d] proven critical to branded checkout performance."

10. In response, PayPal's stock price declined by more than **20% in a single day**, as investors finally learned the truth: adoption of Redesigned Branded Checkout lagged behind expectations (due to the failure to convert enterprise merchants), PayPal had lost market share to competitors, and as a result, branded checkout growth was declining precipitously.

**A. Company Background**

11. PayPal is a digital payments company, operating a global platform that connects consumers and merchants on opposite ends of the online transaction. Although the Company has several products and services, its most important is "branded checkout," which allows consumers to pay for purchases online using their PayPal account (through the branded PayPal button that appears on websites and mobile applications). PayPal earns money by charging merchants a transaction fee each time a customer uses PayPal to complete a purchase.

12. Heading into the Class Period, PayPal was falling behind the competition. The Company had not meaningfully upgraded its branded checkout experience for more than a decade, while rivals like Apple Pay and Google Pay rolled out faster, more seamless checkout experiences. As a result, analysts warned before the Class Period that "market share loss to Apple Pay looks increasingly challenging" and that PayPal's branded checkout business was under mounting pressure with no clear turnaround in sight.

**B. PayPal Announced the Redesigned Branded Checkout Initiative**

13. To help reverse its declining business, PayPal turned to Defendant Chriss. In August 2023, PayPal named him its new President and CEO and charged him with a near singular mission: drive profitable revenue growth by fixing branded checkout, the Company's most important business line which generated approximately 60-70% of the Company's gross profit.

14. Defendants wasted no time declaring that "the full weight of the organization" was focused on reinventing PayPal's branded checkout experience through Redesigned Branded Checkout, which they later explained was the Company's "most important initiative" and "number

one priority." Defendants promised that the switch to the new Redesigned Branded Checkout would drive substantial growth in "Total Payment Volume," or "TPV," the financial metric that investors tracked most closely.

15. Indeed, investors tracked branded checkout TPV because it measures how much money consumers actually spend using the PayPal button at checkout. Because PayPal takes a percentage of each transaction, branded checkout TPV is the key indicator of the Company's **revenue** because the more money that flows through PayPal's platform (i.e., payment volume), the more money the Company makes (i.e., revenue).

16. Defendants explained that the new Redesigned Branded Checkout would drive greater TPV for two main reasons. First, it supposedly presented several improvements—such as password-less authentication—that would upgrade PayPal's technology and convince consumers to choose PayPal's branded checkout, which Defendants claimed would translate directly into accelerating branded checkout TPV growth. Second, Defendants explained to investors that the upgrade was necessary to keep up with the competition and maintain PayPal's market share in the branded checkout space.

17. But in order to realize these promised benefits, Defendants needed their merchants to actually upgrade, or "adopt," the Redesigned Branded Checkout experience—a process that required integrating the new branded checkout code to the existing code on a merchant's website or mobile application. Thus, to drive adoption, Defendants knew they needed to make the process quick and easy for the merchants to upgrade to the latest version of branded checkout. If PayPal could not do that, the merchants would choose not to upgrade, and consumers would continue to encounter PayPal's old checkout button—making it more likely that consumers would choose faster, more seamless alternatives, like Apple Pay, and further harm branded checkout TPV growth.

18. Indeed, during the Class Period, Defendant Keller made adoption the express benchmark of success for the initiative, stating that PayPal "will measure success by growing our new [branded checkout] experience share to over 80%" adoption. According to Defendants, 80% adoption of Redesigned Branded Checkout would drive TPV growth significantly because it would make consumers choose PayPal at checkout, driving the payment volume that flowed through PayPal's

systems, and ultimately increasing revenue. Specifically, Defendants told investors that accelerated adoption of Redesigned Branded Checkout would drive branded checkout TPV growth from 6% growth to 8-10% growth by 2027.

19. Importantly, however, the market and the analysts who covered the digital payments space understood that PayPal needed to drive adoption from its largest and most important merchants, the enterprise merchants. While PayPal's branded checkout reaches consumers through both enterprise merchants (large retailers like Uber, Walmart, or Target) and SMB merchants (smaller sellers that typically do not have as many customers), it was these large enterprise merchants that drove nearly all of branded checkout's TPV. For example, according to research analyst UBS, PayPal's enterprise merchants were responsible for 80% of branded checkout's TPV in 2024.

20. Indeed, former PayPal employees confirm the importance of enterprise merchants to branded checkout TPV and revenue. For example, according to FE-5, there are many small merchants that use PayPal's branded checkout, but it is a much smaller number of large enterprise merchants that generate substantially greater volume. Indeed, FE-5 advised that two enterprise accounts, like Uber and Lyft, could mean far more in payment volume than signing 200,000 small businesses.

21. Therefore, in order to drive TPV growth (and therefore, revenue) through Redesigned Branded Checkout, PayPal needed **enterprise** merchants to adopt it.

### C. Defendants Misled Investors About the Success of the Redesigned Branded Checkout Initiative

22. Throughout the Class Period, Defendants made a series of false and misleading statements designed to convince the market that the Redesigned Branded Checkout initiative was a resounding success and that they were executing on everything needed to drive merchant adoption and branded checkout TPV growth.

#### 1. Defendants Falsely Reported Success in Integrating Critical Code Required for Redesigned Branded Checkout Adoption

23. Starting on February 7, 2024 (the start of the Class Period), Defendants made a series of statements designed to convince investors they were successfully driving merchant adoption and therefore branded checkout TPV growth. For example, Defendant Chriss claimed that PayPal was

already "***leveraging no code/low code integrations***" which allowed PayPal to "***take[] a two-week integration and in some cases br[ing] it down to two hours***." Because the growth of branded checkout TPV depended entirely on merchant adoption, which in turn required an easy integration process, Defendant Chriss's statements were not a peripheral detail, but a critical explanation for why investors should believe that Defendants had already taken the steps necessary to grow branded checkout TPV.

24. Defendant Chriss's statements, however, were materially false and misleading because PayPal did not, and indeed could not, integrate enterprise merchants quickly or easily. In truth, as recounted by several former employees, the process to integrate the all-important **enterprise** merchants took a year, if not longer, because those large merchants have complex systems involving multiple providers, vendors, and complex technology that was difficult to reconcile with PayPal's Redesigned Branded Checkout. As a result, PayPal's attempts to get the enterprise merchants to adopt Redesigned Branded Checkout lagged significantly throughout 2024.

### 2. Defendants Falsely Touted Redesigned Branded Checkout's Adoption Metrics

25. Unable to win over large enterprise merchants for Redesigned Branded Checkout, and aware that the market treated adoption as the key to success, Defendants quietly shifted focus to integrating SMB merchants, who were much simpler and faster to upgrade to the new version of branded checkout. That is because many SMB merchants use "partner" e-Commerce partners, like Squarespace or Shopify, that allow them to manage their business and sell their goods without having to custom build their own website. These partner platforms often have hundreds of thousands of SMBs on their platforms. As a result, PayPal is able to distribute its branded checkout product through the partners to all those SMBs by embedding the branded checkout button into the partner's platform rather than requiring each SMB to integrate directly with PayPal.

26. Indeed, the Individual Defendants **personally** made the decision to shift focus to integrating SMBs through partners. For example, FE-5 recalled that the shift and their focus to drive more into the partner world from channel partners occurred before Investor Day in February 2025.

According to FE-5, the decision to expand the strategy to include partners included Defendant Alex Chriss, Defendant Suzan Kereere, Michelle Gill, and Defendant Frank Keller.

27. As a result, PayPal started to see its adoption metrics rise starting in early 2025. However, although the large number of SMBs allowed Defendants to increase the **total number of merchants** on Redesigned Branded Checkout, and thus increase the percentage of total merchants on the new platform, these low-quality merchants contributed very little to branded checkout **TPV and therefore to PayPal's revenue**.

28. Shortly after the switch, Defendants used the resulting increase in adoption rate—driven by SMB merchants—to publicly tout a steady drumbeat of rising adoption metrics that they then misleadingly tied directly to their promised 8-10% branded checkout TPV growth by 2027. For example, on February 4, 2025, Defendant Chriss told investors Redesigned Branded Checkout was "***now live for more than 25% of US checkout traffic***," up from 5% the prior quarter.

29. Weeks later, on February 25, 2025, Defendant Kereere announced Redesigned Branded Checkout was "***already at 30% penetration in the US on the merchant experiences***," and Defendant Miller explained that PayPal would grow "from 6% volume growth last year to at least 8% to 10% [TPV growth] by 2027" by, among other things, "[t]aking our latest branded checkout experience from about 30% coverage in the US today to more than 80% globally by 2027."

30. Throughout the rest of the Class Period, Defendants continued touting the rising adoption of Redesigned Branded Checkout as proof they were executing on the initiative and driving significant branded checkout TPV growth. For example, on May 14, 2025, Defendant Miller told the market PayPal was "***at about 45% as of the end of April [2025]***," which she stated proved PayPal had "***execut[ed]***" on the Redesigned Branded Checkout rollout. Similarly, by mid-2025, Defendants stated that "***more than 60% of our US checkout transaction***s" were on the new experience, which Defendants claimed gave them "confidence that we are on track to achieve our growth outlook for branded checkout TPV."

31. However, Defendants' statements were materially false and misleading because they deliberately created the misleading impression that Defendants' ostensibly successful execution of the rollout was driving an increase in branded checkout TPV growth. That, however, was not true.

32. In reality, the merchants that mattered most—the enterprise merchants who alone generated as much as 80% of PayPal's branded checkout TPV—were **not adopting** the Redesigned Branded Checkout, and the reported jump in adoption rate therefore was not indicative of branded checkout TPV growth. According to FE-4, who worked as a Director and was responsible for managing two enterprise customer platforms, PayPal was seeing growth in the **number** of merchants upgrading to the latest integration, but that growth came mainly from SMBs that did not generate the level of **TPV** that larger enterprise partners did.

33. By touting these headline adoption percentages without disclosing the material fact that low-value SMB merchants were driving the increase and that adoption from enterprise merchants was lagging behind expectations, Defendants created the misleading impression that Redesigned Branded Checkout was driving branded checkout TPV growth, when, in fact, the opposite was true. Indeed, according to former employees, PayPal's branded checkout TPV growth was under pressure at the very same time due to the failed rollout of Redesigned Branded Checkout and a continued loss of market share.

34. For example, according to FE-3—who was a Director of Strategy and Operations, Business Intelligence, from March 2024 through June 2025—payment volume growth was flat and a persistent struggle. FE-3 explained that everyone at PayPal knew that branded checkout was not healthy or growing and that PayPal was losing their checkout volume because competition was taking market share, especially Apple Pay "which killed PayPal."

### 3. Defendants Falsely Stated PayPal Had Not Lost Any Market Share in the Competitive Checkout Space

35. PayPal's failure to adopt enterprise merchants to Redesigned Branded Checkout caused PayPal to fall even further behind the competition and lose payment volume to competitors like Apple Pay. According to FE-3, PayPal tracked market share and "it was tanking" the entire time she was at PayPal.

36. Nevertheless, Defendants maintained this illusion of success by dismissing investors' direct questions about competition and loss of market share in the checkout space. For example, on March 5, 2025, when answering an analyst's seemingly innocuous request for some color on PayPal's

plan to accelerate branded checkout TPV growth, Defendant Chriss not only evaded the question, but went on an aggressive tangent in which he dismissed as "***nonsense***" any (apparent) suggestion that PayPal had lost market share.

37. Doubling down, Defendant Chriss went on to assert that he and other members of PayPal leadership personally "look at the data very, very closely," including, "look[ing] at our share of checkout," and that based on his purported review of that data, PayPal "***ha[d] not seen any degradation in our share of checkout from competitors launching products, whether it's on mobile, whether it's on desktop, whether it's on other platforms***."

38. However, Defendant Chriss (and other Defendants) knew his statements were false when made. Indeed, at the same time Defendant Chriss publicly boasted that PayPal had not lost any market share of checkout, he was participating in meetings where he and other executives discussed branded checkout's failures and loss of market share.

39. For example, FE-3 explained that she participated in monthly Microsoft Teams meetings that were also attended by Defendants Kereere, Chriss, and Miller, and other executives. These meetings focused on Key Performance Indicator (KPI) reports that assessed PayPal's branded checkout (and Braintree, Venmo, etc.) and consistently reflected that branded checkout was suffering the entire time she was there.[2] FE-3 recalled seeing in the numbers detailed in that report which reflected negative growth in comparison to the previous month, year, etc.

40. Indeed, FE-3 was recruited to PayPal by Defendant Kereere. At the time FE-3 was recruited, Defendant Kereere expressed to FE-3 that PayPal was struggling and that she needed them to look for ways in which they could increase PayPal's branded checkout. According to FE-3, Defendant Kereere was "100% aware" of the problems PayPal was facing with the competition and the fact that the Company had an inferior product, primarily to Apple.

---

[2] According to publicly available information, Braintree and Venmo are two products owned and operated by PayPal. Braintree is part of PayPal's "unbranded" payments processing business; whereas Venmo is part of PayPal's branded checkout business.

### D. The Truth Began Emerging While Defendants Continued Misleading Investors and Concealing the Full Truth

41. Based on Defendants' misstatements and omissions, the market believed that PayPal was executing on its Redesigned Branded Checkout rollout and driving branded checkout TPV growth. For example, on June 2, 2025, an analyst from Mizuho stated, "[w]e are bullish on PYPL's prospects of accelerating Branded Checkout TPV growth from mid-single-digits currently to 8-10% over the next 2-3 years, helped by" among other things, "rollout of the new checkout experience, which is live on nearly half of US transactions and drives better conversion for merchants."

#### 1. Defendants Disclosed Slowing Branded Checkout Growth but Blamed Outside Factors for the Underperformance

42. However, the truth began to emerge on July 29, 2025, when PayPal disclosed that branded checkout TPV growth had decelerated to just 5%, which sent PayPal's stock price down more than 8% in a single day and prompted analysts to press Defendants about what was driving the slowdown.

43. For example, during the earnings call the same day, analysts tried to get more color on why branded checkout TPV was decreasing, and not increasing as Defendants had led them to believe, and asked Defendants specific questions about the cause of the decline. But rather than admit the truth—*i.e.*, adoption from the enterprise merchants was stagnant at best and PayPal had lost share to competitors—Defendants falsely blamed macroeconomic factors for the poor performance and slowing TPV growth. Specifically, Defendant Chriss blamed tariff-related headwinds in Asia, claiming that without that pressure, branded checkout TPV "***really would have been at 6%***." Months later, during PayPal's October 28, 2025 earnings call, Defendant Chriss likewise attributed continued weakness to "***choppy global macro trends***" and softening consumer discretionary spending.

44. These statements were false. In reality—and as Defendants admitted a few months later at the end of the Class Period—PayPal's own internal execution failures in rolling out Redesigned Branded Checkout, as opposed to tariffs or macroeconomic softness, caused this poor TPV growth. Indeed, unbeknownst to the market, the real problem was never PayPal's customers or

the macroeconomy; it was PayPal's own failure to execute and drive adoption of the enterprise merchants that caused declining TPV growth.

**2. Defendants Warned of Slowing Growth but Continued Hiding the True Reason for Branded Checkout's Underperformance**

45. Defendants further partially revealed the truth on December 3, 2025, when Defendant Miller warned investors at the UBS Global Technology and AI Conference that fourth quarter branded checkout growth would decelerate "at least a couple of points slower" than the prior quarter's 5% growth. During that conference, Defendant Miller also admitted that progress on merchant integrations was "slower in terms of progress . . . than we had wanted and we had hoped."

46. In response, PayPal's stock price fell by more than 2.6%, as investors braced for slowing growth in the branded checkout business.

47. However, although Defendant Miller warned that branded checkout TPV growth would be a "couple of points slower" than the prior quarter, she continued to mislead investors about the cause of growth deceleration by, once again, blaming macroeconomic pressures instead of Defendants' own execution failures. Specifically, Defendant Miller stated, "***we continue to see consumers spending less, trading down, average order value is down, and just a shifting in that space***"—a false and misleading statement that obscured the fact that Defendants' own strategic failures caused the decline.

48. Indeed, Defendants continued to withhold the full truth: that PayPal had not achieved adoption from enterprise merchants (which slowed branded checkout TPV growth), that PayPal had lost market share (which also contributed to branded checkout's slowing TPV growth), and that PayPal's own execution failures related to the rollout, not macroeconomic pressures, were to blame for the declining branded checkout TPV growth.

**E. Defendants Finally Revealed the Full Truth When They Admitted Their Own Execution Failures Caused Branded Checkout's Decline**

49. Defendants finally revealed the full truth on February 3, 2026, when PayPal disclosed that branded checkout TPV growth had collapsed to just 1%, a sharp deceleration from 5% in the prior two quarters and from the 3% growth analysts had been led to expect after the partial disclosure

on December 3, 2025. PayPal also withdrew its financial outlook entirely and announced that it had abruptly removed Defendant Chriss as CEO—who PayPal had recently hired specifically (and publicly) to turn around branded checkout—after only 29 months in the role.

50. The Company's further disclosures revealed to the market that it fired Defendant Chriss directly because of the failed Redesigned Branded Checkout initiative. As the Company's Board of Directors bluntly put it: "the pace of change and execution" under Defendant Chriss's leadership "was not in line with the Board's expectations." Nor was it in line with the market's expectations—expectations shaped by Defendants' repeated false and misleading statements touting the purported success of Redesigned Branded Checkout.

51. Indeed, the market immediately tied Defendant Chriss's departure to the branded checkout failures that Defendants had previously concealed from investors. For example, on the same day, analysts at RBC Capital Markets commented that "PYPL's abrupt CEO change clearly signifies that the pace of change necessary to turn around Branded Checkout's TPV growth was moving too slowly."

52. Moreover, during the earnings call that same day, Defendants finally came clean and made several admissions that directly contradicted their prior statements.

53. First, contrary to Defendants' prior statements touting rising adoption as proof of success and TPV growth, Defendant Miller acknowledged that PayPal had been "too optimistic about how quickly we could drive change and customer adoption," explaining that the enterprise merchants required far more hands-on integration support than Defendants led investors to believe, which slowed PayPal's progress on driving branded checkout growth and prompted the Company to "chang[e] our approach to focus on strategic merchants," *i.e.*, enterprise merchants, going forward.

54. Second, Defendant Miller admitted that PayPal's own execution failures—not macroeconomic factors—caused branded checkout's underperformance, stating "we haven't executed as well as we need to" and admitting that "operational and deployment issues [] amplified the pressure" branded checkout faced.

55. Third, contrary to Defendant Chriss's repeated denials of any loss in market share, Defendant Miller finally admitted that competitive pressures "have proven critical to branded

checkout performance," including "competition from alternative payment methods" in Germany, which was one of PayPal's largest markets.

56. Based on these revelations, investors finally understood the truth: enterprise merchant adoption of Redesigned Branded Checkout lagged behind expectations, PayPal had lost market share to competitors, and as a result, branded checkout TPV was declining precipitously. In response, PayPal's stock price **fell more than 20% in a single day**.

57. Taken together, the July 29, 2025, December 3, 2025, and February 3, 2026 disclosures eliminated billions of dollars in shareholder value and inflicted substantial losses on investors who purchased or otherwise acquired PayPal common stock during the Class Period in reliance on Defendants' misrepresentations about the success of the Redesigned Branded Checkout initiative. This action seeks to recover those losses for investors.

## II. JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

58. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

59. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

60. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because PayPal is headquartered in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

61. In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### 1. Lead Plaintiffs

62. Lead Plaintiff Wayne County Employees' Retirement System ("Wayne County Employees") is a single employer defined benefit pension plan based in Wayne County, Michigan that provides pension and ancillary benefit services to approximately 10,000 active and retired members. As set forth in its certification (ECF No. 23-2), Wayne County Employees purchased PayPal common stock on the NASDAQ Global Select Market ("NASDAQ") during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

63. Lead Plaintiff Macomb County Employees' Retirement System ("Macomb County Employees") is a single employer defined benefit pension plan based in Macomb County, Michigan that provides pension and ancillary benefit services to approximately 5,000 employees, retirees, and beneficiaries. As set forth in its certification (ECF No. 23-2), Macomb County Employees purchased PayPal common stock on the NASDAQ during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

64. Lead Plaintiff Macomb County Retirement Health Care Fund ("Macomb Health Care Fund") is a public employee health and welfare trust based in Macomb County, Michigan that provides healthcare benefits to approximately 2,300 employees, retirees, and beneficiaries. As set forth in its certification (ECF No. 23-2), Macomb Health Care Fund purchased PayPal common stock on the NASDAQ during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

65. Lead Plaintiff Macomb County Intermediate Retirees Medical Benefits Trust ("Macomb Intermediate Retirees") is a health and welfare trust based in Macomb County, Michigan that serves as a funding vehicle for the Macomb Health Care Fund. As set forth in its certification (ECF No. 23-2), Macomb Intermediate Retirees purchased PayPal common stock on the NASDAQ during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

66. Lead Plaintiff Norfolk County Retirement System ("Norfolk County") is a defined retiree benefit plan established in 1911 and governed by Massachusetts General Laws, Chapter 32.

Led by a five member Board of Trustees, Norfolk County serves approximately 10,000 active and retired members from the County, 19 towns and 21 authorities and special districts. As set forth in its certification (ECF No. 23-2), Norfolk County purchased PayPal common stock on the NASDAQ during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

**2. Defendants**

67. Defendant PayPal Holdings, Inc. ("PayPal") is a Delaware corporation with its principal executive offices in San Jose, California. During the Class Period, the Company's common stock traded on the NASDAQ under the symbol "PYPL."

68. Defendant Chriss was the Company's President and CEO from September 2023 until his departure on February 2, 2026. In his role as CEO of PayPal, Defendant Chriss participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the success of the Company's Redesigned Branded Checkout initiative and its ability to accelerate branded checkout TPV growth.

69. Defendant Miller joined the Company as CFO in November 2023. In February 2025, PayPal announced that Miller had been appointed to the expanded role of CFO and COO. In her role as CFO and COO, Defendant Miller participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact relating to the success of the Company's Redesigned Branded Checkout initiative and its ability to accelerate branded checkout TPV growth. Defendant Miller was also appointed to serve as Interim President and CEO from February 2, 2026 until March 1, 2026 following the departure of Defendant Chriss.

70. Defendant Kereere has been the Company's President, Global Markets since January 2024. In her role as President, Global Markets, Defendant Kereere participated in conferences with securities analysts, during which she made false and misleading statements and omissions of material fact relating to the success of the Company's Redesigned Branded Checkout initiative and its ability to accelerate branded checkout TPV growth.

71. Defendant Keller was the Company's General Manager, Large Enterprise & Merchant Platform Group since April 2024, and is currently President, Checkout Solutions. Prior to his current role, Defendant Keller held various positions at PayPal since beginning in May 2011. In his role as General Manager, Large Enterprise & Merchant Platform, Defendant Keller participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the success of the Company's Redesigned Branded Checkout initiative and its ability to accelerate branded checkout TPV growth.

72. Defendants Chriss, Miller, Kereere, and Keller are collectively referred to herein as the "Individual Defendants." The Company and the Individual Defendants are collectively, in whole or in part, referred to herein as the "Defendants."

73. The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PayPal, possessed the power and authority to control, and did actually control, the contents of PayPal's SEC filings, press releases, investor presentations, and other market communications during the Class Period. The Individual Defendants were provided with copies of PayPal's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

74. Because of their positions within PayPal, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

### 3. Relevant Third Parties: Former PayPal Employees[3]

75. FE-1 was employed by PayPal as the Vice President, Head of Sales in North America from August 2024 until October 2025. She was responsible for selling PayPal's branded checkout products and led a team of 380 salespersons who sold PayPal's checkout solutions to small and

---

[3] All FEs are described in the feminine to protect their identities.

medium sized businesses. FE-1 advised that she was interviewed and hired by Defendant Suzan Kereere who told her that she was being hired to "fix the sales team and pipeline." FE-1 stated that she originally reported to David Bruce who reported directly to Defendant Suzan Kereere. She recalled that Defendant Kereere eventually hired Yolanda Piazza who served as an intermediary between her and Bruce for several months. In June 2025, Bruce was replaced by "an old buddy of Alex Chriss' from Intuit," Norman Happ, who became FE-1's direct report.

76. FE-2 was employed by PayPal as an SMB Marketer from before the Class Period until Summer 2025 and focused on the UK and Germany throughout the Class Period. FE-2 explained that the SMB marketing team was "merged" with the Enterprise Team after the Fall of 2024.

77. FE-3 was formerly employed by PayPal as Director of Strategy and Operations, Business Intelligence, from March 2024 through June 2025. She worked out of PayPal headquarters in San Jose, California. FE-3 advised that she was recruited to PayPal by Defendant Kereere. At the time she was recruited, Defendant Kereere expressed to FE-3 that PayPal was struggling and that she needed them to look for ways in which they could increase PayPal's branded checkout. FE-3 stated that Defendant Kereere reported directly to the CEO. FE-3 advised that she was a part of monthly Microsoft Teams meetings that were also attended by Defendants Kereere, Chriss, and Miller, and other executives. These meetings focused on Key Performance Indicator (KPI) reports that assessed PayPal's branded checkout (and Braintree, Venmo, etc.) and consistently reflected that branded checkout was clearly suffering the entire time she was there. FE-3 recalled seeing in the numbers detailed in that report which reflected negative growth in comparison to the previous month, year, etc.

78. FE-4 was employed by PayPal most recently as a Director managing enterprise partners from before the Class Period until her departure in fourth quarter of 2025. FE-4 explained that in her most recent role she was responsible for managing two enterprise customer platforms that each generated over $50 million in annual payment volume.

79. FE-5 started working at PayPal before the start of the Class Period and left PayPal prior to the end of Q1 2026. FE-5 was a product manager working on new products for PayPal.

80. FE-6 was employed by PayPal as a Manager, Payment Partnerships from December 2024 until May 2026. FE-6 explained that her role was that of a Partner Growth Manager and she was responsible for assisting with migrations and growing Channel Partners, which consisted of e-commerce platforms (website builders), vertical SaaS companies, payment facilitators, and point-of-sale software companies for a book of business consisting of approximately 20 to 30 active Partners, which rotated. FE-6 recalled that when she joined the Company her team was newly created and consisted of approximately seven to eight Partner Growth Managers that supported the Channel Partner Account Executives, who were responsible for managing the overall relationship with the Channel Partner. FE-6 explained that her role was responsible for handling migrations and growing the percentage of merchants under a Channel Partner's umbrella that was processing payments through PayPal. FE-6 explained that migrations consisted of moving Partners from an older PayPal integration to a new integration, including Redesigned Branded Checkout.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Relevant Background

#### 1. PayPal's Branded Checkout Business

81. PayPal is a payments technology company that enables both consumers and merchants to make digital payments online, on mobile devices, and in-store. PayPal operates a global payments platform that serves both a purchaser and a seller on opposite ends of the same transaction. For buyers, PayPal's products allow consumers to pay for purchases online, send money to friends and family, store multiple payment methods in one place, and pay in installments using installment products. For sellers, PayPal allows merchants to accept, process, and secure those payments from around the world.

82. The Company's most important business line is its branded checkout business, which allows consumers to make purchases online using the PayPal or Venmo button without re-entering payment or address information.[4] The branded checkout offering is commonly recognized by consumers as the PayPal or Venmo payment button that appears on a merchant's website or mobile

[4] Indeed, branded checkout is critical to PayPal's business because it is the Company's highest-margin—*i.e.*, most profitable—offering. During the Class Period, analysts estimated that branded checkout was responsible for approximately 60-70% of PayPal's transaction gross profit.

application, which allows the consumer to use PayPal or Venmo to make a purchase. When a customer clicks that button, she can pay through a PayPal-hosted checkout flow using her PayPal balance, linked bank account or credit cards, Venmo, pay later installment options, or even crypto, without having to re-enter their payment and shipping details each time.

83. PayPal's branded checkout business competes directly with other digital payment options that consumers encounter at checkout. These alternatives frequently include Apple Pay, Google Pay, Amazon Pay, Shopify's Shop Pay, among others. When shopping online—either on a desktop or mobile device—consumers typically see multiple payment buttons and can choose which service to use to complete their transaction. PayPal's ability to maintain and grow its branded checkout business depends on consumers selecting the PayPal or Venmo button over these competing options when completing a transaction.

### 2. Total Payment Volume: PayPal's Most Important Metric

84. PayPal earns revenue primarily by charging transaction fees on the money that flows through its platform. For branded checkout, PayPal generates revenue from charging merchants a fee each time a customer pays using PayPal or one of its related products.

85. As a result, PayPal's most important financial metric is Total Payment Volume, or "TPV," which measures the total dollar value of all payments completed through PayPal's platform. Branded checkout TPV essentially tracks the usage of the "PayPal button" on merchant websites and mobile applications, serving as a critical indicator of the Company's core market share and consumer engagement. Because PayPal earns a small percentage of the money that flows through its network, primarily through transaction fees, the greater the TPV (*i.e.*, the more money that flows through PayPal's network), the more revenue PayPal earns.

86. Moreover, the majority of PayPal's branded checkout TPV comes from the enterprise merchants that process high volumes of online payments, such as retailers like Uber, Walmart, or Target.[5] Indeed, although PayPal's branded checkout serves both enterprise merchants and SMB merchants (the smaller sellers), the enterprise merchants generate the vast majority of PayPal's

---

[5] Upon information and belief, PayPal defined an enterprise merchant as a merchant that processed more than $50 million in payment volume annually through PayPal.

branded checkout TPV. For example, on June 23, 2025, UBS estimated that enterprise merchants accounted for approximately 80% of branded checkout TPV in 2024, while SMB merchants contributed approximately only 18%.

87. Indeed, former employees explained that just one enterprise merchant is more valuable to branded checkout TPV than thousands of SMB merchants. For example, according to FE-5, there are many small merchants that use PayPal's branded checkout, but it is a much smaller number of large enterprise merchants that generate substantially greater volume. FE-5 advised that two enterprise accounts, like Uber and Lyft, could mean far more in payment volume than signing 200,000 small businesses.

88. In other words, a single enterprise merchant generates significantly more branded checkout TPV than thousands of SMB merchants combined.

**3. PayPal Needed to Upgrade its Branded Checkout Experience**

89. Leading into the Class Period, PayPal's branded checkout business had fallen behind the competition due to a lack of innovation. Indeed, the market understood that PayPal was losing competitive ground, and that the Company's most profitable business line—branded checkout—needed to be revitalized to keep up with the competition. This need was most evident on mobile devices, where competitors like Apple Pay have built their payment solutions directly into the iPhone, allowing consumers to pay for purchases across all platforms with a single tap using Apple Pay.

90. For example, Mizuho wrote on January 16, 2024 (just before the start of the Class Period), that "Branded Checkout is PYPL's cash cow" but "PYPL's market share remains under pressure." Mizuho explained that its "data suggests that market share loss to Apple Pay looks increasingly challenging." Mizuho went on to note that "Apple Pay is the primary reason for PYPL's share loss, as Apple (by way of the iPhone) is driving a secular change in consumer checkout habits. The iPhone has forced a shift from desktop (where PYPL has historically performed well) to mobile (where Apple is most prevalent and where PYPL's checkout trends are weaker vs. desktop)."

### 4. Defendant Chriss Took Over as CEO and Announced Redesigned Branded Checkout

91. On August 14, 2023, PayPal announced that it had appointed Defendant Chriss as CEO, effective September 27, 2023. Defendant Chriss was specifically brought on to fend off the competition, turn PayPal's branded checkout business around, and drive profitable growth. Following Defendant Chriss's appointment as CEO, he moved quickly to build his executive leadership team. In November 2023, PayPal hired Defendant Miller as CFO.

92. Shortly thereafter, in January 2024, PayPal hired Defendant Kereere as President, Global Markets. Defendant Kereere then began recruiting employees to help fix branded checkout because it was struggling. For example, FE-3 advised that she was recruited to PayPal by Defendant Kereere. At the time FE-3 was recruited, Defendant Kereere expressed to FE-3 that PayPal was struggling and that she needed them to look for ways in which they could increase PayPal's branded checkout.

93. With his new leadership in place, Defendant Chriss wasted no time making it clear that PayPal's top priority was fixing branded checkout. Directly before the Class Period, on January 25, 2024, Defendant Chriss unveiled six new innovations that he claimed would "change the world of payments and commerce" and would be rolled out throughout 2024 in the US and then globally.[6] Chief among these initiatives was a "massively accelerated" and redesigned branded checkout experience ("Redesigned Branded Checkout").

94. Defendants told the market that in order for PayPal to drive profitable growth, it needed to upgrade its branded checkout because it had fallen behind its peers on technological innovation. For example, Defendant Chriss publicly stated that when he joined PayPal "it was clear that [PayPal] had significant work to do to improve branded checkout." He explained that "PayPal

[6] The six initiatives Defendant Chriss announced on this day include: (1) Redesigned Branded Checkout; (2) Fastlane by PayPal, an unbranded guest checkout experience that would reduce guest checkout time by 40%; (3) PayPal Smart Receipts, which would provide customers with AI-personalized recommendations and allow merchants to have more meaningful post-sale interactions; (4) PayPal Advanced Offers Platform, to assist merchants in serving personalized real-time offers to consumers while providing privacy; (5) PayPal Consumer App, which would provide customers with rewards; and (6) Venmo Business Profiles, a growth platform for small businesses.

had fallen behind on innovation" and needed "to be more competitive, particularly on mobile devices." Analysts agreed.

95. For example, on January 9, 2024, shortly before PayPal announced Redesigned Branded Checkout, Morgan Stanley downgraded PayPal specifically because it was "moving too slowly on . . . improving Branded Checkout." On January 25, 2024, in response to Defendant Chriss's announcement of Redesigned Branded Checkout, TD Cowen wrote that it was "encouraging to see management refocusing to address product needs" and that "PYPL . . . is playing catch-up with competitors in Branded Checkout."

96. As a result, Defendants announced Redesigned Branded Checkout and signaled to investors that PayPal was taking steps to reverse any potential competitive decline. Specifically, as Defendants publicly explained, Redesigned Branded Checkout was introduced to update the technology to make it easier for consumers to use PayPal to make purchases online. This is known in the industry as removing "friction," *i.e.*, removing any obstacles or complexities that consumers experience when checking out online by removing interruptions like password prompts or lagging response times.

97. Defendants publicly stated that these updates (*e.g.*, removing friction) would streamline the checkout process for consumers and convince them to choose PayPal over competitors—thereby gaining market share and driving TPV growth. For example, on February 7, 2024, during the Q4 2023 earnings call, Defendant Chriss told the market that the improvements to "redesigned [] branded checkout . . . are aimed at driving a higher selection rate of PayPal and better conversion for our merchants."[7]

**5. The Success of Redesigned Branded Checkout Depended on Merchant Adoption, Especially Enterprise Merchants**

98. The Redesigned Branded Checkout initiative would be successful (and drive

[7] Conversion is the percentage of customers who successfully check out by the total checkout attempts. An attempt starts when a customer clicks the PayPal button and begins the payment process and a successful checkout is when the payment is approved or when the order is created. A lower conversion rate may signal friction in the checkout experience, but a higher conversion rate indicates that more shoppers are completing their purchases smoothly.

incremental branded checkout TPV growth) only if PayPal's merchants actually adopted it, *i.e.*, upgraded to the new branded checkout. Although PayPal needed to upgrade all its merchants, the enterprise merchants were by far the most important—as they were responsible for approximately 80% of branded checkout TPV.

99. If PayPal could not convince the enterprise merchants to upgrade, those merchants would continue using older versions of branded checkout—meaning PayPal would not see the purported benefits of Redesigned Branded Checkout, the Company would fall even further behind the competition, and PayPal would not grow branded checkout TPV and therefore revenue. Indeed, the market understood that in order for PayPal to drive branded checkout TPV, the Company needed the enterprise merchants to adopt Redesigned Branded Checkout, as those merchants drove the majority of branded checkout volume and profit.

### B. Defendants Misled Investors About the Success of the Redesigned Branded Checkout Initiative

100. Leading into the Class Period, the market was focused on Defendants' efforts to turn around PayPal's declining branded checkout business. For example, on January 25, 2024, Jefferies noted that it wanted to know the Company's "basis for [its] belief in an eventual reversal in the trend of share losses in branded checkout." Jefferies went on to note it was "skeptical the tide will ever meaningfully turn in branded checkout (competitive pressure from Apple Pay / Shop Pay, an aging core demographic), and don't expect a meaningful turn in sentiment until investors see proof of a slower pace of share losses."

101. Throughout the Class Period, Defendants made false and misleading statements designed to convince the market that Redesigned Branded Checkout was a success and proof that Defendants had turned around the business and reversed any loss of market share. Specifically, Defendants made a series of materially false and misleading statements stating they made adoption quick and easy for merchants, touting a steady stream of rising adoption metrics as proof that PayPal was driving branded checkout TPV growth, asserting that PayPal had not lost any market share, and blaming macroeconomic factors for Redesigned Branded Checkout's underperformance.

102. Together, Defendants' misstatements misled the market about the success of the Redesigned Branded Checkout initiative and withheld from the public the material fact that Defendants could not adopt enterprise merchants to Redesigned Branded Checkout, which caused declining TPV growth and loss of market share.

**1. Defendants Falsely Claimed They Had the Tools to Make Merchant Adoption Fast and Easy**

103. Defendants knew that merchant adoption was the linchpin of their growth strategy, and that in order to convince them to adopt the new platform, PayPal needed to make the process quick and easy. This was particularly true for the enterprise merchants, who have complex systems, competing priorities, and other payment options to turn to (like Apple Pay).

104. If PayPal was unsuccessful (and could not make adoption simple for those enterprise merchants), the merchants would choose not to upgrade, and consumers would continue to encounter PayPal's old friction-filled checkout button—making it more likely that those consumers would choose faster, more seamless alternatives at check out, like Apple Pay, and further harm branded checkout TPV growth.

105. Just weeks after announcing Redesigned Branded Checkout, Defendant Chriss assured investors that PayPal had developed the necessary tools to make upgrading fast and easy for its merchants. For example, during the Company's earnings call on February 7, 2024, Defendant Chriss boasted that PayPal had new developer tools that sped up adoption:

> [W]e have to drive adoption. So that is having conversations with merchants, ensuring that they're upgrading to our latest innovations, that's ensuring that we make it easy for them as well so that's why you've seen us launch a new developer portal, ***we're creating no-code, low-code experiences so developer can take the demand that they've shown because they have a best-in-class experience now and get it into market***.

106. Similarly, on June 5, 2024, an analyst directly asked Defendant Chriss, "how much easier is it nowadays for the merchants to do the integrations." Defendant Chriss acknowledged that, "it has to be easy for [merchants] to do," because "whether they're large enterprises or small businesses," merchants have limited resources and long roadmaps. Defendant Chriss then went on to state that PayPal had the tools to make integrations fast and easy for both enterprise and SMB

merchants, stating: "***We are leveraging no code/low code integrations. We're leveraging AI to be able to take their old integrations, plug it into our AI and actually spit out code that they can leverage to be able to get up and running. We've taken a two-week integration and in some cases brought it down to two hours***."

107. Defendant Chriss's statements were designed to convince investors that **all** its merchants, including the all-important enterprise merchants, could rapidly adopt Redesigned Branded Checkout because PayPal had removed the complications and made the upgrade process quick and easy for them.

108. But this was false and misleading, as PayPal could not use the low code integrations to fully upgrade the merchants that mattered most: enterprise merchants. Contrary to his public statements, the fast, AI-powered integrations that Defendant Chriss publicly touted were available to a small subset of SMB merchants, but the integration process for enterprise merchants, on the other hand, remained a very long, resource-intensive process that required significant customization—a far cry from the two-hour integration Defendant Chriss publicly touted.

109. For example, FE-5 explained that PayPal did not direct the AI low-code initiative at enterprise merchants, but rather at small and medium-sized merchants that did not have a channel partner handling the integration on their behalf. FE-5 went on to say that no true "no-code" solution exists, since some code underlies every integration, and that the more accurate description is "low-code." Moreover, she advised that the low code solution has very limited customization and flexibility and is poorly suited for enterprise merchants that typically operate more complex systems involving multiple providers, solutions, vendors and an older technology that is more difficult to reconcile with newer technology.

110. Indeed, according to FE-5, only a small group of SMB merchants would use the artificial-intelligence-assisted, low-code approach compared to the number of merchants utilizing channel partners, and those SMB merchants tended to be smaller, lower-volume merchants. She estimated that for enterprise merchants, an artificial-intelligence-generated code framework might account for roughly 60% of the necessary work, with the remainder requiring manual customization.

111. Furthermore, and contrary to Defendants' public statements, the process for merchants to adopt Redesigned Branded Checkout during the Class Period remained complex and time-consuming. According to FE-5, large and enterprise customers often custom build their websites and ripping out code and subsequently rebuilding new code can cause the website to break.

112. FE-5 explained that you can do one integration, and it breaks another unaffiliated integration. She also said that adopting the redesign and new code also takes a long time to do and they must deprioritize other projects to get it done. FE-5 said the process of convincing an enterprise merchant to adopt the new code is typically a months-long process.

**2. Defendants Misled Investors About Loss of Market Share**

113. At the same time PayPal was rolling out Redesigned Branded Checkout, PayPal's desktop market share, where it historically held a dominant position, was also under pressure. In June 2024, at Apple's Worldwide Developers Conference, Apple announced that Apple Pay would be usable for web payments on browsers other than Safari (the default browser for Apple computers), including Microsoft Edge and Google Chrome.

114. Analysts viewed this as a significant threat to PayPal's desktop stronghold. For example, on June 18, 2024, analysts at UBS warned that "the Apple Pay announcement reinforces our view that PayPal Branded Checkout may face a combination of both market share . . . and unit economics headwinds . . . both of which have the potential to be pressured by the success of the Apple Pay desktop offering."

115. Additionally, on July 17, 2024, Autonomous Research published a report saying, "[f]ollowing Apple's [Worldwide Developers Conference] . . . , Branded [checkout] has taken the spotlight as Apple . . . announced changes that include enabling Apple Pay as a checkout option on web browsers outside of Safari and Cash to Tap using iOS 18," and added, "[w]e do worry that if the checkout process for iPhone users on desktop becomes as seamless as in-app/mobile purchases, it could eat into PayPal's market share more aggressively."

116. Given this, analysts eagerly questioned Defendants about competition during the next earnings call on July 30, 2024. For example, an analyst from Mizuho asked Defendant Chriss "about the competitive positioning regarding Apple Pay" and how PayPal's branded checkout could compete

with them. In response, Defendant Chriss flatly denied that Apple Pay or any other competitor was taking market share from PayPal, either on desktop or mobile, stating: "***we are the number one branded experience across all platforms and devices***" and "***we see no degradation in our share over the past four years. So let me say that again. We've held share despite competition***."

117. This was false. In reality, Defendants knew that PayPal was losing significant market share to Apple Pay and others throughout the Class Period. For example, according to FE-3, PayPal was also tracking market share and "it was tanking" the entire time she was at PayPal. FE-3 recounted how those teams could assess how much the merchants had in total sales and how much came through PayPal over the years. FE-3 stated that there are market research teams at PayPal tracking market share who knew internally which customers were growing compared to those that "were tanking." She recounted how those teams could assess how much the merchants had in total sales and how much came through PayPal over the years.

118. FE-3 explained that payment volume growth was flat and a persistent struggle. She added that everyone at PayPal knew that branded checkout was not healthy or growing and that PayPal was losing their checkout volume because competition was taking market share, especially Apple Pay "which killed PayPal." FE-3 stated that PayPal was always looking for ways to "stop the bleeding" from Apple Pay and this was a problem throughout her tenure at the Company, between March 2024 through June 2025. FE-3 advised that she heard concerns about the competition with Apple Pay, Google Pay, Shop Pay, and others daily. According to FE-3, a lot of merchants were putting PayPal lower on the placement stack behind/below companies like Apple Pay, Klarna, Shop Pay, and other checkout solutions. FE-3 explained that there is "only so much real estate" on a webpage for checkout options and users are going to select Apple Pay almost 100% of the time if it is placed above PayPal.

119. PayPal was also losing market share in Germany, one of its largest and most important international markets.[8] For example, FE-2—a former employee who focused on Germany and the UK

---

[8] During the Class Period, on October 8, 2025, Deutsche Bank Research estimated that in fiscal year 2024 Germany represented approximately 18% of PayPal's branded TPV, based on PayPal's disclosures that PayPal had a market share of approximately 80% of the total digital commerce market in Germany.

throughout the Class Period—stated that metrics showed market share was declining throughout her tenure. FE-2 further recalled that a point of conversation during her tenure—before the Class Period until summer 2025—was that PayPal was not growing and was losing market share across both mobile and desktop. FE-2 explained that mobile was losing market share due to the emergence of Apple Pay, which was so easy for consumers to use. FE-2 noted that PayPal was also losing desktop market share, particularly in Germany.

### 3. Knowing Adoption of Redesigned Branded Checkout was Lagging, Defendants Pivoted to SMB Merchants to Inflate Adoption Metrics

120. When Defendants announced Redesigned Branded Checkout, PayPal initially prioritized migrating PayPal's large enterprise merchants—*i.e.*, the merchants that generate the majority of branded checkout TPV—onto the new experience. Although Defendants publicly portrayed the transition to the Redesigned Branded Checkout as a success, in truth, the adoption process was not going well and therefore led Defendants to internally switch PayPal's strategy just a few months in.

121. Indeed, unbeknownst to investors, throughout 2024, the enterprise migration progress was moving far too slowly because of the complexity involved in upgrading years of complex integration code, a process that could take a year or more per enterprise merchant. These enterprise merchants were unwilling to migrate to Redesigned Branded Checkout because the process required them to deprioritize other projects, posed risks of breaking other parts of their checkout systems, and offered uncertain returns.

122. By the end of 2024, Defendants recognized that enterprise adoption was moving too slowly, and in response, shifted their strategy. Rather than continuing to focus only on the difficult work of upgrading branded checkout for enterprise merchants, which is what the market cared about, Defendants internally shifted their focus to also target SMB merchants through "partner merchants" in order to boost adoption metrics.

123. A "partner" is a term of art used within PayPal (and herein) to refer to an outside company, such as an e-commerce platform, that allows merchants to sell products using their platform. Take Squarespace for example. Squarespace helps SMBs sell goods by providing an all-in-

one platform that combines a website, online store, payments, and marketing tools into one platform. Squarespace integrates with payment processors—like PayPal, Apple Pay, or Google Pay—so SMB merchants can start accepting payments quickly. This allows the SMB to manage most of its online business all from one place. Through these partners, PayPal is able to distribute its branded checkout product to SMBs by embedding the branded checkout button into the partner's platform rather than requiring each SMB to integrate directly with PayPal.

124. In other words, PayPal could provide SMB merchants with branded checkout through the e-commerce partner merchant—like Squarespace, Shopify, or a similar platform—which provided pre-built PayPal integrations for all the smaller merchants on their platform. As a result, Defendants' shift to focus on SMB and partner merchants allowed PayPal to quickly increase the total number of merchants on Redesigned Branded Checkout, but critically, did not necessarily increase in any material way the **amount of TPV** the Company needed to generate in order to drive revenue.

125. Indeed, Defendants Chriss, Kereere, and Keller personally directed PayPal employees to focus on integrating SMB merchants in order to boost adoption metrics. For example, FE-5 recalled that PayPal's original strategy focused on enterprise merchants, but that those merchants moved slowly with longer buying cycles, older code and have more need for rip and replace. FE-5 recounted that PayPal subsequently shifted its strategy to pursue enterprise and partner merchants simultaneously in order to accelerate adoption. FE-5 recalled that the shift and their focus to drive more into the partner world from channel partners occurred before Investor Day in February 2025. According to FE-5, the decision to expand the strategy to include partners included Defendant Alex Chriss, Defendant Suzan Kereere, Michelle Gill, and Defendant Frank Keller.

126. FE-5 explained that small businesses typically integrate with PayPal through shopping carts or e-commerce platform partners, and that those partner platforms tend to maintain a more current code because when the partner performs a single upgrade, it automatically extends to every merchant on that platform. By contrast, she explained that a large, direct enterprise merchant requires its own individual integration, meaning PayPal must repeat that work separately for each such merchant.

127. FE-5 further explained that PayPal counts each merchant as a single adoption when a partner upgrades to the redesigned branded checkout. She explained that if BigCommerce upgraded and had 100,000 merchants on its platform, PayPal's metrics would reflect a large portion of those 100,000 merchants, consistent with standard industry practice. FE-5 stated that getting a partner to adopt the upgraded redesigned checkout would be a way to get a lot adopted at once.

128. However, the shift to focus on SMB merchants did not add much to TPV growth because those SMB merchants made up less than 20% of branded checkout TPV. *See supra* ¶86. For example, according to FE-5, there are many small merchants that use PayPal's branded checkout, but it is a much smaller number of large enterprise merchants that generate substantially greater volume. Indeed, FE-5 advised that two enterprise accounts, like Uber and Lyft, could mean far more in payment volume than signing 200,000 small businesses.

129. Therefore, although PayPal could sign up thousands of SMB merchants quickly (through their e-commerce partner), this increase in adoption did not drive TPV the same way large enterprise merchants did.

130. FE-5 explained that the fastest path to get to scale typically requires pursuing both partner and direct enterprise merchants simultaneously, since a partner-only approach often yields quantity of merchants and transactions, without necessarily yielding higher-quality, higher-volume merchants, whereas majority of direct enterprise merchants are more quality and typically tend to concentrate more transaction volume in a single relationship.

131. Similarly, according to FE-6, some partners, such as Shopify and Squarespace, had a "tremendous" number of merchants. According to FE-6, Partners dealt primarily with SMB merchants and while total merchant numbers are significant, they individually produce lower total payment volume ("TPV").

#### 4. Defendants Touted Misleading Adoption Metrics While Promising 8-10% Branded Checkout TPV Growth

132. On the heels of this strategy shift, Defendants publicly reported that adoption metrics accelerated quickly. Indeed, during the Company's Q4 2024 earnings call on February 4, 2025, Defendant Chriss told investors that "win[ning] checkout" was PayPal's number one priority, and

touted that Redesigned Branded Checkout was "***now live for more than 25% of US checkout traffic, which is up from 5% last quarter***."

133. Then, just weeks later, on February 25, 2025 during Investor Day ("Investor Day"), Defendant Kereere announced that Redesigned Branded Checkout was purportedly "***already at 30% penetration in the US on the merchant experiences***." Similarly, Defendant Miller said that PayPal was, "[t]aking our latest branded checkout experience ***from about 30% coverage in the US today*** to more than 80% globally by 2027."

134. Critically, at this time Defendants told investors that this accelerated adoption of Redesigned Branded Checkout would drive branded checkout TPV growth to 8-10% by 2027. For example, at Investor Day, Defendant Keller told investors, "I know you're all interested in understanding our growth expectations for branded checkout. Our plan is to accelerate TPV growth to between 8% and 10% by 2027**. We will measure success by growing our new experience share to over 80%** . . . ." In other words, Defendants told investors that adoption was the key driver of TPV growth—the more merchants that adopted Redesigned Branded Checkout, the more branded checkout TPV would accelerate.

135. The message to investors was clear: the path to 8-10% branded checkout TPV growth, and therefore revenue growth, depended on merchant adoption, and that the Company planned to grow TPV by getting to 80% adoption by 2027. Indeed, Defendant Keller presented the slide below during his portion of the Investor Day Presentation:



136. Defendant Miller then explained that adoption of Redesigned Branded Checkout would grow branded checkout TPV. Specifically, Defendant Miller stated, "[t]his chart shows our path from 6% volume growth last year to at least 8% to 10% by 2027" and explained that PayPal's "strategy is underpinned by three key building blocks" including, "modernizing checkout solutions to drive higher selection rates" and "[t]aking our latest branded checkout experience from about 30% coverage in the US today to more than 80% globally by 2027." In other words, Defendants specifically led the market to believe that rising adoption would lead to branded checkout TPV growth.

137. Defendants' statements touting the rising adoption of Redesigned Branded Checkout were therefore false and misleading because, contrary to what Defendants led investors to believe, PayPal's ostensibly rising adoption metrics did not cause a commensurate increase in TPV. Critically, and unbeknownst to investors, although the adoption metrics reflected a growing number of total merchants on Redesigned Branded Checkout, the rising adoption metrics **did not reflect enterprise merchants adopting the redesign**, and thus, **did not reflect growing TPV growth**.

138. Instead, these misleading adoption metrics came mostly from Defendants' deliberate pivot to target SMB merchants and platform partners to boost adoption metrics (even though those merchants contributed comparatively little to branded checkout TPV). Indeed, Defendants knew—but withheld from investors—the material fact that rising adoption (from SMB merchants) was not translating into any increase in branded checkout TPV.

139. For example, according to FE-4, PayPal was seeing growth in the number of merchants upgrading to the latest integration, but that growth came mainly from SMBs that did not generate the level of TPV that larger enterprise partners did. FE-4 recalled that the Company saw smaller accounts adopt the new integration more quickly and explained that an account with $3 million in TPV could complete an integration in approximately 30 days whereas a large enterprise customer could take between 12 to 18 months.

140. Further, FE-4 recalled that the slow pace of adoption was tracked in Salesforce. FE-4 explained that Salesforce adoption metrics showed that Enterprise customers were not adopting as quickly as had been expected.

141. As a result of this slow adoption from enterprise merchants, internally, PayPal's leadership was raising alarm bells. According to FE-4, the Company was not tracking to get to 80% adoption and was constantly behind schedule with adoption. FE-4 attended division meetings with approximately 300 attendees that were generally led by Michelle Gill—former EVP, General Manager, Small Business and Financial Services Group / Agentic Commerce—and occasionally attended by Defendant Kereere. FE-4 recalled that her takeaway from these meetings was that the Company was not where it needed to be to achieve its path to 80% adoption. FE-4 explained that the talking points were "we need to accelerate" adoption of the latest integration and "double down."

142. Given the problems Defendants faced upgrading enterprise merchants, PayPal's branded checkout TPV was not growing as Defendants publicly led investors to believe. However, without knowledge of the true facts, the market believed PayPal was executing on its Redesigned Branded Checkout initiative and driving significant growth for the Company. For example, on February 25, 2025, Deutsche Bank Research wrote that "[a] key part of PYPL's strategy for future growth is to continue winning share at checkout. To do this, PYPL highlighted efforts in consumer selection, improving the checkout experience, and **driving continued merchant adoption**."

143. Similarly, on February 25, 2025, J.P. Morgan wrote, "[t]oday 30% of Branded Checkout's U.S. volume is on its modern experience (from 5% last October) . . . . By 2027, PayPal expects over 80% of its global checkout volume to be on this modern experience, helping (along with other efforts) to drive a 1-2ppt acceleration in checkout TPV growth."

144. Analysts also relied on Defendants' misleading adoption metrics to model branded checkout TPV growth. For example, on February 26, 2025, after Defendants disclosed 30% adoption, UBS expected branded checkout TPV to grow on the heels of rising adoption. UBS wrote: "[a]ssuming ~100-300bps of conversion uplift from the new experiences," applying that improvement to the "incremental ~80% of volume that would benefit from this uplift (given management's target of >80% of branded transactions on the new experience by 2027)" would "represent ~180bps of growth uplift over the cumulative period" and "[o]n an annual basis, this would represent ~60bps contribution annually to the Branded TPV growth algorithm." Similarly, on March 10, 2025, Jefferies wrote that "Branded Checkout . . . TPV growth can accelerate to 7%+ in FY27 as ~80% of global

checkout volume is expected to migrate onto the latest branded experience [], leading to increased share as the better [user experience] contributes to higher selection by consumers."

**5. Defendants Continued to Deny Any Loss of Market Share and Dismissed Competitive Threats as "Nonsense"**

145. At the same time, analysts pressed Defendants on whether PayPal was losing branded checkout share to competitors, and Defendants repeatedly assured the market that PayPal's competitive position was stable. In fact, Defendants went so far as to flatly reject the notion that competition was taking market share from PayPal.

146. For example, on March 5, 2025, Defendant Chriss explicitly dismissed any rumors of PayPal losing market share, stating that based on "***all the data that I look at, the rumors are nonsense***." Defendant Chriss further went on to assure investors that PayPal had not lost any market share in mobile or desktop, stating, "***we have not seen any degradation in our share of checkout from competitors launching products, whether it's on mobile, whether it's on desktop, whether it's on other platforms***."

147. These categorical denials by Defendant Chriss directly contradicted what Defendants knew was happening behind the scenes. While Defendants assured investors that competitive threats were "***nonsense***" and that PayPal had "***not seen any degradation***" in market share, former employees confirmed that internally, Defendants knew PayPal was losing market share to Apple Pay. *See, e.g.*, Section IV(B)(2). Moreover, Defendant Chriss's false reassurances were particularly significant because Defendants created Redesigned Branded Checkout for this exact reason—to help PayPal keep pace with competitors like Apple Pay by improving consumer experience. By dismissing competitive threats, Defendants signaled to investors that Redesigned Branded Checkout was working, and consumers were choosing the PayPal button over competitors.

**6. Defendants Continued to Report Rising Adoption Figures That Created a Misleading Impression of Branded Checkout Growth**

148. Despite ongoing competitive pressure and failure to convince enterprise merchants to adopt Redesigned Branded Checkout, Defendants kept publicly touting higher adoption numbers to investors. On April 29, 2025, Defendant Chriss told investors at the Q1 2025 earnings call that PayPal

had "***driven a 25-point jump to more than 45% of U.S. checkout traffic***" and Defendant Chriss boasted that "***[t]his shows we can execute***, and we anticipate an even faster rollout for Europe starting in the second quarter."

149. But in reality, the rising adoption metrics did not prove that PayPal was executing on the Redesigned Branded Checkout rollout. In fact, the opposite was true—PayPal was suffering from severe execution problems, as they could not convince the enterprise customers to adopt the new branded checkout, which caused declining branded checkout TPV growth and loss of market share. *See supra* Section IV.(B)(4). As a result, Defendants' statements touting adoption metrics as proof that PayPal was executing on its growth strategy created the misleading impression that the Redesigned Branded Checkout initiative was successful and driving the branded checkout TPV growth Defendants had promised.

150. Analysts relied on Defendants' false and misleading adoption metrics and believed that, based on those numbers, PayPal was executing on Redesigned Branded Checkout and would deliver strong branded TPV growth. On June 2, 2025, Mizuho stated, "[w]e are bullish on PYPL's prospects of accelerating Branded Checkout TPV growth from mid-single-digits currently to 8-10% over the next 2-3 years, helped by," among other things, "rollout of the new checkout experience, which is live on nearly half of US transactions and drives better conversion for merchants."

151. Similarly, on June 26, 2025, RBC Capital Markets wrote under a header titled "[r]evamped Branded checkout gaining traction" that they view PayPal's "target of accelerating TPV growth to 8-10% in FY27" based on, among other things, improved branded checkout flow design, "predicated on merchant volumes shifting to the modern experiences, which as of now is 45% penetrated in US volumes." RBC Capital Markets continued, "[w]e expect that as management moves towards the >80% of global transactions on the modern experiences, TPV can accelerate, based on higher user adoption."

152. Unfortunately for investors, Defendants' false and misleading statements concealed the truth: the Redesigned Branded Checkout rollout was a failure, the adoption figures were driven by low-value SMB merchants who contributed little to branded checkout TPV, and, as a result of the execution failures, branded checkout TPV was declining.

### C. The Truth was Partially Revealed When Defendants Disclosed Disappointing Branded Checkout TPV in July 2025

153. On July 29, 2025, Defendants partially revealed the truth regarding the failure of Redesigned Branded Checkout during the Company's Q2 2025 earnings call. During the call, Defendants revealed that branded checkout TPV was lower than the 6% growth the market expected. Specifically, during the Q2 2025 earnings call, Defendant Chriss stated:

> **Starting with online branded checkout. TPV, including PayPal, BNPL [Buy Now Pay Later], and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year**. Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs.

154. This disclosure surprised and disappointed analysts because, as Autonomous Research put it on July 29, 2025, "we think investors were hoping for more." Ahead of PayPal's Q2 2025 earnings disclosures, analysts expected that branded checkout TPV growth would be 6% based on Defendants' previous statements touting the progress of Redesigned Branded Checkout and its supposedly rising adoption. This disclosure, however, began to reveal to investors that Defendants' positive statements about the purported success and adoption of the Redesigned Branded Checkout were false and misleading. Indeed, following this unexpected news, investors were confused why adoption of Redesigned Branded Checkout was not translating to meaningful branded TPV growth.

155. For example, on July 29, 2025, Evercore wrote that although Redesigned Branded Checkout penetration was running ahead of PayPal's expectations, "the broader rollout has yet to drive meaningful TPV uplift which caused concern with some investors about the longer-term potential to accelerate growth given how mgmt touted its importance at the recent investor day." Similarly, on July 29, 2025, CFRA wrote, "[w]e think investors are reacting negatively to sequential deceleration in key metrics, with branded checkout slowing to 5% (+6% in Q1) despite significant investments in new experiences . . . ."

156. As a direct and proximate result of this partial corrective disclosure and/or materialization of the concealed risk, shares of PayPal common stock fell from $78.22 per share on July 28, 2025, to $71.45 per share on July 29, 2025, a decline of over 8% in a single day.

**D. Defendants Continued to Mislead Investors About the Success of Redesigned Branded Checkout**

**1. Defendants Blamed Macroeconomic Factors for Underperformance**

157. At the same time Defendants partially disclosed the truth, however, they nevertheless continued misleading investors by reassuring the market that Redesigned Branded Checkout adoption was still growing and blaming tariffs for its underperformance.

158. Indeed, during the Q2 2025 earnings call on July 29, 2025, Defendants told investors that the branded checkout TPV deceleration was unrelated to operational or deployment issues, but rather, resulted from external macroeconomic factors outside of PayPal's control. Specifically, Defendants blamed tariffs for their poor performance, stating PayPal had experienced "headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs."

159. During the earnings call, analysts tried to get more color on why branded checkout TPV was not increasing. For example, one analyst asked about the lower-than-expected branded TPV growth, asking:

> Great to see your strategic plan really gaining momentum this quarter. I wanted to ask about branded online checkout TPV, which decelerated just a bit quarter-over-quarter to remain pretty stable for a few quarters. Sounds like tariffs are offsetting some of your own efforts . . . to accelerate branded online TPV growth. How meaningful was the tariff headwind on branded online checkout TPV in Q2? And in July, are you seeing a stable tariff-related headwind there, or is that a metric - on that same metric, or could we see the headwind change and potentially intensify?

160. In response, Defendant Chriss falsely stated that without the tariff-related headwinds, branded checkout TPV would have been higher. Specifically, Defendant Chriss stated:

> Ramsey, thank you for the question, and I appreciate the comments on branded checkout. Look, we're excited as well. I think our execution on the global rollout, the U.S. rollout is exactly what we were looking for. And really, the cohorts that we now have live in market are delivering exactly the way we expected. To the comment on these

> platforms from Asia, the way we think about it is ***without that pressure, our branded checkout really would have been at 6%***. And so it's a small amount, but we've started to see it stabilize a little bit as we get into this month.

161. This, however, was false. In reality—and as Defendants would later admit—branded checkout's TPV was declining because of operational problems related to the Redesigned Branded Checkout rollout. Indeed, former employees confirm that branded checkout TPV growth was facing pressure throughout the Class Period.

162. For example, FE-3 explained that payment volume growth was flat and a persistent struggle. She added that everyone at PayPal knew that branded checkout was not healthy or growing and that PayPal was losing their checkout volume because competition was taking market share, especially Apple Pay "which killed PayPal."

163. Analysts accepted Defendants' misrepresentations and indicated they believed PayPal's long-term growth prospects remained stable and unchanged. For example, on the same day, analysts from Mizuho noted "2H looks strong" as "[w]e believe PYPL is better set up for 2H25 as the new branded [user experience] continues to roll out across US and Europe merchants (currently rolled out to mid-teens % of global transactions, including >60% in the US)." Analysts from Jefferies similarly stated, "Branded TPV expected to accelerate in the coming quarters and exit this year at a higher level on the back of continued progress in upgrading merchants to the latest checkout experience (15% of global transactions are on upgraded [user experience])." Analysts from UBS "believe[d] the PayPal Branded Checkout modern experience rollout, marketing spend, and increased pace of innovation are all supportive of continued growth in the core business."

164. Finally, a day later on July 30, 2025, analysts from Mizuho stated, "PYPL shares sold off post reporting 2Q results as branded checkout FXN TPV growth decelerated modestly Q/Q and 2H transaction margin dollar guidance was softer than hoped (although we believe it's simply conservatism and see upside as the [user experience] rolls out across the global merchant base)."

### 2. Defendants Continued Touting the Rollout of Redesigned Branded Checkout

165. Following PayPal's disclosures on July 29, 2025, Defendants repeatedly touted that Redesigned Branded Checkout had exceeded 60% in U.S. transactions processed through merchants on Redesigned Branded Checkout in the U.S., and everything was proceeding exactly as they had planned. Defendants also assured investors that PayPal had begun rolling out Redesigned Branded Checkout in the United Kingdom and Germany, and that global checkout traffic had reached 15%.

166. For example, on October 28, 2025, during PayPal's Q3 2025 earnings call, PayPal disclosed that branded checkout TPV remained at 5% growth, stalled at the same percentage as the prior quarter. However, Defendant Chriss assured investors that Redesigned Branded Checkout was going well and claimed that the rising adoption in the U.S. had directly caused double the volume growth of branded experiences.

167. Specifically, Defendant Chriss stated PayPal "reached 10% branded experiences volume growth in the US, more than double our growth in the same quarter a year ago. ***That acceleration comes from two things: growing omnichannel adoption and sustained improvement in the US online branded checkout trends, supported by our improved experiences***."

168. Defendant Chriss then told investors that branded checkout's TPV growth of 5% was "***solid growth, especially with the choppy global macro trends we continue to see this quarter***," thereby further blaming macroeconomic factors—not execution failures—for stagnating branded checkout TPV growth.

169. Defendant Chriss's assurances painted a picture of a successful rollout of Redesigned Branded Checkout, and assured investors that the promised acceleration in branded TPV was just around the corner: adoption was supposedly soaring, Defendants were expanding internationally, the rollout was proceeding exactly as they expected, and once macroeconomic headwinds abated, branded checkout TPV would grow with the purportedly strong adoption of Redesigned Branded Checkout.

170. Analysts trusted Defendant Chriss's assurances. On October 28, 2025, Bernstein specifically addressed PayPal's disclosures and noted that investor day guidance (of 8-10% branded TPV growth) assumed a stable macro environment:

> On macro, management mentioned that they've seen softer consumer spending in Europe and US later in the quarter, offset by better volumes from Asia-based marketplaces selling into the U.S. related to tariffs. Mgmt also reminded investors that the 2027 guidance laid out on Investor Day was under the assumption of consistent consumer environment.

171. On October 29, 2025, Morgan Stanley wrote, "PayPal's Online Branded Checkout grew 5% again in 3Q (vs. 5% in 2Q and 6% in 1Q), with mgmt. calling out pockets of consumer spend weakness around the global and smaller basket sizes even as tariff-related headwinds with Asia merchants abated."

**E. Defendants Further Revealed the Truth When They Warned That Branded Checkout TPV Would Slow**

172. On December 3, 2025, Defendants partially revealed the truth regarding their execution failures associated with Redesigned Branded Checkout. Specifically, at the UBS Global Technology and AI Conference, Defendant Miller warned investors that "we're expecting . . . the fourth quarter branded checkout growth will grow at least a couple of points slower than what we saw in the third quarter."

173. Additionally, in discussing branded checkout growth, Defendant Miller stated, "what we're very focused on is the fact that it's just taking longer to really see the momentum start to shift in the areas we're spending time on," and regarding branded checkout and other products, "if I'm candid, it's slower in terms of progress and in terms of the work effort than we had wanted and we had hoped." Finally, Defendant Miller admitted it was taking longer than expected to get merchants to adopt Redesigned Branded Checkout, stating:

> And because we've been in this business for so long, some of those date back years and are very complex, all the way up to merchants who are on more of our latest integrations, where it's a very simple and easy upgrade process for them. I think what we found is that **there's a real mixed range in terms of how this process can work with our merchants. In many cases, it takes longer than we expected**.

174. As a direct and proximate result of this partial corrective disclosure and/or materialization of the concealed risk, shares of PayPal common stock fell from $62.90 per share on December 2, 2025, to $61.24 per share on December 3, 2025, a decline of over 2.6%.

175. However, Defendants continued to hide the full truth from investors. At the same conference, Defendant Miller still maintained that macro pressure was persisting and hurting branded checkout performance—not any self-inflicted execution failures. For example, in response to a question inquiring into the "slight deceleration [of branded checkout TPV] expected in Q4," Defendant Miller stated:

> Having said that, to your point, we called out in our third quarter earnings call that we had seen some macro pressure in September that had persisted into October, and ***we are continuing to see that persist in our performance in November***. When you look below the surface, we are a very middle income, lower income, main street America sort of consumer base in our portfolio. We also skew retail and a little bit more discretionary. And when you look at that, ***[] we continue to see consumers spending less, trading down, average order value is down, and just a shifting in that space***. And that has persisted. We also have tougher comps this quarter versus last year. Last year, we had real strength in things like gaming and travel verticals and things like that. But as you look at fourth quarter, what we're expecting at this point is that the fourth quarter branded checkout growth will grow at least a couple of points slower than what we saw in the third quarter. But when you pull up and look at the financial framework for the quarter, our guidance, we're well intact on that front.

176. Although Defendant Miller warned that branded checkout TPV growth would be a "couple of points slower" than the prior quarter, she continued to attribute the weakness to macro-related issues, including consumers spending less and declining average order values, which had the effect of concealing the full truth from investors.

177. Analysts accepted Defendant Miller's explanation at face value. Having been told that the slowdown was driven by macro headwinds that would cause branded TPV growth to slow a "couple of points," analysts adjusted their models to expect 3% branded checkout TPV growth in Q4 2025. For example, on December 4, 2025, UBS wrote, "[m]anagement expected Branded Checkout TPV in Q4 2025 to see at least a few points of deceleration from Q3 2025 on the back of macro pressure persisting in October through November . . . ."

178. Similarly, on January 4, 2026, analysts at Citi wrote that they are now estimating 3% branded checkout TPV in Q4 2025, and cited that PayPal told investors the branded checkout TPV deceleration was due to a "discretionary retail spending slowdown from middle- and low-income bracket consumers, particularly in the U.S. and Europe" and the slowdown "began in September, persisted across November."

179. Analysts did not know, however, the full extent of the underperformance. Although Defendants warned of some underperformance, they failed to disclose the full extent of that underperformance, including that PayPal had not achieved adoption from enterprise merchants, that PayPal's loss of market share had contributed to the underperformance, and that PayPal's own execution failures, not macroeconomic factors, were to blame for the declining branded checkout TPV growth.

### F. Defendants Fully Revealed the Truth Regarding Redesigned Branded Checkout When PayPal Reported Branded Checkout TPV Growth of Merely 1%

180. On February 3, 2026, the house of cards came crashing down. On that day, PayPal shocked investors by disclosing that branded checkout TPV growth had collapsed to just 1%—a nearly total deceleration from 5% in the prior two quarters, and a sharp deceleration from the 3% growth analysts were led to believe just two months before on December 3, 2025. PayPal also withdrew its financial outlook entirely. The bad news did not stop there. PayPal also announced that Defendant Chriss—the person responsible for leading the Redesigned Branded Checkout initiative—was removed from his position just 29 months into his tenure as CEO.

181. During the Q4 2025 earnings call, Defendant Miller corrected many of Defendants' prior misstatements and omissions during the Class Period—effectively admitting that their prior statements were false and misleading.

182. First, contrary to Defendants' prior statements touting rising adoption as proof that the Company was executing well and driving TPV growth, Defendant Miller admitted, "we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base." Defendant Miller explained that "[t]he reality is our merchants, **especially the largest ones**, have many competing priorities and require much more hands-on integration support than we

anticipated, which has slowed our progress." Defendant Miller then told investors that PayPal needed to focus on these enterprise merchants, stating their prior "approach has slowed our ability to move quickly on what matters most" and as a result, they were "changing our approach to focus on strategic merchants," *i.e.,* the enterprise merchants.

183. Second, contrary to Defendants' prior misstatements blaming macroeconomic factors for declining branded checkout performance, Defendant Miller admitted that Defendants' own execution failures were responsible for the underperformance. For example, Defendant Miller stated, "**we had operational and deployment issues that amplified the pressure**." Miller continued, "while challenges in the macro environment are real, **we haven't executed as well as we need to**, and our product deployment in the second half of the year was slower than we planned."

184. Third, contrary to Defendants' repeated misstatements claiming that PayPal had not lost any market share, Defendant Miller finally admitted that competitive challenges had proven to be "critical" to branded checkout's underperformance. Specifically, Defendant Miller admitted that "the combination of biometric adoption and **competitive presentment have proven critical to branded checkout performance**." Similarly, Defendant Miller admitted that "international headwinds, particularly in Germany," caused branded checkout TPV to decline because of, among other things, "competition from alternative payment methods."

185. Defendant Miller's admissions belied precisely what investors heard from Defendants—and therefore believed—throughout the Class Period. Indeed, Defendants had repeatedly touted rising adoption metrics as proof that Redesigned Branded Checkout was working and driving TPV growth. Defendants also repeatedly told investors that with the upgrades to branded checkout, PayPal had not lost any market share to competitors such as Apple Pay.

186. Investors cared about these statements because Redesigned Branded Checkout was meant to upgrade branded checkout to keep up with competition and drive profitable growth for the Company. Defendants' misstatements hid from investors the truth—that enterprise merchants' adoption of Redesigned Branded Checkout lagged behind expectations, PayPal had lost market share to competitors, and that, as a result, branded checkout TPV was not increasing, but in fact was actually declining precipitously.

187. Investors were shocked by the February 3, 2026 disclosure and Defendant Miller's admission revealing the Redesigned Branded Checkout rollout was not as successful as Defendants led them to believe. In response, the price of PayPal's common stock declined dramatically, from a closing market price of $52.33 per share on February 2, 2026 to $41.70 per share on February 3, 2026, **a decline of over 20% in a single day**.

188. Analysts immediately reacted to the news, noting the results were far worse than expected. On February 3, 2026, Evercore's analyst noted that PayPal's branded checkout online TPV growth of 1% was "**the lowest growth quarter in recent history**." Similarly, on February 3, 2026, analysts at Autonomous Research underscored the magnitude of the surprise: "[a]ll in, investors were expecting a guide below Street for 2026, but this is **far worse** than most anticipated, and we're also getting a CEO change."

189. Moreover, analysts and news outlets directly connected Defendant Chriss's departure to the branded checkout failures that Defendants had concealed from investors. For example, on February 3, 2026, analysts at RBC Capital Markets commented that "PYPL's abrupt CEO change clearly signifies that the pace of change necessary to turn around Branded Checkout's TPV growth was moving too slowly."

190. Similarly, on February 3, 2026, CTOL Digital Solutions wrote that "PayPal's core economic engine," branded checkout, was a "single metric bleeding out in silence" and "[t]he board's language was surgical: the 'pace of change and execution was not in line with expectations.' In governance terms, that is a firing."[9] A day later, on February 4, 2026, Christian & Timbers wrote, "[b]oards rarely use blunt language in CEO transitions. This time, the urgent message was explicit: execution speed was the problem, and the reset could not wait."[10]

---

[9] Lakshmi Reddy, *PayPal CEO Ouster: The Branded Checkout Crisis Behind the Boardroom Shake-Up*, CTOL Digital Solutions (Feb. 3, 2026), https://www.ctol.digital/news/paypal-ceo-ouster-branded-checkout-crisis-boardroom-shake-up/.

[10] JC Christian, *PayPal CEO Forced to Step Down with Immediate Effect*, Christian & Timbers (Feb. 4, 2026), https://www.christianandtimbers.com/insights/paypal-ceo-forced-to-step-down-with-immediate-effect.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

191. Throughout the Class Period, Defendants made numerous materially false and misleading public statements and omissions, including during investor earnings calls and conferences, press releases, and SEC filings.[11]

192. As outlined below, Defendants repeatedly touted the purported success of the Redesigned Branded Checkout initiative and issued false and misleading statements to investors that stated PayPal had AI-powered tools to make adoption quick and easy for merchants, touted purportedly strong adoption metrics as proof that the Company was driving branded checkout TPV growth, claimed PayPal had not lost any market share to competitors like Apple Pay, and blamed macroeconomic factors for branded checkout's underperformance. Together, Defendants' false and misleading statements and omissions led investors to believe that PayPal was executing on its strategy and driving TPV growth through the adoption of Redesigned Branded Checkout. In truth, however, the rollout of Redesigned Branded Checkout was a failure, as PayPal could not convince enterprise merchants—the merchants that drove most of branded checkout's TPV—to adopt the new experience, and competitors, such as Apple Pay, were taking significant share from PayPal.

### A. February 7, 2024 – Q4 2023 Earnings Call

193. On February 7, 2024, the Company held an earnings call to discuss Q4 2023 financial results. During the call, an analyst from KBW asked Defendant Chriss which of the six initiatives, announced by the Company on January 25, 2024, would "yield the returns quickest" and specifically inquired into their timing. Specifically, the analyst asked Defendant Chriss:

> Alex, one more on the initiatives and just trying to think through the prioritization of these additional investments you'll be making. Of those six initiatives, which do you think will sort of yield the returns quickest? And maybe a little bit more on timing of them, maybe not 2024 but how early?

---

[11] Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of PayPal's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired common stock during the Class Period.

194. In response, Defendant Chriss identified Redesigned Branded Checkout as his top priority, emphasizing that PayPal could drive merchant adoption quickly through integration tools that the Company purportedly already had. Specifically, Defendant Chriss stated:

> So all of the innovations are incredibly exciting for us, but let me be specific on your question. The two that I am closely watching and our teams are executing on immediately is really a focus on the branded experience. This is both for the combination of merchants and consumers. Easing that experience for our customer to choose PayPal, have a reward that comes back to them, ensure that they're able to get through the experience with velocity and check out every time with PayPal, is a huge focus for us and that's where we are driving a new app experience and again, all of these innovations will be coming out over the next couple of weeks to months.
>
> Then we have to drive adoption. So that is having conversations with merchants, ensuring that they're upgrading to our latest innovations, that's ensuring that we make it easy for them as well so that's why you've seen us launch a new developer portal, ***we're creating no-code, low-code experiences so developer can take the demand that they've shown*** because they have a best-in-class experience now and get it into market**.**

195. Defendant Chriss's statement that PayPal had created "***no-code, low-code experiences***" to make it easy for merchants to upgrade to Redesigned Branded Checkout was materially false and misleading. In response to a question about which of the six initiatives announced in January would "yield the returns quickest," Defendant Chriss's response led investors to believe that these simplified integration tools were enabling merchants to adopt the redesign quickly and easily, and therefore, there remained no significant obstacles for Redesigned Branded Checkout to accelerate branded TPV growth. But that was not true. In reality, a "***no-code***" solution did not exist, and these "***low-code***" solutions were directed primarily at a limited subset of SMB merchants, and they could not be solely used to integrate the large enterprise merchants that generate most of branded checkout TPV, which required significant customization. Moreover, because Defendant Chriss chose to tout the Company's "***no-code, low-code***" experiences that purportedly make it easy for merchants to upgrade, Defendants were obligated (but failed) to disclose adverse facts, including that the integrations for those enterprise merchants remained a labor- and time-intensive project.

196. Indeed, former employees confirm that PayPal could not use the AI-powered, low-code integrations to quickly or completely integrate the enterprise merchants to Redesigned Branded

Checkout. For example, FE-5 recalled that PayPal did not direct the AI low-code initiative at enterprise merchants, but rather at small and medium-sized merchants that did not have a channel partner handling the integration on their behalf. FE-5 went on to say that no true "no-code" solution exists, since some code underlies every integration, and that the more accurate description is "low-code." She advised that the low-code solution has very limited customization and flexibility and is poorly suited for enterprise merchants that typically operate more complex systems involving multiple providers, solutions, vendors and an older technology that is more difficult to reconcile with newer technology.

197. Moreover, unbeknownst to investors, it remained a complex and time-consuming process to upgrade enterprise merchants to Redesigned Branded Checkout. For example, according to FE-5, for many legacy merchants who have been using PayPal for many years, if not decades, adopting the redesign means ripping out the majority of the old PayPal code from their websites to integrate the new code. FE-5 explained that large and enterprise customers often custom build their websites and ripping out code and subsequently rebuilding new code can cause the website to break. According to FE-5, you can do one integration, and it breaks another unaffiliated integration. She explained that adopting the redesign and new code also takes a long time to do and they must deprioritize other projects to get it done.

198. As a result, and as Defendants would later admit at the end of the Class Period, *see supra* Section IV.(F), PayPal struggled to integrate enterprise merchants to Redesigned Branded Checkout. For example, FE-5 said the process of convincing an enterprise merchant to adopt the new code is also typically a months-long process.

**B. March 13, 2024 – Wolfe Fintech Forum**

199. On March 13, 2024, during the Wolfe Fintech Forum, the moderator inquired into what PayPal was doing to accelerate branded TPV growth. Specifically, the moderator asked Defendant Miller:

> Maybe we shift to some of the specifics on the business and we'll start with branded checkout experience and improvements. Again, it's an area that you said you mean branded grew at 6% and from a volume standpoint, right, last year and you suggested it's still growing well. So when we think about the branded experience and what's being done to

> try to make that even better and hopefully grow at a notably faster rate than overall e-com perhaps at some point because it's so margin-accretive, tell us a little bit about what's going on.

200. In her response, Defendant Miller reiterated that PayPal had tools to make it easy for merchants to upgrade and that the ease of integration would allow PayPal to keep up with competition:

> So as you mentioned, I mean, branded is growing. And when you look at our global position, it continues to be very strong and it's a healthy business. When you look at the investments we're making though, they're really pretty straightforward on branded. I mean, branded is our number one priority right now. And part of this experience is when you look at online, we're great. When you look at our mobile experience, it has not been as good. And so, while they might seem relatively simple, they're a big deal in terms of frictionless log-in. When you look at reducing latency, ***when you look at no code, low code ways for our merchants to really bring the latest experience to their integrations, and those kinds of things actually bring us on par very quickly with other experiences that are out there***. So that's first. Those are already in the hands of our consumers and merchants, which is really powerful.

201. Defendant Miller's statement was materially false and misleading for the same reasons detailed in ¶¶195-198. Specifically, unbeknownst to investors, a "***no code***" solution did not exist, and these "***low code***" solutions were primarily directed at a limited subset of SMB merchants, and could not be used to fully integrate large enterprise merchants that generate most of branded checkout TPV and were the most difficult to upgrade.

**C. June 5, 2024 – Bank of America Technology Conference**

202. On June 5, 2024, during the Bank of America Technology Conference, a Bank of America analyst asked Defendant Chriss a pointed, process-oriented question about the integration of Redesigned Branded Checkout. Specifically, the analyst asked: "[h]ow much easier is it nowadays for the merchants to do the integrations to get access to next-gen checkout and any way to quantify that?" Defendant Chriss told investors that PayPal was leveraging AI to make integration "easy" for all merchants, including enterprise and SMBs. Defendant Chriss stated:

> Well, merchants need two reasons in order to make a move. They're very busy. They've got lots of things. They're trying to run their business. Whether they're large enterprises or small businesses, there's two things they need in order to make a move and change their integration. One is they need a value. They need to know that there's a reason for them to do it. In the past, we haven't provided them great value proposition to be able to make the move. Today, we have.

> . . . . So step one, there has to be a value proposition. Step two, it has to be easy for them to do, because they all have long roadmaps. They have limited resources, and you have to make it easy.
>
> ***We are leveraging no code/low code integrations. We're leveraging AI to be able to take their old integrations, plug it into our AI and actually spit out code that they can leverage to be able to get up and running. We've taken a two-week integration and in some cases brought it down to two hours.*** And so that kind of innovation and ensuring that we're both giving them value as well as delivering a seamless, frictionless way for them to get up and running, is our two-pronged approach to be able to get as many merchants on as fast as we can.

203. Defendant Chriss's statements that PayPal was "***leveraging no code/low code integrations***" and "***leveraging AI***" to make integrations easy, and had "***taken a two-week integration and in some cases brought it down to two hours***," were materially false and misleading for the same reasons detailed in ¶¶195-198.

204. Specifically, in response to an analyst question about "how much easier" it is to upgrade merchants to the new integration required for Redesigned Branded Checkout, Defendant Chriss's response created the misleading impression that these simplified integration tools would enable all merchants, "whether they're large enterprises or small businesses," to adopt the redesign quickly and easily. Therefore, there would be no significant obstacles for Redesigned Branded Checkout to accelerate branded TPV growth. However, as detailed in ¶¶195-198, the supposedly simplified integration tools could not be used to quickly integrate large enterprise merchants, whose integration took several months and required significant customization and hands-on assistance.

**D. July 30, 2024 – Q2 2024 Earnings Call**

205. On July 30, 2024, PayPal held an earnings call discussing the Company's financial results for Q2 2024. During the earnings call, an analyst from Mizuho asked Defendant Chriss "about the competitive positioning regarding Apple Pay." Specifically, the analyst asked, "[w]anted to ask you, Alex, a little bit about the competitive positioning regarding Apple Pay. Obviously really strong branded checkout. There has [sic] been some worries in the past. Can you maybe contextualize a little bit where we are and what you're doing to beat them?"

206. In response, Defendant Chriss stated that he was not concerned about competition and falsely stated that PayPal had not lost any market share:

> Yeah, thanks, Dan. Great question. So let me set some context. So first we play in a massive multitrillion dollar market and it's not a zero-sum game. So we expect competitors come in since we launched over a decade ago. We went from one button to now there's lots of different buttons and branded experiences and we'll expect that to continue.
>
> Let me set the context of the reality of today and then how we think about the future. So the reality today, we are the number one branded experience across all platforms and devices. If we narrow down into desktop web, which is still 40% to 50% of all checkout, ***we see no degradation in our share over the past four years. So let me say that again. We've held share despite competition.***
>
> Second, if we look across browsers, there's actually no difference in our selection rate across different browsers. So certain buttons moving from one platform to the other just isn't material to us**.** So that's where we are today.

207. Defendant Chriss's statements that PayPal had "***no degradation in our share over the past four years***," and had "***held share despite competition***," were materially false and misleading and directly contradicted what was happening inside PayPal at that time. In reality, PayPal had already lost market share and was continuing to lose market share to competitors, particularly Apple Pay. As Defendants would later admit, the Company faced "competition from alternative payment methods," and faced "competitive presentment" during the Class Period that proved "critical to branded checkout performance." Critically, this rise in competition did not happen overnight, *i.e.*, at the very end of the Class Period (when Defendants finally admitted its flailing market share position), but rather, started before Defendant Chriss's statement and continued throughout the entire Class Period.

208. For example, according to FE-3, PayPal was tracking market share and "it was tanking" the entire time she was at PayPal.[12] FE-3 explained that payment volume growth was flat and a persistent struggle. She added that everyone at PayPal knew that branded checkout was not healthy or growing and that PayPal was losing their checkout volume because competition was taking market share, especially Apple Pay "which killed PayPal." FE-3 stated that PayPal was always looking for ways to "stop the bleeding" from Apple Pay and this was a problem throughout her tenure at the Company, between March 2024 through June 2025.

---

[12] FE-3 was employed by PayPal as Director of Strategy and Operations, Business Intelligence, from March 2024 through June 2025.

209. FE-3 advised that she heard concerns about the competition with Apple Pay, Google Pay, Shop Pay, and others daily. According to FE-3, a lot of merchants were putting PayPal lower on the placement stack behind/below companies like Apple Pay, Klarna, Shop Pay, and other checkout solutions. FE-3 explained that there is "only so much real estate" on a webpage for checkout options and users are going to select Apple Pay almost 100% of the time if it is placed above PayPal. FE-3 described PayPal's checkout product as slow and antiquated, explaining that it was a less seamless experience with multi screens, and a two-part authentication process required after a user logged into their PayPal account. In comparison, the competitors were seamlessly integrated. To make a payment with Apple Pay a user simply double clicks the side of their phone.

210. PayPal was also losing market share in Germany, one of its largest and most important international markets. For example, FE-2—a former employee who focused on Germany and the UK throughout the Class Period—stated that metrics showed market share was declining throughout her tenure. FE-2 further recalled that a point of conversation during her tenure—before the Class Period until summer 2025—was that PayPal was not growing and was losing market share across both mobile and desktop. FE-2 explained that mobile was losing market share due to the emergence of Apple Pay, which was so easy for consumers to use. FE-2 noted that PayPal was also losing desktop market share, particularly in Germany.

211. Moreover, Defendants Chriss, Kereere, and Miller knew that PayPal was losing market share to Apple Pay and others. For example, according to FE-3—who was recruited to PayPal by Defendant Kereere—Defendant Kereere was "100% aware" of the problems PayPal was facing with the competition and the fact that the Company had an inferior product, primarily to Apple. FE-3 could not recall what the numbers were but was certain that everyone including Defendants Kereere and Chriss knew that PayPal's market share was decreasing rapidly.

212. FE-3 advised that she was part of monthly Microsoft Teams meetings that were also attended by Defendants Kereere, Chriss, Jamie Miller (CFO), and other executives, including Michael Scolnic who was the Head of Analytics and reported to Defendant Kereere. These meetings focused on Key Performance Indicator (KPI) reports that assessed PayPal's branded checkout (and Braintree, Venmo, etc.) and consistently reflected that branded checkout was clearly suffering the entire time

she was there. FE-3 recalled seeing in the numbers detailed in that report which reflected negative growth in comparison to the previous month, year, etc.

213. In addition to internal discussions of declining market share during monthly meetings, Defendants knew about PayPal's declining market share through the Company's internal tracking of market share. For example, FE-3 stated that there are market research teams at PayPal tracking market share who knew internally which customers were growing compared to those that "were tanking." FE-3 recounted how those teams could assess how much the merchants had in total sales and how much came through PayPal over the years.

214. Similarly, FE-2 explained that there was an internal PayPal team located in the United States that was responsible for tracking market share information and provided insights or "proof points" that were used in marketing materials. According to FE-2, this team was able to provide country specific data related to the German market that then could "legally" be used in marketing materials. FE-2 further explained that this information at times was broken out by desktop and mobile.

**E. February 4, 2025 – Q4 2024 Earnings Call and Press Release**

215. On February 4, 2025, the Company held an earnings call discussing the Company's Q4 2024 financial results. During that call, Defendant Chriss discussed PayPal's "number one priority," branded checkout, and touted the adoption of Redesigned Branded Checkout. Defendant Chriss stated:

> Starting with win checkout, our number one priority. With our upgraded experiences, we now have the leading checkout solution on desktop and mobile. When fully implemented, the upgraded experiences reduce latency by more than 40% and drive more than 100 basis points of conversion lift on average, consistent with the early results we've shared. ***These upgrades are now live for more than 25% of US checkout traffic, which is up from 5% last quarter.*** We have a lot of room to grow here as adoption increases in the US and then expands globally.

216. Defendant Chriss's statement touting rising merchant adoption was false and misleading because it created the misleading impression that the Redesigned Branded Checkout initiative was successful and driving the TPV growth that Defendants had promised. However, that was not true. In reality, the rise in merchant adoption did not reflect the success of Defendants' efforts to drive TPV growth through Redesigned Branded Checkout. Rather, the publicly reported adoption

numbers came from Defendants' deliberate pivot to target SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV.

217. Moreover, because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus, did not reflect increasing TPV growth. *See supra*, Section IV.(B)(4). Defendant Chriss's statement touting the rising adoption of Redesigned Branded Checkout was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV.

218. For example, according to FE-4, PayPal was seeing growth in the number of merchants upgrading to the latest integration, but that growth came mainly from SMBs that did not generate the level of TPV that larger enterprise partners did. FE-4 recalled that the Company saw smaller accounts adopt the new integration more quickly and explained that an account with $3 million in TPV could complete an integration in approximately 30 days whereas a large enterprise customer could take between 12 to 18 months. Further, FE-4 recalled that the slow pace of adoption was tracked in Salesforce. FE-4 explained that Salesforce adoption metrics showed that Enterprise customers were not adopting as quickly as had been expected.

219. Indeed, according to FE-5, PayPal's original strategy focused on enterprise merchants, but those merchants moved slowly with longer buying cycles, older code and have more need for rip and replace. FE-5 recalled, that the shift and their focus to drive more into the partner world from channel partners occurred before Investor Day in February 2025. She explained that the fastest path to get to scale typically requires pursuing both partner and direct enterprise merchants simultaneously, since a partner-only approach often yields quantity of merchants and transactions, without necessarily yielding higher-quality, higher-volume merchants, whereas majority of direct enterprise merchants are more quality and typically tend to concentrate more transaction volume in a single relationship. According to FE-5, the decision to expand the strategy to include partners included Defendant Alex Chriss, Defendant Suzan Kereere, Michelle Gill, and Defendant Frank Keller.

220. However, this deliberate business strategy—caused by Defendants' failure to get enterprise merchants, who were responsible for 80% of branded checkout's TPV, to adopt the new Redesigned Branded Checkout—caused PayPal's business to suffer and put pressure on branded checkout's TPV growth.

221. For example, FE-3 advised that she always followed public statements and recalled that there was always a mismatch between what was being said and what she knew internally such as checkout growth which clearly was not healthy. FE-3 explained that payment volume growth was flat and a persistent struggle. She added that everyone at PayPal knew that branded checkout was not healthy or growing and that PayPal was losing their checkout volume because competition was taking market share, especially Apple Pay "which killed PayPal."

222. FE-3 advised that she was part of monthly Microsoft Teams meetings that were also attended by Defendants Kereere, Chriss, Jamie Miller (CFO), and other executives, including Michael Scolnic who was the Head of Analytics and reported to Defendant Kereere. These meetings focused on Key Performance Indicator (KPI) reports that assessed PayPal's branded checkout (and Braintree, Venmo, etc.) and consistently reflected that branded checkout was clearly suffering the entire time she was there. She recalled seeing in the numbers detailed in that report which reflected negative growth in comparison to the previous month, year, etc.

223. Similarly, FE-5 stated that there were monthly staff meetings where Alex Chriss and Suzan Kereere discussed the branded checkout initiative. FE-5 explained that directors or senior directors attended as subject matter experts to answer detailed questions, while vice presidents and senior vice presidents were generally responsible for presenting to Alex Chriss. FE-5 explained that during these meetings, nobody hid underperformance of branded checkout growth relative to expectations.

224. FE-5 also explained that there were frequent sales pipeline review meetings in which sales personnel explained to Suzan Kereere that merchant adoption was moving slowly.

225. Moreover, Defendants' later admissions corroborate the FE allegations. As Defendants conceded at the end of the Class Period, although Defendants' decision to prioritize SMB merchants and partners may have caused merchant adoption metrics to increase, it caused branded

TPV growth to decline as PayPal was unable to get the enterprise merchants upgraded to the new experience. Specifically, at the end of the Class Period, Defendant Miller admitted that PayPal suffered from "operational and deployment issues," and failed to provide the "hands-on integration support" that the enterprise merchants required, which "slowed [PayPal's] progress" on the Redesigned Branded Checkout rollout.

226. Also on February 4, 2025, PayPal published a press release containing the Company's Q4 2024 results. The press release contained a quote from Defendant Chriss stating:

> ***PayPal had a strong finish to a successful 2024 with results that were better than we expected***. We set out at the beginning of 2024 to narrow our focus, improve execution, and reposition the business. One year later, I'm proud that we've laid a strong foundation for long-term, profitable growth across the company's most important areas. ***The improvements we made to branded checkout, peer-to-peer, and Venmo, plus the progress we made on our price-to-value strategy, are beginning to show up in our results.*** The strong momentum we've created sets us up well for 2025, which is about scaling adoption. I'm excited to share more at our Investor Day later this month.

227. Defendant Chriss's statements that "***PayPal had a strong finish to a successful 2024***" as a result of "***improvements we made to branded checkout***" were materially false and misleading. Because Defendant Chriss attributed PayPal's purported "***successful 2024***" to Redesigned Branded Checkout, that led investors to believe that PayPal was executing on its Redesigned Branded Checkout initiative and was delivering the branded checkout TPV growth Defendants promised. Because Defendant Chriss told investors that improvements stemming from Redesigned Branded Checkout were already "beginning to show up in our results," Defendant Chriss had a duty (but failed) to disclose the material fact that as a result of execution failures, enterprise merchants were not adopting Redesigned Branded Checkout, which was causing branded checkout TPV to decline.

**F. February 25, 2025 – PayPal Annual Analyst/Investor Day Call**

228. On February 25, 2025, PayPal held its investor day, and analysts asked targeted questions about when PayPal expected branded TPV to grow to 8-10%. A Bank of America analyst asked:

> I wanted to follow up on branded check out. When do we start this path towards acceleration, we're talking about 300 basis points two years from now. When does it start? Is it late this year? Is it first half of next

> year? Talk about cadence. And then, just in terms of geographic mix, our understanding right now, US is growing a little slower than international. So does the bulk of the acceleration in the next couple of years come from the US? Thanks.

229. In response, Defendant Kereere boasted that Redesigned Branded Checkout already achieved impressive adoption metrics, stating:

> So, Jason, let me talk about that in maybe two parts. The first, really thinking about margin dollar growth over the next couple of years and then I'll pivot and talk a little bit about the US.
>
> From a margin dollars perspective, our guidance this year assumes a 100 basis points of shift in margin. And certainly, all the things I talked about are a part of that and a significant part of that. ***Branded checkout, we're already at 30% penetration in the US on the merchant experiences.*** All the work Diego has done around offline, debit, marketing, that stuff, you're going to see us continue and be very focused on as we move through 2025.
>
> So what I'd say to that is it'll be a gradation over the period of time is how to think about transaction margin. When we come over to branded checkout, the US side of it, we are very, very focused on US growth with branded checkout. It is something that has the full weight of the organization behind it. We have very, very strong market positions internationally. We expect growth there too, and to continue taking share, but the US is a big, big focus there. And Frank talked about the merchant experiences being a key part of that.

230. Defendant Kereere's statement that PayPal was "***already at 30% penetration in the US on the merchant experiences***" was materially false and misleading for the same reasons detailed in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and that adoption was driving increased branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

231. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus, did not reflect increasing TPV growth. *See supra* Section IV.(B)(4). Defendant Kereere's statement

touting "***30% penetration in the US***" of Redesigned Branded Checkout was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV.

**G. March 5, 2025 – Morgan Stanley Technology, Media & Telecom Conference**

232. On March 5, 2025, Defendant Chriss participated in the Morgan Stanley Technology, Media & Telecom Conference. At this conference, an analyst asked Defendant Chriss the following question regarding how PayPal was using Redesigned Branded Checkout to accelerate branded checkout TPV growth:

> I want to go back to kind of one of the things that you mentioned . . . around branded checkout. At Investor Day, you and the team outlined a plan to accelerate branded checkout to 8% to 10% growth by 2027. Can you remind us the steps that you've laid out to get there, what the drivers are, and how we should think about cadence from 2025 to 2027 to those target levels?

233. In response, Defendant Chriss touted the adoption metrics and, unprompted, claimed that PayPal had not lost any market share on desktop or mobile, stating:

> So we feel really good about now having a best-in-class experience on both desktop and mobile. So that means reduced latency, it means a frictionless experience. It means on whatever device you're on, whether it's on a desktop device, you put your finger on your keyboard and you are checking out using biometrics, it means on a mobile device, you're just smiling at your phone and checking out automatically. These are now experiences that are in market and those cohorts are performing very well. We have to now ramp those, we've talked about going from, I think, two quarters ago we were at 5% adoption, ***we've now ramped that up to 30% in the US.*** We, at Investor Day talked about getting to 80% globally adoption in the next couple of years by the end of 2027.
>
> So we have a very clear line of sight to get there with our best-in-class experience. So that's our path. And that's why I have conviction that our branded checkout will inflect and we'll be growing at or above e-commerce.
>
> There's one thing just because it's important that I hear it from time to time, it feels like every few months there's another rumor about some competitor that's coming in and potentially taking branded checkout share. ***The rumors so far, as far as I can tell and all the data that I look at, the rumors are nonsense. I can tell you, we look at the data very, very closely. We look at it on desktop, we look at it on mobile. We look at our share of checkout, we look at competitors. And we have not seen any degradation in our share of checkout from competitors launching products, whether it's on mobile, whether it's***

> ***on desktop, whether it's on other platforms. And so again, we have a very stable base and now as we put our new innovations into market, I feel really good about inflecting our branded checkout.***

234. Defendant Chriss's statement that PayPal had "***ramped that up to 30% in the US***" was materially false and misleading for the same reasons detailed in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus did not reflect increasing TPV growth. *See supra* Section IV.(B)(4).

235. Defendant Chriss's statement touting that adoption of Redesigned Branded Checkout was up to "***30% in the US***" was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV. Moreover, Defendant Chriss's categorical denial of competitive threats as "***nonsense***" and his statement that PayPal had not lost any share of checkout, either on desktop or mobile, was materially false and misleading for the same reasons detailed in ¶¶207-214.

236. Specifically, when an analyst asked about PayPal's path to 8-10% branded checkout TPV, Defendant Chriss took the opportunity to address competitive concerns head on, claiming that from "***all the data that [he] look[s] at***" the "***rumors are nonsense***" and he has "***not seen any degradation***" in PayPal's share and he "***look[s] at it on desktop, . . . look[s] at it on mobile.***" In reality, "***all the data***" that Defendant Chriss personally reviewed "***very, very closely***" showed that PayPal was losing market share. *See id.* As Defendants would later admit, the Company faced "competition from alternative payment methods," during the Class Period that proved "critical to branded checkout performance" and was a key contributor to the sharp deceleration of branded checkout TPV growth. While Defendants assured investors that there were no competitive threats,

former employees confirmed that internally, everyone knew PayPal was losing market share to Apple Pay. *See id*.

### H. March 11, 2025 – Wolfe Fintech Forum

237. On March 11, 2025, Defendant Miller participated in the Wolfe Fintech Forum hosted by Wolfe Research. During this forum, the moderator inquired into Defendant Miller's "conviction" of going from 30% US adoption to 80% global adoption of Redesigned Branded Checkout by 2027, and noted that some investors were unsure how PayPal would succeed. Specifically, the moderator asked:

> I mean, I guess the conviction you have of going 30% US to 80% globally on that modern checkout is a big deal. It doesn't seem like intuitive for investors to understand how you're going to get it done. So, just help us understand what goes into that and why you have conviction in that, because I know it comes with a great conversion uplift, to have someone on a single checkout or multi checkout.

238. In response, Defendant Miller dismissed concerns that PayPal's goals were overly ambitious, and touted rising adoption metrics as proof:

> Yeah, our conviction really comes from the fact that there's maybe a few pieces of this in terms of how you execute. The first piece is really things that are largely within our control and things that we can do that – and push out with merchants or push out with consumers that naturally drive the experience to be better and the conversion uplift to happen.
>
> ***As I mentioned, we're already at 30% penetration within the US*** and between the US and what we can roll out in Europe, there's still a significant amount of execution that is just that. When we start to look at Europe, a lot of our merchants are ready on our latest integration.
>
> So, the uplift for them, it's not a ton of work and it's something that we think can come pretty quickly once we move into Europe for execution.

239. Defendant Miller's statement was materially false and misleading for the same reasons identified in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and

platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

240. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus did not reflect increasing TPV growth. *See supra* Section IV.(B)(4). Defendant Miller's statement touting "***30% penetration within the US***" of Redesigned Branded Checkout was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in branded checkout TPV.

**I. March 18, 2025 – Bank of America Securities Electronic Payments Symposium**

241. On March 18, 2025, Defendant Keller participated in the Bank of America Securities Electronic Payments Symposium. During the symposium, an analyst directly asked Defendant Keller about competition from Apple Pay:

> So, speaking of biometric, Apple Pay obviously always comes up as a kind of premier e-commerce checkout experience. So, how would you say PayPal's new button compares to that? And then, just hearing a little bit about Apple Pay's planned entry into non-Safari browsers, that's still nascent but seems like it's coming down the pike. How does that potentially impact the competitive landscape from PayPal's perspective?

242. In response, Defendant Keller dismissed any competitive threat from Apple Pay, stating:

> We've been hyper-focused on delivering an experience that is the best-in-class experience, right? Our new – I can confidently say, when you use the new PayPal experience, it is as slick as anything out there. It is – especially on mobile – it is super powerful. If you have our app installed, you will not see, we use the app as an authentication method. It will feel like other biometrics, it is super slick and seamless. There's a lot of speculation when competitors launch new experiences. I get inbound – internally, we have a lot of debates about it, you can imagine.
>
> I have personally looked into this. ***We have not seen a significant difference in any share dynamics based on these announcements.*** So, so far, I can say it's pretty consistent, but there's always speculations.

243. Defendant Keller's statement saying that he "personally looked into" if competitors, like Apple Pay's, new product launches and he has "***not seen any significant difference in any share***

***dynamics based on these announcements***" was materially false and misleading for the same reasons identified in ¶¶207-214. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the rollout of Redesigned Branded Checkout because it was allowing PayPal to keep pace with competitors like Apple Pay, and would therefore drive branded checkout TPV growth, when in reality, PayPal was losing significant market share to Apple Pay.

244. For example, FE-2 recalled that a point of conversation during her tenure—before the Class Period until summer 2025—was that PayPal was not growing and was losing market share across both mobile and desktop. FE-2 explained that mobile was losing market share due to the emergence of Apple Pay, which was so easy for consumers to use. FE-2 noted that PayPal was also losing desktop market share, particularly in Germany.

**J. April 29, 2025 – Q1 2025 Earnings Call**

245. The Company held an earnings call on April 29, 2025, to discuss PayPal's financial results for Q1 2025. During that call, Defendant Chriss provided an update on the "rollout of [PayPal's] upgraded online branded checkout flows." He said, "***[s]ince the beginning of the year, we've driven a 25-point jump to more than 45% of U.S. checkout traffic***. ***This shows we can execute,*** and we anticipate an even faster rollout for Europe starting in the second quarter."

246. Defendant Chriss's statement that PayPal had "***more than 45% of U.S. checkout traffic***" on Redesigned Branded Checkout was materially false and misleading for the same reasons identified in ¶¶216-225. Specifically, Defendant Chriss's statement that the rising adoption metrics was proof that PayPal was executing gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. As Defendants later conceded, rising adoption metrics were not indicative of successful execution.

247. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but

failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus did not reflect increasing TPV growth. *See supra* Section IV.(B)(4).

248. Moreover, Defendant Miller later admitted that PayPal had not "executed as well as [it] need[ed] to" and had been "too optimistic about how quickly [it] could drive change and customer adoption across a massive global user base." Defendant Chriss's statement that Redesigned Branded Checkout was adopted by "***more than 45% of U.S. checkout traffic***," and that adoption proved they could execute, was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV and Defendants' execution failures were causing a decline in branded checkout's business.

### K. May 14, 2025 – J.P. Morgan Global Technology, Media and Communications Conference

249. On May 14, 2025, Defendant Miller participated in the J.P. Morgan Global Technology, Media and Communications Conference. An analyst asked Defendant Miller about the 45% of U.S. traffic that had been upgraded and about the experience of the Redesigned Branded Checkout. Defendant Miller replied:

> So our branded checkout redesign is really about bringing just lower latency, better experience, better auth rates. It really improves not only the consumer experience, less app switching, things like that, but it also, most importantly, improves conversion uplift for our merchants. ***And that is what they're really excited about. As we've rolled that out, we were at about 45% as of the end of April, and really from a starting point back in October of just starting. So I think nice execution there from that perspective.***

250. Defendant Miller's statement that PayPal had "***about 45%***" on Redesigned Branded Checkout was materially false and misleading for the same reasons outlined in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be

converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

251. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus, did not reflect increasing TPV growth. *See supra* Section IV.(B)(4). Defendant Miller's statement touting 45% adoption of Redesigned Branded Checkout was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV.

**L. June 10, 2025 – RBC Financial Technology Conference**

252. On June 10, 2025, at the RBC Financial Technology Conference, an analyst asked, Defendant Kereere, "maybe talk to where the branded adoption curve sits today in terms of percentage or however you would like to describe it and then what the long term ambitions are in order to achieve those kinds of goals that you have set for yourself?"

253. Defendant Kereere replied:

> ***In the US, we're at over 45% of the volume now on modern experiences, and that is continuing to scale.*** We are live now in Germany and in the UK and our confidence that we can move faster in Europe is pretty high, because more than half of our European volume is already on new integrations. We are moving fast and learning a ton as we engage with merchants directly and we've built playbooks now that work across verticals, because we now have a deeper understanding of what it takes to convert merchants at pace and how to make that merchant conversion journey much easier. And we continue to stand by the commitment we made to get to 80% of our experiences on new integrations by 2027.

254. Defendant Kereere's statement that PayPal had "***over 45%***" on Redesigned Branded Checkout was materially false and misleading for the same reasons outlined in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be

converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

255. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus, did not reflect increasing TPV growth. *See supra* Section IV.(B)(4). Defendant Kereere's statement touting 45% adoption of Redesigned Branded Checkout was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV.

### M. July 29, 2025 – Q2 2025 Earnings Call

256. On July 29, 2025, PayPal announced disappointing branded TPV growth, causing investors to start questioning Defendants' previous misstatements about the success of Redesigned Branded Checkout. Nevertheless, during the Q2 2025 earnings call, Defendant Chriss further misled investors and obscured that branded TPV growth was declining because the Redesigned Branded Checkout rollout was not successful.

257. Specifically, Defendants blamed macroeconomic factors for the decelerating branded TPV growth. Defendant Chriss explained that PayPal experienced "headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs." Then during the earnings call, an analyst asked Defendants if tariffs contributed to branded TPV's deceleration to 5%. Specifically, the analyst from Barclays asked:

> I wanted to ask about branded online checkout TPV, which decelerated just a bit quarter-over-quarter to remain pretty stable for a few quarters. It sounds like tariffs are offsetting some of your own efforts - like modern checkout . . . to accelerate branded online TPV growth. How meaningful was the tariff headwind on unbranded [sic] online checkout TPV in Q2? And in July, are you seeing a stable tariff-related headwind there, or is that a metric – on that same metric, or could we see the headwind change and potentially intensify?

258. In his response, Defendant Chriss attributed the branded checkout TPV shortfall entirely to tariffs, and said without them, branded checkout TPV would have increased. Defendant Chriss also stated that they had successfully executed on the Redesigned Branded Checkout rollout—

thereby shutting down any speculation that the declining TPV growth was caused by PayPal's own execution failures. Specifically, Defendant Chriss said:

> Hey Ramsey, thank you for the question, and I appreciate the comments on branded checkout. Look, we're excited as well. I think our execution on the global roll-out, ***the US rollout is exactly what we were looking for***. And really, the cohorts that we now have live in market are delivering exactly the way we expected. To the comment on these platforms from Asia, the way we think about it is ***without that pressure, our branded checkout really would have been at 6%***. And so, it's a small amount, but we've started to see it stabilize a little bit as we get into this month.

259. Defendant Chriss's statement that "***branded checkout really would have been at 6%***" without pressure from tariffs in Asia was materially false and misleading. By attributing branded checkout TPV's underperformance to external factors—tariffs on platforms and merchants in Asia—Defendant Chriss gave the false and misleading impression that PayPal was effectively executing on the rollout of Redesigned Branded Checkout and was not the cause of branded checkout's shortfall. As Defendants would later admit on February 3, 2026, branded checkout TPV deceleration was caused primarily by internal operational execution failures, not external market conditions. The February 3, 2026 disclosure made clear that branded checkout's struggles were rooted in PayPal's own execution shortfalls, including the failure to provide the "hands-on integration support" that enterprise merchants required, and not tariff-related headwinds. Defendant Chriss's attribution of the branded checkout TPV deceleration to external tariff pressures concealed the true internal causes of branded checkout's underperformance that Defendants later acknowledged.

260. Moreover, Defendant Chriss's statement that "***the US rollout is exactly what we were looking for***" was also materially false and misleading. This statement created the misleading impression that PayPal's execution of Redesigned Branded Checkout was proceeding smoothly, without significant issues in product deployment or merchant adoption. In reality, as former employees detailed (*see, e.g.*, Section IV.(B)(1)-(4)) and Defendants later admitted, PayPal was experiencing substantial operational and deployment issues during this very period that were causing branded TPV growth to decline.

261. In addition to blaming external factors (tariffs) for branded checkout's poor performance, Defendants continued to mislead investors about the success of the Redesigned Branded Checkout rollout by continuing to tout misleading adoption metrics. For example, during the Q2 2025 earnings call, Defendant Chriss stated:

> ***So again, just to highlight, we were very deliberate in our strategy to start our rollout of our new branded experiences in the US. We're up over 60% now in the US. And again, the cohorts that we've rolled out are continuing to operate in the way that we wanted and showing the uplift that we expected, that we talked about in the past.***

262. Defendant Chriss's statement that over 60% of PayPal's checkout transactions in the U.S. was on Redesigned Branded Checkout was materially false and misleading for the same reasons outlined in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

263. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus did not reflect increasing TPV growth. *See supra* Section IV.(B)(4). Defendant Chriss's statement was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV.

**N. September 4, 2025 – Jefferies Fintech Conference**

264. On September 4, 2025, Defendant Miller attended the Jefferies Fintech Conference. During that conference, an analyst asked Defendant Miller the following question:

> And so sticking with branded, if we go through some of the main initiatives, the biggest one has been getting merchants upgraded to the latest branded experience. And you've said roughly, I think 60% of US transactions are on the latest experience. It's 15% globally. You've targeted that 15% to get to 80% by 2027 in the medium-term targets. First, just talk through the visibility into getting to that 80% level, the

> mechanics of getting merchants upgraded and if there's any nuance depending on country or region, just as now you're reporting more in Europe, if that motion looks similar to what it's been in the US?

265. Included in her response, Defendant Miller responded:

> So maybe I'll start with just talking generally about branded checkout. When we think about the shifting in our branded checkout profile, we've thought about it in three big buckets. First includes our upgrade to the latest branded experience for our merchants, but that also includes the investments we've been making around branded checkout and things like offline, omni, debit, all around consumer habituation back to the product. The second is buy now, pay later. And the third would be pay with Venmo. ***And so if we think about the rollout of the checkout experiences, we really started this process about nine months ago and we're already at the end of July at 60% penetration in the US. So we've been making really good progress across our merchant cohorts.***

266. Defendant Miller's statement was materially false and misleading for the same reasons outlined in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

267. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus, did not reflect increasing TPV growth. *See supra* Section IV.(B)(4). Defendant Miller's statement touting "***60% penetration***" of Redesigned Branded Checkout was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in TPV.

### O. September 9, 2025 – Goldman Sachs Communacopia and Technology Conference

268. On September 9, 2025, Defendant Chriss spoke at the Goldman Sachs Communacopia and Technology Conference. When asked about the status of upgrading integrations for PayPal's

checkout initiatives, Defendant Chriss replied and provided an update on the amount of merchants who have adopted branded checkout in the U.S.:

> ***We started in the US. We've now broken 60%. So more than 60% of our transactions are now on the new experiences in the US***. We've now started to roll out in UK and Germany. If you look at our global transactions, this is still about 15%, mid-double digits – mid-teens when it comes to the actual transaction. So it's still very small when it comes to the actual impact to the business.
>
> But when I look at the cohorts of merchants that are fully optimized and up and running on the new experience, we're seeing tremendous improvement when it comes to conversion.
>
> And so, that's what gives us confidence that as we continue to roll this out, as we now start to get momentum from merchants that are seeing that from their competitors, seeing that from others, we're able to share that data and they want in.

269. Defendant Chriss's statement was materially false and misleading for the reasons outlined in ¶¶216-225. Specifically, this statement gave investors the false and misleading impression that PayPal was successfully executing on the Redesigned Branded Checkout rollout and adoption was driving an increase in branded checkout TPV growth. In reality, the publicly reported adoption figures stemmed from Defendants' deliberate pivot to targeting SMB merchants and platform partners who could be converted quickly but who contributed comparatively little to branded checkout TPV, and not from high-value enterprise merchants.

270. Because Defendants chose to tout PayPal's rising adoption rate, they were obligated (but failed) to disclose the adverse facts that the adoption metrics did not reflect adoption of the redesign by high-value enterprise merchants, which was lagging and slower-than-expected, and thus did not reflect increasing branded checkout TPV growth. *See supra* Section IV.(B)(4). Defendant Chriss's statement touting that Redesigned Branded Checkout had "***broken 60%***" was therefore false and misleading because, contrary to what Defendants led investors to believe, the rising adoption metrics were not causing an increase in branded checkout TPV.

**P. October 28, 2025 – Q3 2025 Earnings Call**

271. On October 28, 2025, PayPal held an earnings call conference discussing the Company's financial results for Q3 2025. During the Q3 2025 earnings call, Defendant Chriss continued to tout branded checkout's purported success. Specifically, he said:

> For example, in the third quarter, we reached 10% branded experiences volume growth in the US, more than double our growth in the same quarter a year ago. ***That acceleration comes from two things: growing omnichannel adoption and sustained improvement in the US online branded checkout trends, supported by our improved experiences***.
>
> We have the right set of drivers and initiatives in place. Now our focus is on adoption and investing to amplify our impact. As we move into 2026, we will be leaning more into these efforts and expanding across key international markets.
>
> Let me address online branded checkout in more detail. TPV grew 5% in the third quarter on a currency neutral basis. ***That solid growth, especially with the choppy global macro trends we continue to see this quarter***. Given the competitive intensity online, we know more work is needed to close the gap between our performance and overall e-commerce growth.

272. Defendant Chriss's statements were materially false and misleading. First, Defendant Chriss attributed accelerated branded experiences volume growth to "***growing omnichannel adoption***" and "***improved experiences***," when, in reality, and as Defendants would admit just over two months later, the enterprise merchants were not adopting Redesigned Branded Checkout and the rollout was delayed by "operational and deployment issues" during this very time period, and therefore, was not a source of success for branded experiences volume growth.

273. Second, Defendant Chriss's statement that branded checkout TPV grew 5% in the third quarter was "***solid growth, especially with the choppy global macro trends we continue to see this quarter***" was false and misleading because it created the misleading impression that in Q3 2025, branded checkout TPV was stalled at 5% growth because of "***choppy global macro trends***" but in reality, it was declining because of operational and execution failures within PayPal's control.

274. Also, during the Q3 2025 earnings call, Defendant Miller addressed the reason why branded TPV growth remained at 5%. Specifically, she said:

> On an online-only branded checkout basis, volume grew 5% on a currency-neutral basis. Compared to last quarter, there was less

> pressure from volumes from Asia-based marketplaces selling into the US. ***At the same time, this improvement was offset by pockets of softer consumer discretionary spending in Europe and the US later in the quarter***.
>
> ***Overall, we have seen relatively consistent growth in the number of checkout transactions, but basket sizes or average order value has decreased***. While still early in a back-end loaded quarter, we've observed this trend continuing through October.
>
> We remain focused on the initiatives we can control. We're confident in our branded checkout strategy and the roadmap that our teams are advancing. The early results in the US demonstrate that we're on the right path with our initiatives, including our redesigned experiences, buy now, pay later, and Pay with Venmo.

275. Defendant Miller's statements attributing branded checkout TPV's deceleration to "***softer consumer discretionary spending in Europe and the US***" and maintaining that PayPal had "***relatively consistent growth in the number of checkout transactions, but basket sizes or average order value has decreased***," were false and misleading. Defendant Miller misled investors to believe that branded checkout's TPV deceleration was because of reasons outside of PayPal's control, and thus misled investors about the true cause of branded checkout's stagnating growth.

276. Defendant Miller's own admissions prove her statements were false and misleading when made. Specifically, Defendant Miller later admitted on February 3, 2026 that PayPal's own execution failures were to blame, stating that "while challenges in the macro environment are real, we haven't executed as well as we need to, and our product deployment in the second half of the year was slower than we planned." Therefore, contrary to what Defendant Miller led investors to believe, outside macroeconomic factors were not the true cause of branded TPV's underperformance. In reality, as the February 3, 2026 disclosure revealed, PayPal was experiencing substantial operational and deployment issues at this very time, the second half of 2025, and enterprise merchants were not adopting Redesigned Branded Checkout at the rates necessary to drive branded TPV growth.

**Q. December 3, 2025 – UBS Global Technology and AI Conference**

277. On December 3, 2025, Defendant Miller participated in the UBS Global Technology and AI Conference. During the conference, an analyst asked for an update on how macro pressures could affect branded checkout TPV growth in Q4 2025. Specifically, the analyst asked:

> Let's move into branded checkout. As I mentioned, we'll start with Q4 and then we'll talk – then we'll move into 2026. So to set the stage, in terms of Q4, you had talked about at the earnings call a little bit of an – a slight deceleration expected in Q4. You had called out a little bit of macro and you had mentioned lower AOV. At a recent conference, you talked about some of that persisting into – a few more weeks into the quarter. Maybe you could, with that context, give us a little more thoughts on Q4 branded TPV growth?

278. Defendant Miller replied:

> Yeah. Well, we just completed Cyber 5. And as you know, that plus the coming weeks, the rest of the quarter, are really important weeks for our merchants and our consumers. And so we're really focused right now on just delivering them.
>
> Having said that, to your point, we called out in our third quarter earnings call that we had seen some macro pressure in September that had persisted into October, and ***we are continuing to see that persist in our performance in November***. When you look below the surface, we are a very middle income, lower income, main street America sort of consumer base in our portfolio. We also skew retail and a little bit more discretionary. And when you look at that, ***that we continue to see consumers spending less, trading down, average order value is down, and just a shifting in that space***. And that has persisted.
>
> We also have tougher comps this quarter versus last year. Last year, we had real strength in things like gaming and travel verticals and things like that. But as you look at fourth quarter, what we're expecting at this point is that the fourth quarter branded checkout growth will grow at least a couple of points slower than what we saw in the third quarter. But when you pull up and look at the financial framework for the quarter, our guidance, we're well intact on that front.

279. Defendant Miller's statements that PayPal was continuing to experience macro pressure in November and that other macro related issues like consumers spending less would contribute to deceleration of branded TPV in Q4 2025 are false and misleading for the same reasons outlined in ¶259, *supra*.

## VI. LOSS CAUSATION

280. Defendants' materially false and misleading statements and omissions alleged above directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Defendants' material misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of PayPal and its business, prospects, operations, and

results which caused the Company's common stock to be overvalued and artificially inflated throughout the Class Period. Lead Plaintiffs and other Class members purchased or otherwise acquired PayPal common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.

281. As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements and omissions of material fact regarding the adoption of Redesigned Branded Checkout and its ability to accelerate branded TPV growth. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their shares of PayPal common stock at the artificially inflated prices that they were offered at.

282. As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of PayPal's common stock, causing losses for Lead Plaintiffs and other Class members. The timing and magnitude of PayPal's common stock price decline negate any inference that the losses suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomics or industry factors, or due to Company-specific facts unrelated to Defendants' fraudulent conduct.

283. Specifically, on July 29, 2025, December 3, 2025, and February 3, 2026, the foreseeable risks and relevant truth concealed by Defendants' Class Period misstatements and omissions concerning PayPal's redesigned branded checkout and its ability to accelerate branded TPV growth were revealed and/or materialized. Indeed, each of the partial corrective disclosures, discussed above, *see supra* Sections IV.(C), (E)-(F), and herein, revealed the relevant truth and foreseeable risks previously misrepresented and/or concealed by Defendants' materially false and misleading statements and omissions.

### A. July 29, 2025 — First Partial Corrective Disclosure/Materialization of the Concealed Risk

284. On July 29, 2025, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' misstatements and omissions during the Class Period were partially

revealed and/or partially materialized. On this day, PayPal disclosed that branded checkout TPV had grown only 5%, lower than what investors expected based on Defendants' positive statements about Redesigned Branded Checkout.

285. Specifically, during the Q2 2025 earnings call, Defendant Chriss stated:

> **Starting with online branded checkout. TPV, including PayPal, BNPL [Buy Now Pay Later], and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year**. Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs.

286. This disclosure caused concern amongst analysts because, heading into PayPal's Q2 2025 earnings, analysts expected branded checkout TPV growth would be 6% based on previous growth rates and the progress Redesigned Branded Checkout was supposedly achieving. For example, on July 24, 2025, Morgan Stanley expected branded checkout growth acceleration "helped by . . . progress on the rollout of advanced checkout integrations, which now stands at 45% of US merchants (vs. 30% in December) and low double-digits globally," and noted that they estimated, "6% Branded Checkout growth (vs. 4% in 1Q)."

287. As a direct and proximate result of this corrective disclosure and/or materialization of the concealed risk, shares of PayPal common stock fell from $78.22 per share on July 28, 2025, to $71.45 per share on July 29, 2025, a decline of over 8% in a single day.

288. Analysts expressed concern and confusion as a result of PayPal's weak branded checkout TPV growth. For example, on July 29, 2025, Evercore wrote that although Redesigned Branded Checkout penetration was running ahead of PayPal's expectations, "the broader rollout has yet to drive meaningful TPV uplift which caused concern with some investors about the longer-term potential to accelerate growth given how mgmt touted its importance at the recent investor day."

289. Similarly, on July 29, 2025, CFRA wrote, "[w]e think investors are reacting negatively to sequential deceleration in key metrics, with branded checkout slowing to 5% (+6% in Q1) despite significant investments in new experiences . . . ." On July 29, 2025, analysts from RBC Capital Markets noted "Branded misses the mark" and more specifically noted "PayPal's Branded checkout

TPV growth came up short against the expectation hurdle, which combined with slowing transaction margin dollar growth is pressuring the shares." The following day, on July 30, 2025, Morgan Stanley queried when and if Redesigned Branded Checkout would drive branded TPV growth as promised, writing "it's still not yet clear to us when and if we can expect recent initiatives to drive direct and durable improvement toward the low-end of 8-10% medium-term target . . . ."

290. At the same time that they partially disclosed the truth, Defendants continued misleading investors by reassuring the market that PayPal's branded checkout business was still intact and that the unexpectedly poor performance had nothing to do with operational or deployment issues, but instead, was supposedly the result of external factors outside of PayPal's control. *See supra* Section V.(M).

291. Analysts accepted Defendants' misrepresentations and indicated they believed PayPal's long-term growth prospects remained stable and unchanged. For example, on the same day, analysts from Jefferies stated, "Branded TPV expected to accelerate in the coming quarters and exit this year at a higher level on the back of continued progress in upgrading merchants to the latest checkout experience (15% of global transactions are on upgraded [user experience])." On July 29, 2025, analysts from UBS "believe[d] the PayPal Branded Checkout modern experience rollout, marketing spend, and increased pace of innovation are all supportive of continued growth in the core business." *See also* Section IV.(D)(1).

292. Therefore, despite the partial disclosure of previously misrepresented and/or concealed material facts, the price of PayPal common stock remained artificially inflated due to Defendants' failure to disclose dwindling branded checkout TPV growth.

### B. December 3, 2025 — Second Partial Corrective Disclosure/Materialization of the Concealed Risk

293. On December 3, 2025, further elements of the relevant truth and foreseeable risks concealed by Defendants' misstatements and omissions during the Class Period were partially revealed and/or partially materialized. On this day, Defendant Miller attended the UBS Global Technology and AI Conference and disclosed that online branded checkout growth would decelerate "at least a couple of points slower" than the prior quarter, and admitted that progress on merchant

integrations was "slower in terms of progress and in terms of the work effort than we had wanted and we had hoped."

294. Specifically, during the UBS Global Technology and AI Conference on December 3, 2025, Defendant Miller stated, "what we're expecting at this point is that the **fourth quarter branded checkout growth will grow at least a couple of points slower** than what we saw in the third quarter." Additionally, in discussing branded checkout growth, Defendant Miller stated, "what we're very focused on is the fact that it's just taking longer to really see the momentum start to shift in the areas we're spending time on," and regarding branded checkout and other products, "if I'm candid, **it's slower in terms of progress and in terms of the work effort** than we had wanted and we had hoped." Finally, in discussing the integration of merchants to PayPal's branded checkout, Defendant Miller stated:

> And because we've been in this business for so long, some of those date back years and are very complex, all the way up to merchants who are on more of our latest integrations, where it's a very simple and easy upgrade process for them. I think what we found is that **there's a real mixed range in terms of how this process can work with our merchants. In many cases, it takes longer than we expected**.

295. Analysts were disappointed and taken off guard, as they expected that, with 60% adoption in the US and 15% adoption globally, PayPal would see benefits from Redesigned Branded Checkout. As a direct and proximate result of this partial corrective disclosure and/or materialization of the concealed risk, shares of PayPal common stock fell from $62.90 per share on December 2, 2025, to $61.24 per share on December 3, 2025, a decline of over 2.6%.

296. At the same time that they partially disclosed the truth, Defendants continued misleading investors by (i) maintaining that macroeconomic pressure was persisting and hurting branded checkout performance, and (ii) failing to disclose the full extent of the underperformance, including that PayPal had not achieved adoption from enterprise merchants, that PayPal's loss of market share had contributed to the underperformance, and that PayPal's own execution failures were to blame for the declining branded checkout TPV growth. *See supra* Section V.(Q).

297. Although Defendant Miller warned that branded checkout TPV growth would be a "couple of points slower" than the prior quarter, she continued to attribute the weakness to macro-

related issues, including consumers spending less and declining average order values. Despite this warning, Defendant Miller assured investors that PayPal's guidance remained "well intact."

298. Analysts accepted Defendant Miller's explanation and adjusted their models to expect 3% branded checkout TPV growth in Q4 2025. For example, on December 4, 2025, UBS wrote, "[m]anagement expected Branded Checkout TPV in Q4 2025 to see at least a few points of deceleration from Q3 2025 on the back of macro pressure persisting in October through November . . . ." Similarly, on January 4, 2026, analysts at Citi wrote that they are now estimating 3% branded checkout TPV in Q4 2025, and cited that PayPal told investors the branded checkout TPV deceleration was due to a "discretionary retail spending slowdown from middle- and low-income bracket consumers, particularly in the U.S. and Europe," and the slowdown "began in September, persisted across November."

### C. February 3, 2026 — Final Corrective Disclosure/Materialization of the Concealed Risk

299. On February 3, 2026, before the market opened, the full truth and foreseeable risks regarding the underperformance of Redesigned Branded Checkout—caused by PayPal's severe execution and customer adoption problems—were revealed and/or materialized when the Company published its results for Q4 and FY 2025.

300. Whereas Defendants had previously told investors that the rising adoption of Redesigned Branded Checkout was driving TPV growth, that PayPal had not lost any market share, and, when the truth started to be revealed, blamed stalled TPV growth on macroeconomic issues outside of PayPal's control, PayPal stunned investors by disclosing that branded checkout TPV grew only 1% as a result of PayPal's own execution failures. To make things worse, on this same day PayPal withdrew its financial outlook and announced the sudden departure of its CEO, Defendant Chriss, who had just recently been hired to turn around branded checkout and drive profitable growth for the Company.

301. In the press release dated February 3, 2026, PayPal announced Enrique Lores would replace Defendant Chriss as CEO, effective March 1, 2026. The press release told investors that the appointment of a new CEO "follows a detailed evaluation conducted by the Board of Directors on the

current position of the company relative to its competition and the broader industry landscape. While some progress has been made in a number of areas over the last two years, **the pace of change and execution was not in line with the Board's expectations**."

302. Then, during the Q4 2025 earnings call, Defendant Miller corrected many of Defendants' prior misstatements and omissions during the Class Period.

303. First, contrary to Defendants' prior statements touting rising adoption as proof that the Company was executing and driving TPV growth, Defendant Miller admitted, "we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base." Defendant Miller explained that "[t]he reality is our merchants, especially the largest ones, have many competing priorities and require much more hands-on integration support than we anticipated, which has slowed our progress." Defendant Miller then told investors that PayPal needed to focus on its enterprise merchants, stating their prior "approach has slowed our ability to move quickly on what matters most" and as a result, they were "changing [their] approach to focus on strategic merchants," *i.e.*, the enterprise merchants.

304. Second, contrary to Defendants' prior misstatements blaming macroeconomic factors for declining branded checkout performance, Defendant Miller admitted that their own execution failures were responsible for the underperformance. For example, Defendant Miller stated, "**we had operational and deployment issues that amplified the pressure**." Miller continued, "while challenges in the macro environment are real, we haven't executed as well as we need to, and our product deployment in the second half of the year was slower than we planned."

305. Third, contrary to Defendants' repeated misstatements claiming that PayPal had not lost any market share, Defendant Miller finally admitted that competitive challenges had proven to be "critical" to branded checkout's underperformance. Specifically, Defendant Miller admitted that "the combination of biometric adoption and **competitive presentment have proven critical to branded checkout performance**." Similarly, Defendant Miller admitted that "international headwinds, particularly in Germany, which is one of our largest markets" caused branded checkout TPV to decline because of, among other things, "normalization of our long-standing market leadership position[] and competition from alternative payment methods."

306. Investors and analysts were shocked and reacted immediately to the revelations, causing the price of PayPal's common stock to decline dramatically. In just one day, PayPal's stock **declined by 20.31%**, from a closing market price of $52.33 per share on February 2, 2026, to $41.70 per share on February 3, 2026.

307. The news shocked analysts, who did not expect the depth of branded checkout's collapse or the abrupt ouster of Defendant Chriss just 29 months into his tenure. On February 3, 2026, Evercore's analyst noted that PayPal's branded checkout online TPV growth had dropped to just 1%, "the lowest growth quarter in recent history," a sharp reversal from the acceleration Defendants had been promising investors for nearly two years.

308. Similarly, on February 3, 2026, Autonomous Research underscored the magnitude of the surprise: "[a]ll in, investors were expecting a guide below Street for 2026, but this is **far worse** than most anticipated, and we're also getting a CEO change."

309. On February 3, 2026, analysts at Bernstein captured the disconnect between Defendants' Class Period assurances and the actual results: "[w]hile there were already growing concerns around branded deceleration, challenges in execution and a potentially bleak 2026 outlook (all of which came to fruition this morning), the most unexpected part of the release was the appointment of new CEO." On the same day, Wells Fargo also commented on Defendant Chriss's brief tenure and noted that "[j]ust 2.5 years after being named PYPL's CEO, and one year following Investor Day, PYPL unexpectedly announced another CEO change."

310. Analyst and news consensus made clear that the market believed and reacted negatively to the fact that Defendant Chriss's departure was directly linked to the branded checkout failures that Defendants concealed from investors. On February 3, 2026, analysts at RBC Capital Markets commented that "PYPL's abrupt CEO change clearly signifies that the pace of change necessary to turn around Branded Checkout's TPV growth was moving too slowly." On February 3, 2026, CFRA Research also commented on the disclosure stating that "Q4 results were undeniably challenging, marked by a sharp deceleration in branded checkout. This underperformance culminated in a necessary leadership change."

311. News articles also reported on the connection between Defendant Chriss's departure and the alarming deceleration of branded checkout TPV. For example, on February 4, 2026, Christian & Timbers wrote, "[b]oards rarely use blunt language in CEO transitions. This time, the urgent message was explicit: execution speed was the problem, and the reset could not wait." On February 3, 2026, CTOL Digital Solutions wrote that "PayPal's core economic engine," branded checkout, was a "single metric bleeding out in silence" and "[t]he board's language was surgical: the 'pace of change and execution was not in line with expectations.' In governance terms, that is a firing."

312. The disclosures made on February 3, 2026 directly contradict statements Defendants made throughout the Class Period, causing investors significant losses when the full truth was finally revealed.

## VII. ADDITIONAL INDICIA OF SCIENTER

313. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and deliberately reckless issuance and/or ultimate authority over PayPal and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V., *supra*, were materially false or misleading when made, and knowingly or recklessly participated in or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further supported by the following facts.

### A. Defendants Publicly Acknowledged Throughout the Class Period that They Closely Monitored the Company's Metrics for Branded Checkout

314. At all relevant times, Defendants closely monitored the company's Branded Checkout business and market share. Both FE testimony and Defendants' own statements reveal that Defendants were aware of information which contradicted their public statements.

#### 1. Defendants Paid Close Attention to Redesigned Branded Checkout, Which They Called Their Number One Priority

315. Defendants' own statements acknowledged the importance of branded checkout to PayPal's business and that they closely monitored Redesigned Branded Checkout since it was their

"number one priority."

316. For example, on March 4, 2024, Defendant Chriss stated, "branded checkout is a[n] essential and important part of our business and it is the **number one priority for us**." On December 4, 2024, Defendant Miller spoke at the UBS Global Technology and AI Conference and told investors, "**branded checkout is our number one priority**. And when you look at what we're investing in, all of that really is in service of branded." At this same conference, Defendant Miller also addressed branded checkout's profitability, stating, "[b]randed checkout is a healthy transaction margin dollar growth contributor, and really, after interest income, **the largest contributor to that**."

317. The practice continued throughout the Class Period. For example, on June 10, 2025 at the RBC Financial Technology Conference, Defendant Kereere stated, "**there is no single priority at the company that is getting more attention than the work we are doing to reinvent the way branded checkout works at PayPal**." On September 9, 2025, at the Goldman Sachs Communacopia and Technology Conference, Defendant Chriss stated, "[s]o **branded checkout remains a core focus for the organization**. It's where we're putting a lot of our energy and a lot of our investment."

318. Based on these representations, the market understood PayPal's branded checkout was the most important initiative for the Company. For example, at the KBW Fintech Payments Conference on November 13, 2025, analysts stated, "it seems like branded experiences and **branded checkouts are really critical** and important to the story, and it sounds like you're having some success." Likewise, at the Wolfe Fintech Forum on March 11, 2025, analysts focused on branded checkout, stating "I want to stay on branded given how important it is for investors and for the story overall."

319. Therefore, the Individual Defendants' knowledge, or their reckless disregard, of the severe execution issues with PayPal's Redesigned Branded Checkout growth strategy and declining market share within branded checkout can be inferred because these facts were critical to PayPal's business and profitability. Branded checkout is PayPal's most important business segment because it is the Company's highest margin offering and the largest driver of gross profit. For example, analysts estimated that branded checkout was responsible for approximately 60-70% of PayPal's transaction gross profit.

### 2. Defendants Closely Monitored PayPal's Branded Checkout Business Through Key Performance Indicators

320. Former employee testimony confirms that Defendants had access to real time data which contradicted their public statements about the success of Redesigned Branded Checkout and its TPV growth.

321. FE-3 advised that she was a part of monthly Microsoft Teams meetings that were also attended by Defendants Kereere, Chriss, Jamie Miller (CFO), and other executives, including Michael Scolnic who was the Head of Analytics and reported to Defendant Kereere. These meetings focused on Key Performance Indicator (KPI) reports that assessed PayPal's branded checkout (and Braintree, Venmo, etc.) and consistently reflected that branded checkout was clearly suffering the entire time she was there. She recalled seeing in the numbers detailed in that report which reflected negative growth in comparison to the previous month, year, etc.

322. FE-1 advised that Defendant Kereere and Defendant Chriss received weekly pipeline reports. She explained that she attended meetings every Wednesday when the pipeline reports were compiled to "get to Chriss's office by Thursday." She advised that Defendant Kereere attended a weekly meeting with her direct reports from the revenue operations team including Anne Bitzer, Andrea Reiners, and Selwyn Peters, who prepared all Defendant Kereere's documents, briefs and "ran point" on everything that came out of her office. FE-1 went on to say that the meetings were also attended by all department heads, including David Bruce, and sales teams companywide such as small business, large enterprise, global strategic accounts and partnership teams, all of whom were required to report on what was happening with branded checkout in the pipeline.

323. According to FE-1, the pipeline reports received by Defendant Kereere and Defendant Chriss detailed how PayPal was losing merchants, competition and integration issues. They also listed the deals that were expected and those that were lost. She recalled that the losses had to be explained and were attributed to several factors, including but not limited to, the inability to integrate, pricing and competition. FE-1 recalled that the meeting attendees reviewed the pipeline reports and referred to different reports from previous weeks and months and changes were reflected with red or green arrows in accordance with sales figures that went up or down. FE-1 advised that the pipeline reports

were verbal, written, recorded and transcribed. She advised, however, that Defendant Kereere was in every meeting and reported directly to Defendant Chriss and they both knew exactly why deals were being lost. She recalled looking at public statements throughout her tenure knowing that they were untrue, "they were bullshit."

324. Indeed, PayPal's executives discussed the slow pace of adoption from enterprise merchants during internal meetings.

325. For example, according to FE-4, the Company was not tracking to get to 80% adoption and was constantly behind schedule with adoption. FE-4 attended division meetings with approximately 300 attendees that were generally led by former EVP, General Manager, Small Business and Financial Services Group / Agentic Commerce Michelle Gill and occasionally attended by Defendant Kereere. FE-4 recalled that her takeaway from these meetings was that the Company was not where it needed to be to achieve its path to 80% adoption. FE-4 explained that the talking points were "we need to accelerate" adoption of the latest integration and "double down."

**3. Defendants Publicly Acknowledged Throughout the Class Period That They Closely Monitored Market Share Data**

326. Defendants' own statements make clear that Defendants closely monitored PayPal's competition and market share. During the Class Period, Defendants' own public statements to the market make clear that they closely monitored the Company's metrics concerning Branded Checkout. For instance, Defendant Chriss stated during the Morgan Stanley Technology, Media & Telecom Conference on March 5, 2025:

> There's one thing just because it's important that I hear it from time to time, it feels like every few months there's another rumor about some competitor that's coming in and potentially taking branded checkout share. ***The rumors so far, as far as I can tell and all the data that I look at, the rumors are nonsense. I can tell you, we look at the data very, very closely. We look at it on desktop, we look at it on mobile. We look at our share of checkout, we look at competitors. And we have not seen any degradation in our share of checkout from competitors launching products, whether it's on mobile, whether it's on desktop, whether it's on other platforms***.

327. Defendant Chriss's statement that from "***all the data***" he looks at, rumors about competitors taking branded checkout share "***are nonsense***" and he looks at the data "***very, very***

***closely***" on both desktop and mobile, and he has "***not seen any degradation***" in PayPal's share of checkout from competitors, proves that Defendant Chriss was aware of "***all the data***" concerning PayPal's market share and assessments on competition.

328. Similarly, during the Bank of America Securities Electronic Payments Symposium on March 18, 2025, an analyst asked about how PayPal's new button in branded checkout compares to Apple Pay, and how Apple Pay's planned entry into non-Safari browsers potentially impacts the competitive landscape. Defendant Keller replied, "**I have personally looked into this**. We have not seen any significant difference in any share dynamics based on these announcements." Likewise, during the Q1 2025 earnings call on April 29, 2025, Defendant Miller stated in response to an analyst question about online branded volume growth, "we talked in the fourth quarter about seeing some shifting in our US branded checkout level. We saw that hold again this quarter, **watching it very closely**, but cautiously optimistic about that."

329. FE testimony further establishes that Defendants closely monitored PayPal's market share and had access to real time data that contradicted their public statements. According to FE-3, PayPal was also tracking market share and "it was tanking" the entire time she was at PayPal. Further, FE-3 stated that there are market research teams at PayPal tracking market share who knew internally which customers were growing compared to those that "were tanking." FE-3 recounted how those teams could assess how much the merchants had in total sales and how much came through PayPal over the years. FE-3 stated that Defendant Kereere was "100% aware" of the problems PayPal was facing with the competition and the fact that the Company had an inferior product, primarily to Apple. FE-3 could not recall what the numbers were but was certain that everyone including Defendants Kereere and Chriss knew that PayPal's market share was decreasing rapidly.

### B. Defendant Miller's Admissions on the Day of the Final Corrective Disclosure Support a Strong Inference of Scienter

330. On February 3, 2026, Defendant Miller made several admissions that support a strong inference of scienter. Taken together, Defendant Miller admitted that PayPal had internal execution problems that prevented large merchants from adopting Redesigned Branded Checkout, that these

problems existed during the Class Period, and they primarily contributed to branded checkout TPV's deceleration announced the same day.

331. For instance, first, Defendant Miller admitted, "we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base." Defendant Miller explained that "[t]he reality is our merchants, especially the largest ones, have many competing priorities and require much more hands-on integration support than we anticipated, which has slowed our progress." Defendant Miller then told investors that PayPal needed to focus on its enterprise merchants, stating their prior "approach has slowed our ability to move quickly on what matters most," and as a result, PayPal was "changing [their] approach to focus on strategic merchants." As Defendant Miller acknowledged, the merchants that "matter most" were not adopting Redesigned Branded Checkout at the rates Defendants led investors to believe.

332. Second, Defendant Miller also addressed Defendants' prior misstatements blaming macroeconomic factors for declining branded checkout performance, Defendant Miller admitted that their own execution failures were responsible for underperformance. For example, Defendant Miller stated, "we had operational and deployment issues that amplified the pressure." Miller continued, "while challenges in the macro environment are real, we haven't executed as well as we need to, and our product deployment in the second half of the year was slower than we planned."

333. Third, contrary to Defendants' repeated misstatements claiming that PayPal had not lost any market share, Defendant Miller finally admitted that competitive challenges had proven to be "critical" to branded checkout TPV growth. Specifically, Defendant Miller admitted that "the combination of biometric adoption and competitive presentment have proven critical to branded checkout performance." Indeed, Defendant Miller admitted that "international headwinds, particularly in Germany," caused branded checkout TPV to decline because of, among other things, "competition from alternative payment methods."

334. Defendant Miller's admissions above directly contradicted Defendants' prior misstatements concerning branded checkout's performance. The admissions reveal that Defendants knew that large merchants were not adopting Redesigned Branded Checkout and, as a result, consumers were choosing seamless checkout experiences from competitors instead of selecting

PayPal's outdated branded checkout button. Therefore, when considered holistically, the admissions support a strong inference that the Individual Defendants had knowledge about, or were reckless in disregarding, that adoption from enterprise merchants lagged, that PayPal had lost market share, and that, as a result, the Redesigned Branded Checkout rollout strategy was not growing branded checkout TPV as promised.

### C. Defendants Chriss, Kereere, and Keller Personally Directed the Company to Pivot to SMB Merchants to Inflate Adoption Metrics

335. As alleged herein, Defendants Chriss, Kereere, and Keller played a direct role in planning and executing the strategic pivot designed to inflate PayPal's publicly touted Redesigned Branded Checkout's U.S. adoption metrics. Defendants Chriss's, Kereere's, and Keller's direct involvement in directing the Company to abandon its original strategy to upgrade enterprise merchants first, in favor of one that also prioritized SMB—not because those merchants moved the needle on branded checkout TPV, but because doing so would accelerate adoption—supports a strong inference of scienter.

336. Throughout the Class Period, Defendants made adoption the centerpiece of their public narrative that Redesigned Branded Checkout would drive branded checkout TPV, and repeatedly told investors that adoption was linked to the success of Redesigned Branded Checkout. For example, they told the market that PayPal would "measure success by growing our new experience share to over 80%" and that rising adoption would drive branded checkout TPV growth to 8-10% by 2027.

337. Following the announcement of Redesigned Branded Checkout, Defendants initially prioritized migrating enterprise merchants who generated the majority of branded checkout TPV, but that original strategy proved time consuming and failed to deliver the adoption numbers Defendants needed to convince the market that they were executing. Indeed, by the end of 2024, only 5% of U.S. checkout traffic was on Redesigned Branded Checkout, nearly a year after the critical initiative was announced.

338. As set forth above, *see supra* ¶125, rather than disclose that enterprise adoption was moving too slowly, Defendants Chriss, Kereere, and Keller made the decision to pivot the rollout strategy and focus on SMB merchants to accelerate adoption. According to FE-5, the decision to

expand the strategy to include partners included Defendant Alex Chriss, Defendant Suzan Kereere, Michelle Gill, and Defendant Frank Keller.

339. Defendants Chriss, Kereere, and Keller personally participated in the decision to shift strategy toward SMB merchants in order to accelerate adoption. By doing so, these Defendants inflated the adoption metrics they then publicly touted to investors as proof that PayPal was executing on Redesigned Branded Checkout and that branded checkout TPV growth would soon follow. Defendants Chriss's, Kereere's, and Keller's personal direction of this strategy supports a strong inference of scienter.

**D. Defendant Chriss's Abrupt Departure Supports Scienter**

340. The timing and circumstances of the departure of Defendant Chriss, the architect and public face of PayPal's Redesigned Branded Checkout, are highly suspicious. The fact that this departure is connected to the corrective disclosures of the Company's fraud further supports that inference.

341. On February 3, 2026 PayPal announced that Defendant Chriss had ceased serving as President and CEO just one day earlier and simultaneously resigned from the Board of Directors. There was no pre-announced succession plan. Instead, PayPal was forced to temporarily install Defendant Miller as Interim President and CEO until the Board of Directors appointed Enrique Lores as President and CEO of PayPal, effective March 1, 2026. In a press release dated February 3, 2026, PayPal told investors that Lores' appointment "follows a detailed evaluation conducted by the Board of Directors on the current position of the company relative to its competition and the broader industry landscape. While some progress has been made in a number of areas over the last two years, the **pace of change and execution** was not in line with the Board's expectations."

342. Only 29 months prior, the Board hired Defendant Chriss, reconstituted PayPal's entire senior leadership team around him, and had publicly committed the Company to his branded checkout strategy—PayPal's number one priority—at the Investor Day presentation just one year earlier. As CEO, Defendant Chriss was responsible for the Company's Redesigned Branded Checkout strategy to accelerate branded checkout and he repeatedly touted to investors that the initiative was successfully driving merchant adoption and TPV growth.

343. Yet Defendant Chriss's departure was announced on the same day the Company disclosed that branded checkout TPV growth decelerated to just 1% (described by Evercore as "the lowest growth quarter in recent history"), withdrew its financial outlook, and admitted that "we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base." This confluence of events strongly suggests that Defendant Chriss's departure was connected to the Company's concealed execution failures of Redesigned Branded Checkout, rather than the product of ordinary corporate succession.

344. Indeed, the market understood exactly what Defendant Chriss's departure meant. Analysts immediately connected his ouster to the concealed execution failures. Analysts at RBC Capital Markets commented that "PYPL's abrupt CEO change clearly signifies that the pace of change necessary to turn around Branded Checkout's TPV growth was moving too slowly." CFRA Research also commented on the February 3, 2026 disclosure, stating that "Q4 results were undeniably challenging, marked by a sharp deceleration in branded checkout. This underperformance culminated in a necessary leadership change." The consensus view was clear: Defendant Chriss's departure was directly connected to the branded checkout failures that Defendants concealed from investors throughout the Class Period.

345. News articles also reported on the connection between Defendant Chriss's departure and the alarming deceleration of branded checkout TPV. For example, on February 4, 2026, Christian & Timbers wrote, "[b]oards rarely use blunt language in CEO transitions. This time, the urgent message was explicit: execution speed was the problem, and the reset could not wait." On February 3, 2026, CTOL Digital Solutions wrote that "PayPal's core economic engine," branded checkout, was a "single metric bleeding out in silence" and "[t]he board's language was surgical: the 'pace of change and execution was not in line with expectations.' In governance terms, that is a firing."

346. In sum, the timing and circumstances of Defendant Chriss's departure strongly support an inference that he knew, or was deliberately reckless in not knowing, that his Class Period representations were false when made.

## VIII. CONTROL PERSON ALLEGATIONS

347. The Individual Defendants, by virtue of their high-level and controlling positions at PayPal, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

348. Defendants Chriss, Miller, Kereere, and Keller, as senior executive officers of PayPal—a publicly held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of PayPal's publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

349. Defendants Chriss, Miller, Kereere, and Keller, because of their positions of control and authority as senior executive officers of PayPal, were able to and did control the content of PayPal's SEC filings, press releases, and other public statements issued by or on behalf of PayPal during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.

350. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

351. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of PayPal common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding PayPal's business, operations, and management, and

the intrinsic value of PayPal common stock, and caused Lead Plaintiffs and members of the Class to purchase PayPal common stock at artificially inflated prices.

## IX. THE STATUTORY SAFE HARBOR IS INAPPLICABLE

352. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

353. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

354. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

355. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.

356. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of PayPal who knew that the statement was false when made.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

357. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiffs and other members of the Class purchased or otherwise acquired PayPal's publicly traded common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

358. At all relevant times, the market for PayPal shares was efficient for the following reasons, among others:

(a) PayPal's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, PayPal filed periodic public reports with the SEC and the NASDAQ;

(c) PayPal regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging

public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d) PayPal was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

359. As a result of the foregoing, the market for PayPal securities promptly digested current information regarding PayPal from publicly available sources and reflected such information in PayPal's securities price(s). Under these circumstances, all persons and entities who or which purchased or otherwise acquired PayPal's common stock during the Class Period suffered similar injuries through their purchase of PayPal common stock at artificially inflated prices and thus, the presumption of reliance applies.

360. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of PayPal common stock.

361. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or otherwise acquired shares of PayPal common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

362. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to PayPal's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XI. CLASS ACTION ALLEGATIONS

363. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who or which, during the period from February 7, 2024 to February 2, 2026, inclusive, purchased or otherwise acquired the publicly traded common stock of PayPal, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of PayPal during the

Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) PayPal's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

364. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were over 920 million shares of PayPal common stock outstanding, and the average daily trading volume was over 12 million shares. While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by PayPal or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

365. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

366. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

367. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c) Whether, and to what extent, the market price of PayPal common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether the Individual Defendants were controlling persons of PayPal; and

(f) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

368. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

369. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section X, *supra*.

370. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XII. COUNTS AGAINST DEFENDANTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

371. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

372. This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

373. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

374. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

375. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

376. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PayPal personnel to members of the investing public, including Lead Plaintiffs and the Class.

377. As a result of the foregoing, the market price of PayPal securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Lead Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of PayPal securities during the Class Period in purchasing PayPal securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

378. Had Lead Plaintiffs and the other members of the Class been aware that the market price of PayPal securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased or otherwise acquired the Company's securities at the artificially inflated prices that they did, or at all.

379. As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

380. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of PayPal securities during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

381. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

382. During the Class Period, the Individual Defendants participated in the operation and management of the Company. The Individual Defendants conducted and participated, directly and indirectly, in the conduct of PayPal's business affairs. Because of their senior positions, they knew the material information regarding the Company's operations, including key metrics like branded checkout TPV and revenue.

383. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

384. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

385. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment on behalf of themselves and the Class, as follows:

(a) Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: August 10, 2026

Respectfully submitted,

*<u>/s/ Michael H. Rogers</u>*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty
(*pro hac vice*)
Michael H. Rogers
(*pro hac vice*)
Nicholas D. Manningham

(*pro hac vice*)
Grace T. Harmon
(*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
mcanty@labaton.com
mrogers@labaton.com
nmanningham@labaton.com
gharmon@labaton.com

*Co-Lead Counsel for Lead Plaintiffs*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Emma Gilmore (*pro hac vice*)
Villi Shteyn (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**POMERANTZ LLP**
Jennifer Pafiti (Bar No. 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel: (310) 405-7190
jpafiti@pomlaw.com

*Local Counsel for Lead Plaintiffs*